1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

   UNITED STATES OF AMERICA              )
4                                        )
   vs.                                   )  Criminal Action
5                                        )
   HERZZON SANDOVAL,                     )  No. 15-10338-FDS
6  EDWIN GUZMAN,                         )
   CESAR MARTINEZ,                       )
7  ERICK ARGUETA LARIOS,                 )
                        Defendants       )
8

9

   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11

12                     <u>JURY TRIAL DAY 10</u>

13                     <u>TESTIMONY ONLY</u>

14

15         John Joseph Moakley United States Courthouse
                        Courtroom No. 2
                       1 Courthouse Way
16                     Boston, MA 02210

17              12th day of February, 2018

18

19

20

21

22

                        Valerie A. O'Hara
23                     Official Court Reporter
              John Joseph Moakley United States Courthouse
24                 1 Courthouse Way, Room 3204
                       Boston, MA 02210
25                 E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by CHRISTOPHER J. POHL,
     ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;
5
     For the Defendant Herzzon Sandoval:
6
         Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
7    MADELEINE K. RODRIGUEZ, ATTORNEY,
     155 Seaport Boulevard, Boston, Massachusetts 02210;
8
     For the Defendant Edwin Guzman:
9
         Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
10   88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11   For the Defendant Erick Arueta Larios:

12       THOMAS J. IOVIENO, ESQ., 345 Neponset Street
     Canton, MA 02021;
13
     For the Defendant Cesar Martinez:
14
         Stanley W. Norkunas, 11 Kearney Square,
15   Howe Building, Suite 202, Lowell, Massachusetts 01852.

16       ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
     Stoneham, Massachusetts 02180.
17

18

19

20

21

22

23

24

25

1                         I N D E X

2    WITNESS                      DIRECT  CROSS  REDIRECT  RECROSS

3      By Mr. Iovieno                       4
       By Mr. Norkunas                     37
4      By Mr. Murphy                       74

5


6    EXHIBITS                            FOR I.D.   IN EVIDENCE

7      48                                              77
       62.5                                            15
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        TESTIMONY ONLY

 2           (A recess was taken.)

 3           THE CLERK:  All rise for the jury.

 4           (JURORS ENTERED THE COURTROOM.)

 5           THE CLERK:  Thank you.  You may be seated.  Court is

 6    now in session.

 7           THE COURT:  Good morning, everyone.  We're starting 25

 8    minutes late because of transportation issues with the witness,

 9    and let's just see how much we get done today.  Why don't we go

10    until 11:00 before we take a break.

11           Mr. Iovieno, are you ready?

12           MR. IOVIENO:  Yes, your Honor, thank you.

13           THE COURT:  Let me just remind the witness he's still

14    under oath.  Do you understand that?

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.  Go ahead.

17                   JOSE HERNANDEZ MIGUEL, RESUMED

18                   CROSS-EXAMINATION, CONTINUED

19    BY MR. IOVIENO:

20    Q.   Good morning, Mr. Miguel Hernandez.

21    A.   Good morning.

22    Q.   Last Friday, we left off talking about the activity that

23    you and Pelon had -- strike that.  We talked about the drug

24    activity that you and Pelon were undertaking, correct?

25    A.   Yes.
```

1    Q.    And it's fair to say that this had been ongoing for -- at

2    least through 2014 into 2015?

3    A.    Yes.

4    Q.    And you protected some of the deals he was doing, right?

5    A.    Yes.

6    Q.    And then on about, I think it was four or five occasions,

7    you went up to New Hampshire?

8    A.    As far as I recall, there were two.

9    Q.    Two times, okay.  The first time you did that, you brought

09:27AM 10    up or Pelon brought up one kilo of cocaine, right?

11    A.    Yes.

12    Q.    And Mr. Larios wasn't involved in that episode, right?

13    A.    No.

14         MR. IOVIENO:  If I could have Exhibit 55, please.  I

15    believe it's in evidence.

16    Q.    And this is -- you identified this as a transcript of the

17    recording for the January 21, 2014, and that involved a trip to

18    New Hampshire and the one kilo, right?

19    A.    Yes.

09:28AM 20    Q.    Okay.  And could we turn to page 3, please.  I'm just

21    going to direct your attention down to the bottom.

22         CW-1 says, "No, this isn't a big deal.  Right now this

23    is nothing.  I had just asked them to help me out because I

24    don't have" -- and it was your understanding he was referring

25    to the trip, the anticipated trip to New Hampshire for the one

1    kilo when he said it wasn't a big deal, right?

2    A.    I don't understand the question.

3    Q.    This conversation involved the trip to New Hampshire and

4    the one kilo, right?

5    A.    Yes.

6    Q.    And it was your understanding that this wasn't a big deal,

7    it was one kilo, right?

8    A.    Yes.

9    Q.    And the next time you went up, you went up with more

09:29AM 10    people, right?

11    A.    Yes.

12    Q.    And that was in December of 2014, right?

13    A.    Yes.

14    Q.    And on this occasion, is it fair to say that all the

15    arrangements of who was going to go up and who got the people

16    to go up, those were made by Pelon, right?

17    A.    Yes.

18    Q.    And you understand that subsequently after your arrest

19    that -- you understand that Pelon recorded every conversation

09:30AM 20    he had with Mr. Larios, right?

21            MR. POHL:  Objection.

22            THE COURT:  I'll let him answer it.  Overruled.

23    A.    Yes.

24    Q.    And you've identified those transcripts here in court,

25    right?

1    A.    Yes.

2    Q.    And just so we're clear, this was the December 8, 2014

3    trip to New Hampshire, right?

4    A.    Yes.

5    Q.    And Pelon had asked you to go with him, right?

6    A.    Yes.

7    Q.    And he asked Caballo to go with him, right?

8    A.    Yes.

9    Q.    And also asked your brother, Smiley, who became known as

09:31AM 10   Danger, right?

11    A.    Yes.

12    Q.    And Crazy also went, right?

13    A.    Yes.

14    Q.    And Mr. -- Lobo was asked, Mr. Larios was asked to go?

15    A.    Yes.

16    Q.    And Pelon made all those arrangements, right?

17    A.    Yes.

18          MR. IOVIENO:   Could I have Exhibits 62.1 through 62.4.

19    Q.    And so you identified these last week, and specifically

09:32AM 20   these were the telephone conversations between Pelon, who we

21    know as CW-1, and my client, Mr. Larios, right?

22    A.    Yes.

23    Q.    And this begins on December 1, 2014, and it's at about

24    5:12 in the afternoon, right?

25    A.    Yes.

1        MR. IOVIENO:  Could I have the next page, please.

2    Q.   And you understand -- you understood from reviewing these

3    transcripts that CW-1 was asking Lobo to go to New Hampshire,

4    right?

5    A.   Yes.

6    Q.   And you testified last week that before the cars left, you

7    had a meeting with everybody involved, right?

8    A.   Yes.

9    Q.   And during this meeting, Pelon told everybody what he was

09:34AM 10   carrying, right?

11   A.   Yes.

12   Q.   And he specifically told them it was 5 kilos of powdered

13   cocaine, right?

14   A.   Yes, but that was told to them prior to that when they

15   were talking about going to New Hampshire.

16   Q.   Okay.  That's not what you said last week.  Okay.  You

17   said --

18        MR. POHL:  Objection.

19        THE COURT:  Well, just put a question to him.

09:34AM 20   Q.   You said last week that you met before you went to

21   New Hampshire and you talked about what you were bringing up?

22   A.   Beforehand, they were told how many people were going and

23   how much he would be taking, and then after that there was a

24   meeting.

25   Q.   Okay.  You understood that Pelon recorded the entire trip

1    from Massachusetts up through New Hampshire, right?  You

2    understand that?

3    A.   I don't know.

4    Q.   You haven't seen recordings of the trip from --

5    surveillance photographs, have you seen surveillance

6    photographs?

7    A.   Yes.

8    Q.   And you know there's recordings, there was a camera inside

9    Pelon's car, right?

09:35AM 10   A.   Yes.

11   Q.   And Pelon had an audio recorder on his person, right?

12   A.   I don't know that.

13   Q.   Well, you listened to recordings, have you not?

14   A.   Yes.

15   Q.   And that's in order to cooperate with the government

16   you've listened to and identified certain videos and audio,

17   correct?

18   A.   Yes.

19   Q.   And you know from listening to those audio recordings and

09:36AM 20   video recordings that this entire trip was recorded?

21   A.   Yes.

22   Q.   Have you listened to a recording of a prior meeting with

23   Pelon and everybody else involved where Pelon described what he

24   was bringing up?

25   A.   I heard the phone calls.

1   Q.   Okay.  These are the phone calls here that you identified

2   last week?

3   A.   Yes.

4   Q.   And specifically in this area here, CW-1 says exactly, "If

5   we're going to go, you will have to ask for the day off because

6   I don't want you to let me down because I'm counting on you.

7   You know it will be $500 for a short while, you know."

8           Lobo:  "Yes, yes, yes."

9           CW-1:  "It's not that big a deal.  But you have to ask

09:37AM 10   for the day off because you can't tell me you're going to go

11   out with me for a little while and then you can't do."

12           Lobo:  "No, no, I'm saying we will go."

13           THE INTERPRETER:  Your Honor, may the interpreter read

14   that?

15           THE COURT:  Yes.

16           THE INTERPRETER:  Could you put the arrow where it

17   begins, counsel?

18           MR. IOVIENO:  Go to the next page, please, the next

19   exhibit, I'm sorry.

09:38AM 20   Q.   So then there's another phone call at December 4th at

21   about 5:52.  And, again, this is a telephone conversation

22   between Lobo and CW-1, Pelon.  Turn to the last page.  And then

23   down toward the end, Mr. Larios says, "Let's go get some tacos,

24   man."

25           CW-1:  "Where, man?"

1          Lobo:  "I don't know."

2          CW-1:  "Call me back later and we'll make a plan.

3     I'll stop by your place later."

4          Lobo:  "Fine."

5          CW-1:  "Fine, man."

6          And then you understood from that conversation that

7     you listened to that there was some conversation about getting

8     something to eat later, right?

9     A.   Yes.

09:39AM 10          MR. IOVIENO:  Could I have the next exhibit.

11    Q.   The next telephone call is December 6, 2014 at about 5:30.

12    That's the next exhibit, correct?

13    A.   Yes.

14    Q.   And this was offered by the government last week.

15    A.   Yes.

16    Q.   And these are recordings that you listened to and you

17    identified the recording and the transcript?

18    A.   Yes.

19    Q.   But there's a call missing, isn't there?

09:40AM 20    A.   I don't remember.

21          MR. IOVIENO:  Can I have the document camera just for

22    the witness, please.

23    Q.   I'm going to show you a document, sir.  And if you recall

24    we just talked about the December 4th conversation where they

25    talked about getting something to eat.  And that was about 5:52

1    on December 4th.  And this appears to be a document reflecting

2    a telephone conversation that happened four minutes later after

3    that conversation.  Do you recall reviewing that?

4    A.   Yes.

5    Q.   So this was not put in by the government last week,

6    correct?

7    A.   I don't remember.

8    Q.   Well, do you agree with me this is part of the

9    conversation between Lobo and CW-1?

09:41AM 10          MR. POHL:  Judge, I'd object at this point.

11          THE COURT:  I'm sorry?

12          MR. POHL:  I'd object.

13          THE COURT:  Well, it's an identification question, not

14   a content question.  I'll permit it.

15          THE INTERPRETER:  Could you repeat the question,

16   please?

17   Q.   You identified a number of documents last week --

18   A.   Yes.

19   Q.   -- of transcripts between CW-1 and my client, Lobo,

09:42AM 20   transcripts of the telephone conversations?

21   A.   Yes.

22   Q.   And these occurred prior to December 8th, the trip to

23   New Hampshire, right?

24   A.   Yes.

25   Q.   And this document reflects one of the conversations that

```
 1    wasn't introduced last week?

 2    A.   I don't remember.

 3    Q.   Well, because it wasn't introduced last week, this is --

 4    you have just seen this today, correct?

 5    A.   I don't remember.

 6    Q.   Was your memory refreshed that there was another

 7    conversation --

 8         MR. POHL:  Objection.

 9    Q.   -- by looking at this document?

09:43AM 10   A.   Before this?

11    Q.   Your memory.  You didn't have a memory of this

12    conversation, this December 6th -- I'm sorry, December 4th

13    conversation last week, right?

14         MR. POHL:  Objection.  I don't think that's the

15    testimony.

16         THE COURT:  Sustained in that form.

17    Q.   You testified last week to a number of telephone

18    conversations and transcripts, you identified those,

19    Exhibit 62.1 through 62.4, correct?

09:43AM 20   A.   Yes.

21    Q.   And this December 4, 2014 transcript was not part of that

22    group that you identified, right?

23    A.   I don't remember.

24    Q.   Okay.  But looking at this document, do you now recall

25    that there was another conversation?
```

1    A.    Before leaving for New Hampshire, there was a conversation

2    between Pelon and Lobo where Lobo was saying he was at

3    Casa Mariachi.

4    Q.    That was December 8th.  This is December 4th, sir, right,

5    you understand this is December 4th?

6    A.    I don't remember that.

7    Q.    Well, you remember the conversation you spoke about a

8    minute ago regarding them getting something to eat, right?

9    A.    Yes.

09:45AM 10    Q.    And this conversation happened four minutes later?

11    A.    I don't remember.

12        MR. IOVIENO:  May I approach, your Honor, at sidebar?

13        THE COURT:  Yes.

14        (THE FOLLOWING OCCURRED AT SIDEBAR:)

15        MR. IOVIENO:  Judge, I just wanted to approach

16    sidebar.  I'm going to offer this under 106, I believe it's

17    part of the recordings that was introduced last week, but it's

18    not the complete recordings that were introduced.  This is

19    another conversation, and under 106, under verbal completeness,

09:45AM 20    this should go in as part of that exhibit.

21        THE COURT:  Yes, Ms. Lawrence.

22        MS. LAWRENCE:  Well, it's a separate call, number one.

23    They're each separate calls, and the content, I don't believe

24    there's anything in the content that explains or clarifies

25    anything that was said in the other calls.  As to the issue,

1    I'm not sure what the substance of this is.

2           THE COURT:  Well, you tell me what are you getting it

3    in for other than the fact that he has a daughter who's 11

4    years old?  Is there anything substantive?

5           MR. IOVIENO:  Yes, this is on the back page.

6           THE COURT:  I didn't see the back page.  All right.

7    Let's do this.  It is a separate call.  It is hearsay, but I'm

8    going to admit it under Rule 106, in light of the four-minute

9    gap between this and the earlier call and the fact that that

09:46AM 10   earlier call talked about this, I'll let it in.  I'm going to

11   take each one of these separately.  In other words, I'm not

12   giving everyone a license to put in any statement they want,

13   but under the circumstances here of the very short time frame,

14   I'll allow it.

15           Can we call it 62.5, will that mess it up?

16           MR. IOVIENO:  That's fine.

17           (SIDEBAR CONFERENCE WAS CONCLUDED.)

18           THE COURT:  You're offering it, Mr. Iovieno?

19           MR. IOVIENO:  Yes, your Honor.

09:47AM 20          THE COURT:  I'll admit it as 62.5.

21           (Exhibit No. 62.5 received into evidence.)

22   Q.   This document has been admitted as 62.5, and I'm just

23   going to refer -- it's for the jury -- to the back page of this

24   and with respect to this area.

25           CW-1:  "Fine, but don't tell Casper about this thing

1    or anything because last time I told the dudes, they told me

2    some shit that they were going for sure and at the last minute

3    they canceled on me, man."

4         Lobo:  "Don't worry about that."

5         Has that been read to you?

6    A.    Yes.

7    Q.    Okay.  And you understood that this drug activity that you

8    were engaged in with Pelon was something that you didn't want

9    to share with Casper or any other members of the Eastside,

09:48AM 10    correct?

11    A.    No.

12    Q.    Okay.

13    A.    They were asked if they wanted to go and they said that

14    they were going to go and afterwards they said no.

15    Q.    Right.  Those are the people that are going to

16    New Hampshire now on December 8, I understand that.  Some of

17    the members weren't members of Eastside, I understand that, but

18    this was money that you kept for your own personal gain, right?

19         THE INTERPRETER:  I'm sorry, you, meaning who, for the

09:49AM 20    interpreter?

21    Q.    Mr. Hernandez Miguel, this is money that you kept?

22    A.    Yes.

23    Q.    And so on that day, December 8th, you agreed to meet I

24    think it was at the Burger King parking lot?

25    A.    Yes.

1    Q.    And, again, this entire trip is recorded, right?

2    A.    Yes.

3    Q.    And you testified last week that you always met before and

4    you talked about what was going to happen?

5    A.    Yes, he always said how much, the quantity of drugs that

6    was going up and how much he was going to pay.

7    Q.    Well, it's recorded, so if he said that, we'll know that,

8    but it's fair to say that Lobo showed up, was driving a

9    different car, right?

09:50AM 10    A.    Yes.

11    Q.    And Pelon had a car?

12    A.    Yes.

13    Q.    And I think -- did Crazy bring another car or one of the

14    other people?

15    A.    No, Pelon had his car and another car, a Nissan and a

16    Honda, and Lobo had a different car, so I drove one.

17    Q.    Pelon had two cars, right?

18    A.    Yes.

19    Q.    Because he operated a gypsy cab company or something like

09:51AM 20    that?

21    A.    I don't know if he had two cars.  When we went with the

22    drugs, he told me to drive his car, and he was driving a

23    different car.

24    Q.    Okay.  And you know that Lobo showed up and came into the

25    car for a short period of time, right, came into the car you

1   were in?

2   A.   Yes.

3   Q.   And that conversation was recorded, you know about that

4   conversation, right?

5   A.   I don't remember.

6   Q.   You don't remember that you heard recordings of that

7   conversation?

8   A.   We all went into the same car there, but I don't remember.

9   Q.   Okay.  But after you were arrested, after you agreed to

09:52AM 10   cooperate with the government, did you hear any recordings of

11   that conversation?

12   A.   I saw when we were inside the car.

13   Q.   There's a video of you inside the car, right, video

14   recording?

15   A.   Yes.

16   Q.   And you've seen that?

17   A.   Yes.

18   Q.   But there's also audio, you can hear the conversation that

19   is going on, can't you?

09:52AM 20   A.   I don't remember.

21   Q.   That's not something you reviewed for the government?

22   A.   Yes.

23   Q.   You did review it?

24   A.   Yes.

25   Q.   So you do remember an audio conversation that you could

1   hear?

2   A.    Because we all got in the car and what was said was how we

3   were going to go in the cars.

4   Q.    Right.  How you were going to go to Saugus?

5   A.    Yes.

6   Q.    Who was going go in front, who was going to go behind?

7   A.    Yes.

8   Q.    And then how to go to New Hampshire?

9   A.    Yes.

09:53AM 10   Q.    And Lobo came in the car for that conversation, right?

11   A.    Yes.

12   Q.    And he left the car, right?

13   A.    Yes.

14   Q.    He was only in the car for a short period of time, right?

15   A.    Yes.

16   Q.    And then the cars left and you went to Saugus, right?

17   A.    Yes.

18   Q.    And you recall it was snowing out?

19   A.    I don't remember.

09:54AM 20   Q.    Okay.  So then you left, Pelon met someone in Saugus and

21   picked up the product, right?

22         THE INTERPRETER:  I missed the last part.

23   Q.    Pelon met somebody in Saugus and picked up the package,

24   right?

25   A.    Yes.

1    Q.    And Lobo wasn't in that car, was he?

2    A.    No, he was behind.

3    Q.    And then you left and went up to -- drove up to

4    New Hampshire, right?

5    A.    Yes.

6    Q.    And you got on 93 and went through a toll booth, right?

7    A.    I don't remember paying a toll.

8    Q.    Okay.  But you went into New Hampshire on Route 1,

9    correct?  On 93, I'm sorry, 93.

09:55AM 10    A.    We went down at Saugus, and then we took off to

11    New Hampshire.

12    Q.    And do you know what a toll booth is?

13    A.    A toll, yes.

14    Q.    And you don't have to physically stop and pay, you can

15    just drive through, correct, you understand that?

16    A.    That I can recall, we didn't go through a toll.

17    Q.    But you know a toll booth, they can take photographs of

18    every car that goes through, right, you know that?

19    A.    Yes.

09:56AM 20    Q.    And so you went into New Hampshire and you got off the

21    exit, and Pelon met somebody and delivered what he was supposed

22    to deliver, right?

23    A.    Yes.

24    Q.    And do you recall on the trip up that -- you recall a

25    conversation about Lobo, he got lost, he wasn't around?

A.    Yes, I recall, but it wasn't that he had gotten lost.  He
called to say that I was driving too slowly and that I needed
to go faster.

Q.    And you've seen surveillance photographs of the cars,
right?

A.    Yes.

Q.    And there's a lot of those photographs.  There's a lot of
them.  Are there a lot?  There's a great number of those
photographs, isn't there?

A.    Yes.

Q.    And there's no photograph in there of Lobo's car in
New Hampshire?

A.    I don't know.

Q.    Isn't it true, sir, that Lobo left and went back to a
restaurant to eat?

A.    After we finished with the trip, we did go to a restaurant
and also to drop off Lobo's car.

Q.    Lobo was already at the restaurant, wasn't he?

A.    No, that was afterwards coming back from New Hampshire.

Q.    He was already there when you came back, right?

A.    I don't understand the question.

Q.    When you came back, Lobo was not around, was he?

A.    He was the last one to arrive at the parking lot again.

Q.    He had to be called to the car, didn't he?  He had to be
called to the car, telephone call?

1    A.    No, he was called to find out where he was because it

2    wasn't about the car.

3    Q.    Well, he was called because you didn't know where he was,

4    right?

5    A.    No, he was behind us.  The thing is he was the last one.

6    He was the last one to arrive at the parking lot again when

7    Pelon paid everybody.

8    Q.    But he had to be called to the car by Pelon.  Pelon

9    physically picked up his cell phone and called Lobo, right?

09:59AM 10    A.    There was a call to Lobo asking where he was at.

11    Q.    Okay.  And Lobo was eating in Acapulco's Restaurant,

12    wasn't he?

13              MR. POHL:  Objection.

14              MR. IOVIENO:  I'll withdraw the question.

15              THE COURT:  All right.

16    Q.    Sir, you testified about Vida Loca and delivering a

17    firearm to him, correct?  Do you recall that last week?

18    A.    Yes.

19    Q.    And I believe you testified that Crazy was calling, it was

10:01AM 20    late at night, and you were at the garage, right?

21              THE INTERPRETER:  I'm sorry, could you repeat the

22    question?

23    Q.    Crazy was calling, and it was late at night when you were

24    at the garage?

25    A.    Yes.

1    Q.    And Lobo wasn't there, right?

2    A.    No.

3    Q.    And Lobo didn't know anything about delivering the gun to

4    Vida Loca, did he?

5    A.    No.

6    Q.    Now, you talked about the firearm that Lobo was given, and

7    you talked about the reason why he was given a gun.  Do you

8    recall that last week?

9    A.    Yes.

10:01AM 10    Q.    And that was in January, just to refresh your

11    recollection, January 25, 2015 that Mr. Larios was arrested,

12    right?

13    A.    Yes.

14    Q.    And he had been given the firearm because someone reported

15    he had been shot at, right?

16    A.    He reported that.

17    Q.    And a decision was made to let him have a gun to protect

18    himself, right?

19    A.    Yes.

10:02AM 20    Q.    All right.  And you had a meeting -- when I say you,

21    Eastside had a meeting February 8, 2015, right?  Do you recall

22    that testimony?

23    A.    Yes.

24    Q.    And during that meeting, one of the topics that was

25    discussed was Lobo had to explain himself why he lost the gun

1    and how he lost it?

2    A.    Yes.

3    Q.    And CW-1, Pelon, was at that meeting, right?

4    A.    Yes.

5    Q.    And actually Pelon was with Lobo at Casa Mariachi when

6    Lobo got arrested, right?

7    A.    He was there before Lobo was arrested because Pelon left

8    Casa Mariachi.

9    Q.    So, during the meeting February 8th, when Lobo was asked

10:03AM 10    to explain himself, is it fair to say that a number of the

11    members, including yourself, you weren't satisfied with his

12    explanation, correct?

13    A.    Yes.

14    Q.    All right.  And, in fact, he was confronted by a number of

15    you about -- to tell the truth, to tell us what really

16    happened?

17    A.    Yes.

18    Q.    And at no time during that meeting did Lobo say Pelon

19    snitched on me or Pelon is an informant, he never said anything

10:04AM 20    about Pelon, did he?

21    A.    Not at that time.  He told me that later at Wyatt.

22    Q.    So, and later on after you were arrested, you had a

23    conversation you testified to last week that Lobo told you then

24    that he asked for a green light on Pelon, right?

25    A.    Yes.

1    Q.    Okay.  And this meeting about the firearm happened

2    February 8, 2015, right?

3    A.    Yes.

4    Q.    And you were arrested January of 2016, so a little less

5    than a year later you were arrested?

6    A.    Yes.

7    Q.    And you learned -- well, strike that.  You agreed to

8    cooperate with the government about May of 2016, right?

9    A.    Yes.

10:06AM 10    Q.    Okay.  When you agreed to cooperate with them, you told

11    them things that you had learned after you had been arrested,

12    right?

13    A.    Yes, I told them that he and Checha were planning to kill

14    Pelon because Lobo was 100 percent sure that he had been the

15    snitch.

16    Q.    Okay.  And he told you that, according to you -- after you

17    agreed to cooperate with the government, you gave the

18    government this information, right?

19    A.    That was before I started cooperating and we were together

10:07AM 20    at Wyatt.

21    Q.    Okay.  But you had a meeting in May of 2016 with the

22    government, right?

23    A.    Yes.

24    Q.    And they took notes of what you told them, right?

25    A.    I don't remember.

1          MR. IOVIENO:  This is just for the witness, your

2    Honor.

3    Q.   You understand that they took notes of your meeting of

4    May 19, 2016, right?

5    A.   Yes.

6    Q.   And part of what you told them in May, even though you

7    just testified that Lobo told you this before you began to

8    cooperate with the government and, this was one of your initial

9    first meetings with the government, you told them some

10:08AM 10  information while you were in custody what you learned, you

11   told them some information, right?

12          THE INTERPRETER:  I'm sorry, could you repeat the

13   second part of your question?

14   Q.   You told them information -- well, let me start over

15   again.  You began to cooperate about May of 2016, right?

16   A.   More or less, yes.

17   Q.   And you just testified that Lobo apparently told you

18   before you began to cooperate that he asked for a green light

19   on Pelon?

10:08AM 20  A.   Yes.

21   Q.   Okay.  In May, you began to cooperate and you wanted to

22   tell them all the information that you learned that you were

23   aware of while you were in custody, right?

24   A.   I don't understand the question.

25   Q.   Okay.  If you just refer down to the bottom portion and

1    perhaps the interpreter can read, with the Court's permission,

2    the highlighted portion to you.

3            THE COURT:  All right.

4            (Interpreter translating document)

5    Q.    Maybe start right here, I'm sorry.  So having been read

6    that, it was your understanding that a green light had been

7    issued from El Salvador against Pelon, right?

8    A.    That's what Chucky told me that he was certain.

9    Q.    But you learned that while you were custody, right?

10:10AM 10            MR. POHL:  Objection.

11            THE COURT:  I'm sorry.  You're objecting to that

12    question, Mr. Pohl, that you learned that while you were in

13    custody or the previous question?

14            MR. POHL:  Previous question.

15            THE COURT:  The question before that I think was

16    problematic.  You asked -- you said based on your reading that,

17    it was your understanding X.  I'm not sure that's a proper

18    question, so let's start over.  In other words, he can't learn

19    something for the trial and then testify about it.  You have to

10:11AM 20    ask him about what happened in the past.

21    Q.    So, when you began to cooperate, you had the opportunity

22    to tell the government what you had learned while you were in

23    custody, and that was in May of 2016, right?

24    A.    Yes.

25    Q.    And according to your testimony, you were aware at this

1    point in time that Lobo had apparently said -- he had asked for

2    a green light on Pelon, right?

3    A.    Yes.

4    Q.    But you didn't tell them, the government, that in May of

5    2016, did you?

6    A.    No, but I did tell them.

7    Q.    You told them afterwards, after you had some time to think

8    about your cooperation and what you were going to say, you told

9    them afterwards, right?

10:12AM 10              MR. POHL:  Objection.

11              THE COURT:  Overruled.

12              THE INTERPRETER:  Could you repeat the question,

13    please?

14    Q.    So you told them afterwards after you had an opportunity

15    to think about what you were going to say to the government

16    about your cooperation, you didn't tell them about Lobo until

17    afterwards, right?

18    A.    No, we were working on that.

19    Q.    Working on your cooperation?

10:13AM 20    A.    And all of this.

21    Q.    Okay, But you just testified you knew about it before the

22    May meeting?

23    A.    Yes, I knew, and Lobo told me.

24    Q.    But you didn't tell the government that in May?

25    A.    The government knows it.

1    Q.    They didn't know it until it came from you, sir, right?

2    A.    Yeah, I told them.

3    Q.    So it comes from your words, what you say.  You told the

4    government, and the government relies on what you say.

5    A.    I told them that Lobo had told me --

6               MR. MURPHY:  Objection, your Honor.

7               THE COURT:  Sustained.

8    Q.    Now, I direct your attention to September of 2015.  You

9    knew Joel Martinez, right?

10:14AM 10    A.    I met him only by telephone.  I used to talk to him on the

11    phone.

12    Q.    And that was around September of 2015?

13    A.    I don't remember when it was.

14    Q.    When is the first time you met him in person?

15    A.    I don't remember.

16    Q.    Do you recall meeting him for the first time with Pelon?

17    A.    I think we went to bring him from New Jersey.

18    Q.    Okay.  And that was Pelon and yourself went to pick him up

19    in New Jersey, right?

10:15AM 20    A.    Yes.

21    Q.    And that's the first time you physically met him?

22    A.    I don't remember if it was the first time.

23    Q.    But Mr. Larios didn't know him prior to December of 2015,

24    right?

25    A.    I don't know that.

1    Q.    But, in any event, you went down to New Jersey with Pelon,

2    and it was Pelon's idea to pick him up, right?

3    A.    Yes.

4    Q.    And you testified last week you had many conversations

5    with Pelon, and you hung out with him regularly, right?

6    A.    Yes.

7    Q.    And it was Pelon's idea to bring up Animal, Joel Martinez,

8    and introduce him into the Eastside clique, right?

9    A.    When I spoke with Animal, he told me that he had already

10:16AM 10    spoken to Casper.

11    Q.    Okay.  But, in any event, you brought him up.  Physically

12    you went down with Pelon and brought him up to stay up here,

13    right?

14    A.    Yes.

15    Q.    And CW-1 proposed or Pelon proposed that he be jumped into

16    the Eastside clique, right?

17    A.    I don't know.

18    Q.    Well, he was jumped into the clique at some point in

19    January.  Do you recall testifying about that meeting?

10:17AM 20    A.    Yes.

21    Q.    And you know that not everybody agreed that Animal should

22    be jumped in, correct?

23    A.    Animal had spoken with Casper, and Animal had told Casper

24    that he wanted to hang out with the Eastside clique, and Casper

25    had told him to come to Boston and hang out with the clique and

1    if he liked the clique, then that would be fine.

2    Q.    Okay.  But other members of Eastside, there was a number

3    of members who didn't want anything to do with Animal, right?

4    A.    I don't know.

5    Q.    Did you tell the government that, that there were members

6    who did not want to jump in Animal?

7    A.    What I do know is that there were a lot of dudes that

8    wanted Animal to be in the MS-13.

9    Q.    A lot of dudes wanted him to be in?

10   A.    Yes.

11   Q.    Okay.  And there were a lot of dudes who didn't want him

12   in, right?

13   A.    I don't know that.

14         MR. IOVIENO:  Just for the witness, your Honor.

15   Q.    FBI agents, they took notes of your sessions with them,

16   correct?

17   A.    Uh-huh.

18         MR. IOVIENO:  And with the Court's permission, may the

19   interpreter read this area down here that's highlighted?

20         THE COURT:  Yes.

21   Q.    Now do you remember telling the FBI that many members of

22   Eastside didn't want to jump in Animal?

23   A.    Not a lot because -- perhaps two because had it been the

24   majority, we would not have jumped him in.

25   Q.    When you told the FBI, you didn't say "perhaps two," did

1    you?

2              MR. POHL:  Objection.

3              THE COURT:  No, overruled.

4    A.    I didn't say two, what I'm saying is that had the majority

5    opposed his being jumped in, we would not have jumped him in.

6    Q.    No, I understand that, but I'm saying you told him many,

7    many ESLS members opposed?

8    A.    If we had been opposed, we wouldn't have jumped him in.

9    Q.    I know that, I understand that.  Now, directing your

10:20AM 10    attention to May of 2015, do you recall testifying last week

11    about a stabbing that you committed at Highland Park in

12    Chelsea?

13    A.    Yes.

14    Q.    Okay.  And you said that you were at the garage, correct,

15    and then you were going to go eat at Casa Mariachi?

16    A.    Yes.

17    Q.    Okay.  And you received a telephone call?

18    A.    Yes.

19    Q.    And as a result of that telephone call, Pelon told you to

10:21AM 20    do something, right?

21              MR. POHL:  Objection.

22              THE COURT:  Overruled.

23    A.    I don't understand the question.

24    Q.    Well, Pelon asked you to call somebody, right?

25    A.    Oh, yeah.

1    Q.    Domingo, right?

2    A.    Yes.

3    Q.    You testified last week that you called Domingo to bring

4    something, you testified to that, right?

5    A.    Yes.

6    Q.    But you didn't identify what that something was last week,

7    did you?

8    A.    I don't remember.

9         MR. IOVIENO:  This is page 34, line 24.

10:22AM 10    Q.    "Pelon told me let's call Domingo, so I called Domingo to

11    bring something from the house?"  That something was a knife,

12    sir, wasn't it?

13    A.    Yes.

14    Q.    So you called Domingo to bring a knife?

15    A.    Yes.

16    Q.    And you then arrived at the park, and Pelon was driving

17    and you're in the passenger's seat, right?

18    A.    Yes.

19    Q.    And you testified that you were going to go in but you

10:23AM 20    weren't going to start any problems.  Do you remember

21    testifying to that last week?

22    A.    Yes.

23    Q.    You didn't want to start problems, but you had someone

24    bring a knife?

25    A.    Yes.

1    Q.    And it wasn't just a knife, it was what you called a

2    yatagan?

3    A.    Yes.

4    Q.    And that's a pretty large knife, correct?

5    A.    Yes.

6    Q.    And you also testified that Pelon stayed in the car,

7    right?

8    A.    He was the last one in the car.

9    Q.    Okay.  He didn't stay in the car, did he?

10:24AM 10    A.    At the end he also got out.

11    Q.    He got out and chased the 18th Street members, didn't he?

12    He chased them, didn't he?

13    A.    We went in first, when I went in, it was me, myself,

14    Brujo, Domingo, Vampiro, and Vago.  We went in from the other

15    side, and when we chased the chavalas, the dude Pelon was the

16    last one that was just coming in the park.

17    Q.    So he didn't stay in the car, did he?

18    A.    He was the last one to leave the car, and then he went in

19    that direction, too.

10:25AM 20    Q.    And he chased the chavalas, right?

21    A.    I don't know that because I wasn't watching for that.  I

22    was just involved in what I was doing.

23    Q.    Well, you told the government that he chased them and

24    grabbed one of them and was beating one of them, right?

25    A.    Not that I can recall.

1    Q.   Did you also -- do you also recall that he knocked one of

2    them down and you tried to stab the individual that was knocked

3    down by Pelon?

4         THE INTERPRETER:  I'm sorry, can you repeat the

5    question?

6    Q.   Do you recall that Pelon knocked one of the 18 Street

7    members down, the chavalas down; do you remember telling the

8    government that?

9    A.   I don't remember.

10:26AM 10   Q.   But, in any event, you stabbed the chavala, right, or

11   tried to stab him?

12   A.   Yes.

13   Q.   And then you left with Pelon again, he was driving the

14   car?

15   A.   Yes.

16   Q.   And Lobo wasn't there for any of this, right?

17   A.   No.

18   Q.   And this happened rather quickly, the call, as you're on

19   your way to the restaurant, and Lobo didn't know anything about

10:26AM 20   this prior to it occurring, right?

21   A.   Yes.

22        MR. IOVIENO:  Just one moment.

23        Can I have Exhibit 49.2.  This is for everybody, I

24   believe.  Could I have page 2, please.

25   Q.   Again, back to your cooperation agreement that you have

1    with the government.  You understand from this agreement that

2    it's the United States Attorney who will determine whether or

3    not -- the value of your testimony, correct, you understand

4    that?

5    A.   Yes.

6    Q.   And you understand that in order to get the benefits and

7    the promises they promised you, they make that determination,

8    no one else, right?

9    A.   Yes.

10:28AM 10        MR. IOVIENO:  Can I have just one moment, your Honor.

11    Q.   Just briefly, we talked earlier about the Highland Park

12    stabbing, and you indicated you didn't remember if Pelon had

13    held somebody down or pushed someone down or chased somebody;

14    do you remember that?

15    A.   I don't understand the question.

16    Q.   Okay.

17        MR. IOVIENO:  This is just for the witness, your

18    Honor.

19    Q.   Again, you understood that the agents took notes of your

10:29AM 20    interviews?

21    A.   Yes.

22    Q.   And you talked to them about the Highland Park stabbing?

23    A.   Yes.

24        MR. IOVIENO:  With the Court's permission, can the

25    interpreter just read the highlighted portion?

1           THE COURT:  Yes.

2    Q.   Do you recall now that Pelon held that individual down?

3           MR. POHL:  Objection.

4           THE COURT:  Overruled.

5    A.   Pelon was the last one to come in.

6    Q.   I know he's the last one to come in, but he held down the

7    chavala while you stabbed him, right?

8    A.   I don't remember that.

9    Q.   So even though you told the agent that --

10:31AM 10          MR. POHL:  Objection.

11   Q.   -- in January, you don't remember today?

12          THE COURT:  Sustained in that form.

13          MR. IOVIENO:  I have no further questions, your Honor.

14          THE COURT:  Mr. Norkunas.  We'll take a break.

15          THE CLERK:  All rise.

16          (JURORS EXITED THE COURTROOM.)

17          (A recess was taken.)

18          THE CLERK:  All rise for the jury.

19          (JURORS ENTERED THE COURTROOM.)

10:47AM 20          THE COURT:  All right.  Mr. Norkunas.

21          MR. NORKUNAS:  Thank you, your Honor.

22                        CROSS-EXAMINATION

23   BY MR. NORKUNAS:

24   Q.   Good morning, sir.

25   A.   Good morning.

1    Q.    You had told Mr. Iovieno and you had told Mr. Pohl that

2    you had complained in 2014 and 2015 that the members of the

3    clique were not going out to do enough acts of violence; is

4    that correct, sir?

5    A.    Yes.

6    Q.    And the older members particularly were the ones you were

7    upset with, they were not active, correct?

8    A.    Yes.

9    Q.    Now, some time at the end of 2015, beginning of 2016, you

10:48AM 10    had just told us that Mr. Iovieno, you went down to New Jersey

11    with Pelon to bring back a person known as Animal, correct?

12    A.    Yes.

13    Q.    And you knew either before going down or on the way back

14    that Animal had murdered a young man back in Massachusetts,

15    correct?

16    A.    Yes.

17    Q.    And he also told you, was it on the ride back, that at

18    some point in time he had participated in stabbing another

19    person along with Brujo?

10:49AM 20    A.    No, that was later.

21    Q.    The second stabbing was later after the ride back; is that

22    correct?

23    A.    Yes.

24         MR. NORKUNAS:  Could I see Exhibit 9, please.

25    Q.    Exhibit 9 is being presented to you, sir.  Is that the

1    person you knew as Animal?

2    A.    Yes.

3    Q.    And he's a young man.  Do you know how young he was and

4    what his age was?

5    A.    He's not so young.  He's more than 20 years old.

6    Q.    How old are you, sir?

7    A.    Thirty.

8    Q.    Now, bringing him back, you and Mr. Pelon, particularly

9    you wanted him to join your clique so that there would be more

10:50AM 10    active younger men, correct?

11    A.    No.  When I spoke with Animal, he told me he had already

12    spoken to Casper, and Animal had told Casper that he wanted to

13    join the clique, and Casper had told him that if he wanted to

14    join the clique, first he had to come to Massachusetts to see

15    the clique and hang out and only then decide if he really liked

16    the clique or not.

17    Q.    You wanted him to come into the clique, sir, because he

18    was a young man of violence, right?

19    A.    The majority wanted him to enter the clique.

10:51AM 20    Q.    I asked about you, sir.

21    A.    Being in MS, yes, everybody wanted that, because he's also

22    going to be in MS-13.

23    Q.    Well, you wanted him in, sir, because you're a person of

24    great violence, right?

25    A.    Everyone who is in MS-13 is violent.

1   Q.   I asked you, sir.  You're a person, you would agree, of

2   great violence, right?

3   A.   All of us who are in MS-13 are violent.

4   Q.   You, Mr. Hernandez Miguel, have stabbed many people,

5   right?

6   A.   Yes.

7   Q.   Some of them you stabbed with a three-bladed knife,

8   correct?

9   A.   Yes.

10:52AM 10   Q.   And the purpose of that is so you can turn it a little bit

11   and make the damage more significant, right?

12   A.   Yes.

13   Q.   And you had a machete, right, a three-foot machete with a

14   sharp-edged blade, right?

15   A.   That machete was given to me, and I never took it out of

16   the house, and I never used it.

17   Q.   I think Mr. Iovieno already established, sir, that you

18   told the government agents, however, that you took it out

19   consistently and had problems putting it in your pants to hide

10:53AM 20   it, right?

21   A.   No, I explained to him how the MS-13 people took out their

22   machetes in the street, not how I did it.

23   Q.   You told us, sir, that starting at the age of 18 in

24   California, you were involved in fights and stabbings, correct?

25   A.   It was when I was about 17.

1    Q.    In California, sir?

2    A.    Yes.

3    Q.    So, when you were first in the Seaside in California, you

4    were 17 years of age, you were not 14?

5    A.    I was 14 when I came to Seaside, not when I went into

6    MS-13.

7    Q.    I didn't ask you that, sir.  When you were in California,

8    you told us, in high school in California, you were involved in

9    many beatings and stabbings, correct?

10:55AM 10    A.    No, not many stabbings, only one.  That's what I said.

11    Q.    In California?

12    A.    Yes.

13    Q.    And many beatings?

14    A.    Fights, yes.

15    Q.    Now, when you brought Animal up here and you were

16    expecting that he would become a member of your clique, sir,

17    you discussed that with Pelon, right?

18    A.    I don't understand the question.

19    Q.    Well, when you were coming up from New Jersey and you were

10:56AM 20    talking to Animal about what he had done, you also were

21    bringing him up as you told us to hopefully be beaten in to

22    your clique as a younger violent man?

23    A.    It was Casper who told him to come up.  I at no time told

24    him to come to the clique.

25                MR. MURPHY:  Objection.  Motion to strike.

1        THE COURT:  I'll let it stand.  Overruled.

2   Q.   Sir, as the date for the Animal's beat-in came, there was

3   dissension in the clique, right, to your knowledge?

4   A.   Some didn't want it, and most of them, the majority did.

5   Q.   You knew several days before the meeting, sir, you knew

6   one of the people that were strenuously opposed to that was

7   Cesar Martinez, right?

8   A.   I heard about that.

9   Q.   Well, you knew, sir, that he had expressed concern about

10:57AM 10   the number of young people that were trying to be brought in to

11   the clique, right?

12   A.   I don't understand the question.

13   Q.   Well, he had -- you knew that he had expressed his anger

14   about the number of young people being brought in to the shop

15   because he had no idea what any of them had done?

16        THE INTERPRETER:  I'm sorry, counsel, could you use

17   the name of the person that you're referring to, the "he"?

18   Q.   You, sir, Mr. Hernandez Miguel, knew and had heard Cesar

19   express his reservations about Animal coming in, correct?

10:59AM 20   A.   What Checha said was Animal was hot, and that could cause

21   dudes from the clique to get arrested.

22   Q.   Sir --

23   A.   At no time did I hear him say let's not jump Animal in.

24   Q.   You knew that -- you were present, sir, at the meeting.

25   He was chastised at that meeting for his stance, right?  Pelon

1    singled him out, right?

2            THE INTERPRETER:  I'm sorry, I hadn't translated.

3    Could you repeat that, please?

4    Q.   Correct, Pelon had singled him out for his stance against

5    Animal?

6            MR. POHL:  Objection.

7            THE COURT:  I'll sustain it as argumentative.

8    Rephrase.

9    Q.   Cesar had been called out at the meeting because of his

11:00AM 10    position, right?

11   A.   Because that day, Cesar was drinking, and that's why he

12   was told to be careful with what he said because he was

13   drinking.

14   Q.   Did you ever tell anybody in the world that day Cesar had

15   been drinking?  You've never made that statement ever before,

16   right?

17   A.   No, I wasn't there.  Pelon said that.

18   Q.   You were at the meeting where Animal was going to be beat

19   in, right?

11:00AM 20   A.   Yes.

21   Q.   And you hear Cesar being called out because he opposed the

22   young kids coming in, and he didn't want Animal to come in,

23   right?

24   A.   But Cesar wanted to jump a different friend of his.

25   Q.   The question, sir, is --

1    A.    That is what he wanted.  He said --

2          MR. NORKUNAS:  Your Honor, I ask that the answer be

3    stricken, not responsive to the question.

4          THE COURT:  All right.  The answer will be struck.

5    Put another question to him.

6    Q.    Now, the place where you had your meetings, sir, was a

7    functioning mechanical garage, right?

8    A.    Yes.

9    Q.    And Cesar did work there, did mechanical work there,

11:02AM 10    right?

11    A.    No.

12    Q.    He had a tow business, as well, associated with that,

13    correct?

14    A.    Yes.

15    Q.    And that operated out of that garage, right?

16    A.    Not at the garage, no.

17    Q.    Well, you have to keep a tow truck someplace, correct?

18    A.    Yes, but he didn't put it at the garage.

19    Q.    And he did mechanical work also at the garage, correct?

11:02AM 20    A.    Not that I know of.

21    Q.    Sir, one of the statements he made, that is

22    Cesar Martinez, that day was on January 8, 2016, that you heard

23    was, "You could close down my shop if you bring Animal in

24    here," right?

25          MR. POHL:  Objection.

1          THE COURT:  I'm sorry.  Was there an objection?

2          MR. POHL:  Yes, your Honor.

3          THE COURT:  I'm sorry.  Sometimes you're talking over

4     each other.  I can't quite pick it up.  Overruled.

5     A.    That's what he told Pelon earlier, not at the time that we

6     jumped Animal in.  He explained later what he had said.

7     Q.    Now, sir, in 2008, when you came here -- or in 2008, where

8     were you working, sir?

9     A.    I worked chopping trees down.

11:04AM 10  Q.    And in 2012 to 2016, did you do any work?

11    A.    Yes.

12    Q.    Well, the primary work you had was selling drugs, right?

13    A.    No, my main job was painting, painting houses.

14    Q.    Sir, you sold crack cocaine from 2012 to when you were

15    arrested in 2016, right?

16    A.    I didn't sell it.  I went with Pelon as protection so that

17    he could buy it.

18    Q.    Well, you found out after you were arrested, you made some

19    sales, you made some sales to undercover FBI agents of crack

11:05AM 20  cocaine, right?

21    A.    Yes.

22    Q.    And you were selling powder cocaine, right?

23    A.    I don't understand the question.

24    Q.    You also sold powder besides crack cocaine separately,

25    correct?

1    A.    I don't understand the question.

2    Q.    When you were selling cocaine, you would cook some of it

3    at your house into crack cocaine, right?

4    A.    I've never cooked cocaine.

5    Q.    You sold the powder along with the hard rock substance

6    called crack cocaine, right?

7    A.    I never sold cocaine.  I always accompanied Pelon when he

8    sold to protect him, and he would give me $100.

9    Q.    You already told us, sir, you knew you sold crack cocaine

11:06AM 10    to some undercover FBI agents?

11    A.    Pelon was in Texas, and he asked me if I could go and get

12    the cocaine and deliver it to him and he would give me $100.

13    Q.    Now, besides being a drug merchant, you were also a gun

14    merchant, right?

15    A.    I've never been a drug merchant.  I would get $100, and

16    that's what I did.

17    Q.    Well, at one point in time, you brought Mr. Pelon over,

18    and you arranged a sale for him to buy a handgun directly,

19    right?

11:07AM 20    A.    The guy that had the gun told me he had a gun, and then

21    Pelon said he wanted to buy it and he went and bought it.

22    Q.    Well, you went with him, sir, right, you introduced him?

23    A.    Yes.

24    Q.    And if you didn't introduce him, Mr. Pelon would not have

25    known that person had a gun for sale, right?

1    A.    Yes.

2           MR. NORKUNAS:    If I could have Exhibit 122, please.

3    Q.    Now, sir, back as part of the January 8, 2016 meeting --

4           MR. NORKUNAS:    Could I have the next page, please.

5    Q.    You were having a conversation with Caballo, and you're

6    talking about guns, correct?

7    A.    I don't remember.

8    Q.    And in context of telling him -- if we can go back to page

9    2 for a moment.    You say that you ask him what gun do you want,

11:09AM 10   and you tell him I have to talk to a guy, right?

11   A.    Yes.

12   Q.    And you tell him -- page 3, please -- that both you and

13   Mr. Caballo indicate that when you get a new gun, you scrape

14   off the serial number, right?

15          THE INTERPRETER:    I'm sorry, can you repeat the

16   question?

17   Q.    You tell Mr. Caballo, have a discussion with Mr. Caballo

18   that both you, Mr. Hernandez Miguel and Mr. Caballo, when you

19   get a new gun, you scrape off the serial number?

11:10AM 20   A.    I never said that to Caballo.

21   Q.    Sir, you said, "I erase those two, homie," right?

22   A.    I didn't even have a gun.    The clique gun was there.

23   Q.    Sir, back on January 8, 2016, Mr. Caballo says to you, "I

24   spent about four weeks erasing the serial numbers that it has

25   underneath where the trigger is."    Muerto:    "I erased those

1    too, homie."

2              THE INTERPRETER:  Your Honor, may the interpreter read

3    that?

4              THE COURT:  Yes.

5    A.    How would I erase something if I don't have one?

6    Q.    You obviously did have it, sir, you were talking to your

7    friend telling him you did erase the serial numbers, correct?

8    A.    That's what it says there.

9    Q.    So, is it your position that you, once again, you were

11:11AM 10    lying to enhance yourself to look better?

11    A.    I've never erased numbers from a gun.

12    Q.    That wasn't my question, sir.  Did you say you did that to

13    enhance your status even though you knew you were lying?

14    A.    I don't remember.

15    Q.    Sir, when you were initially shown the handgun though,

16    you -- this, which is marked as Exhibit Number 51, the black

17    semiautomatic, you immediately knew what the caliber was,

18    right?

19    A.    Yes.

11:12AM 20    Q.    That would mean a person has to be familiar with handguns

21    to be able to do that, right?

22    A.    I had it.

23    Q.    And the serial numbers are usually kept in a very small

24    area where it becomes difficult to get at it if you're trying

25    to scrape it off, right?

```
 1   A.   I've never seen that.

 2   Q.   Well, you told Mr. Caballo that you scraped off serial

 3   numbers.  Why would you want to scrape off a serial number off

 4   a handgun?

 5   A.   I don't know if that gun has the numbers erased or not.

 6   I've never had a different gun.

 7   Q.   Now -- and sir, again, how old are you today?

 8   A.   Thirty.

 9   Q.   And during your 30 years, you've used five or six
```
11:14AM 10   different names, correct?
```
11   A.   I use them for work purposes.

12   Q.   Well, the question though, sir, is you used five or six

13   different names in your life, right?

14   A.   I don't know if I've used that many.

15   Q.   Did you use just -- did you ever use your brother's name

16   as your name?

17   A.   Not that I can recall.

18   Q.   Did you ever indicate that you had different places of

19   birth other than El Salvador?
```
11:15AM 20   A.   Not that I can recall.
```
21   Q.   Do you recall telling anyone you were born in Mexico?

22   A.   I don't remember.

23   Q.   But you do admit to using five or six different names

24   throughout your life, correct?

25   A.   I don't remember.  When I came here, I was using a
```

1   different name when I was arrested.  That was the name that I

2   used to work.

3   Q.   Now, Mr. Iovieno has talked to you about the five

4   different times you went in, six different times you went in to

5   meet with the government and talked to them in what is called a

6   proffer session, correct?

7   A.   Yes.

8   Q.   Now, when you were selling the crack cocaine on your

9   own --

11:16AM 10         MR. POHL:  I object to whatever is coming next because

11   I don't think that's the testimony.

12         THE COURT:  Sustained in that form.

13   Q.   Sir, when you were selling any drugs on your own, did you

14   have anybody else come with you as a protection detail?

15   A.   I've never sold drugs.

16   Q.   You told us earlier, sir, you did recall selling the crack

17   cocaine, and you learned after you were arrested to the

18   undercover FBI agents, right?

19   A.   I would get $100 to bring it to him.

11:17AM 20   Q.   Now, when you would go along with Mr. Pelon for the

21   protection detail for the sales that he would make, you would

22   ride in the car with him?

23   A.   Yes.

24   Q.   And you would carry a firearm with you?

25   A.   No.

1    Q.    Well, you're there to protect for what?

2    A.    Who would want to mess with MS-13?

3    Q.    Do you have a sign on the side of your car that said MS-13

4    when you pull up for a drug deal?

5    A.    When one gets there, who's going to try to rob somebody

6    else there?  If you go alone, they will try to rob you, but if

7    you go with another person, do you think they're going to try

8    to rob you?

9    Q.    The protection detail, sir, is so you can be a violent

11:19AM 10   person if someone tries to rob Mr. Pelon, correct?

11   A.    So everyone who delivers drugs is violent?  That's why we

12   go there.

13   Q.    They're associated with drug deals, right?

14   A.    I'm not going to be paid just to go there.

15   Q.    So you go, and to protect Mr. Pelon and the drugs and the

16   money, you've got a weapon with you, and you're prepared to use

17   it, right?

18   A.    I never had a gun.  Many went to protect the drugs, and as

19   far as I know, many did not take guns.  I never saw them.

11:20AM 20   Q.    So you basically just went along for the ride with

21   Mr. Pelon?

22   A.    I would go with him, he would buy the drug, and I was

23   always next to him, so the person that was selling the drug was

24   there, and I was there on the sidewalk also.  Afterwards, he

25   would give me $100.

1    Q.   Now, some time in January of 2014, Mr. Pelon comes up to

2    you, and he's got a presentation about being a protector of him

3    if he drives drugs into New Hampshire, right?

4         THE INTERPRETER:  I'm sorry, the interpreter did not

5    understand the question.

6    Q.   Some time in early 2014, Mr. Pelon comes up to you,

7    Mr. Hernandez Miguel, and has a proposal about protecting drugs

8    going into New Hampshire, right?

9    A.   Yes.

11:21AM 10    Q.   And Mr. Pelon has decided he's going to approach

11    Cesar Martinez to see if he can get him into this scam, right?

12    A.   I spoke with Pelon, and Pelon asked me if I knew anyone

13    else who might be interested in going, and I suggested that

14    maybe Checha could go because Checha had always told me that he

15    would go to Texas --

16         MR. NORKUNAS:  Judge, I would ask it be stricken.

17    It's beyond the question.

18         THE COURT:  We'll stop it there.  I'll let it stand,

19    but put another question to him.

11:22AM 20    Q.   Sir, at some point in time, you asked Cesar to come on a

21    date that's agreed upon, right?

22         THE INTERPRETER:  I'm sorry.  Could you repeat the

23    first part?

24    Q.   At some point, they're going to meet Cesar on a date that

25    they agreed upon?  Yes or no, sir.

1    A.    Yes.

2    Q.    Then on that particular day, Cesar doesn't show up when

3    you are expecting him to show up, correct?  Yes or no.

4    A.    I don't remember.

5    Q.    Well, there's a phone call.  You have to call him and ask

6    him where he is, correct?

7    A.    Yes.

8    Q.    Then when he comes, he's got a buddy with him, right,

9    another man?

11:23AM 10    A.    Yes.

11    Q.    And he's got a rental car, right?

12    A.    I don't know if it was rented or if it belonged to his

13    friend.

14    Q.    At that point in time, there's a discussion, you, Pelon

15    and Cesar, and it's like this isn't play time, get rid of your

16    friend, and let's go, right?

17    A.    Yes.

18    Q.    And when you head out into New Hampshire all the way up,

19    you and Pelon are complaining about Cesar, correct?  Yes or no,

11:24AM 20    sir.  Yes or no, are you complaining about him?

21    A.    Not that I can recall because Cesar was behind us.

22    Q.    Well, there's constant communication between you and him,

23    right?

24    A.    I don't remember.

25    Q.    And at the end of the day, you're so upset, you meet with

54

1    Pelon -- you had been in the car with Pelon, correct?

2    A.    I don't remember.

3    Q.    You don't remember if you were in the car with Pelon?

4    A.    I remember going to New Hampshire.  I was with Pelon in

5    the car.

6    Q.    Well, do you remember you and Pelon, when you come back

7    and you say to Pelon, Cesar's fired, he's not doing this

8    anymore, he's out; do you remember that?

9    A.    Because Cesar followed the other guy who was taking the

11:25AM 10    drug, and he wasn't supposed to do that.  That was not part of

11    the plan that Cesar would follow the guy taking the drugs.

12    Q.    So you fired him, you said you're not going to use him

13    again, he's out?

14    A.    We said that for the time being no more.

15    Q.    He was fired, right, he was out?

16    A.    I don't recall firing him.

17    Q.    You said you're never going to use him again to Pelon,

18    right?

19    A.    I recall I did not say that.

11:26AM 20    Q.    You don't recall saying he was fired, sir, or you don't

21    recall the conversation?

22    A.    I don't remember.

23    Q.    Now, in 2008, sir, where were you living?

24    A.    In East Boston.

25    Q.    You were living in East Boston?

```
 1   A.   Yes.
 2   Q.   Do you recall that Cesar Martinez was living in Revere on
 3   20 Summer Street?
 4   A.   At that time there was an accident with Cesar Martinez,
 5   and at that time he lived in Chelsea.
 6          THE INTERPRETER:  I'm sorry, excuse me, Chelsea
 7   Street.
 8   Q.   He was living in Revere at that time, correct, 2008?  Yes
 9   or no.
10   A.   As far as I know, I met him in East Boston, not in Revere.
11   Q.   So you didn't know where he was living?
12          MR. POHL:  Objection.
13          THE COURT:  Overruled.
14   A.   He told me that he lived in East Boston, and I went to
15   where he lived.
16   Q.   Well, so you don't really know where he lived, sir, that
17   would be a fair assessment?
18   A.   I was at his house.
19   Q.   Well, you told us that at some point in time in 2008, you
20   went over to his house for a barbecue, right?
21   A.   Yes.
22   Q.   So if you go over to his house for a barbecue, chances are
23   it's good weather, right?
24   A.   I think so.
25   Q.   You're not going to be having too many barbecues inviting
```

1   friends over in January, right?

2   A.   We were there eating and we were inside.

3   Q.   Now, you brought your girlfriend along, right?

4   A.   Yes.

5   Q.   And then good weather, everybody in shorts and T-shirts?

6   A.   I don't remember.

7   Q.   Well, and at some point in time, according to you, a phone

8   call comes in?  Yes or no.

9   A.   Yes.

11:29AM 10   Q.   And as a result of the phone call, people get up to leave,

11   correct?

12   A.   To leave, I don't understand the question.

13   Q.   I'm sorry, I missed that.

14   A.   I don't understand the question.

15   Q.   Well, following the phone call, according to you, you

16   then -- people then get up and start to leave, correct, start

17   to go out of the house?  Yes or no, sir.  Some people go out of

18   the house?

19   A.   I don't remember.

11:30AM 20   Q.   Well, did you tell us that at some point in time a group

21   of people went down to the bus station looking for somebody?

22   A.   Yes.

23   Q.   And initially did you make the statement that when people

24   left the house, two people had machetes, you had a baseball bat

25   and somebody else had a knife?

1   A.   I said one person had a machete.  I don't recall saying

2   two people had machetes.

3   Q.   Do you ever recall saying to the -- two people had a

4   machete at some point in time, sir?

5   A.   No, I don't recall that.

6   Q.   Well, on October 14, 2016, you met for a proffer session

7   with agents and members of the U.S. Attorney's Office, correct?

8   A.   Yes.

9   Q.   And at that point in time, you were asked or you had a

11:32AM 10   discussion with them about what you were claiming wasn't your

11   story about something that took place at the Maverick Street

12   Station in East Boston.  Please.

13          THE INTERPRETER:  Could you repeat the question for

14   the interpreter?

15          MR. NORKUNAS:  Let me strike that question.

16          Can I have the Elmo just for the witness, please.  And

17   down at the bottom, if you could read -- if the interpreter

18   could read that to the witness.

19          THE INTERPRETER:  Starting on the last two lines?

11:33AM 20          MR. NORKUNAS:  The last two lines and the top line of

21   the next page.

22          THE INTERPRETER:  Just the highlighted?

23          MR. NORKUNAS:  Just the highlighted portion, correct,

24   the top line.

25   Q.   Having read that, sir, does that refresh your memory of

1    what you had told the investigators back on October 14, 2016,

2    about what weapons you say people had when they left the house

3    in East Boston?

4    A.    Yes.

5    Q.    So, four people leave the house.  You told us it was two

6    blocks from the Maverick Street Station, right?

7    A.    Yes.

8    Q.    That's one of the busiest areas in all of East Boston,

9    correct?

11:34AM 10    A.    At that moment it wasn't very full.

11    Q.    Well, you're having a barbecue, chances are it's going to

12    be daylight, right?

13    A.    But not at Maverick.

14    Q.    Pardon me.

15    A.    But you were asking me if Maverick was crowded.

16    Q.    Well, we are trying to figure out the time of the day,

17    daylight, warm weather, right, you told us?

18    A.    It was going into the afternoon.

19    Q.    Going into the afternoon.

11:35AM 20    A.    Because we had already gone indoors.

21    Q.    Well, you didn't change your clothes, you're still in

22    shorts and T-shirts, right?

23    A.    I don't remember that.

24    Q.    But you're carrying, according to you, on this story

25    you're telling us, two machetes, a baseball bat -- and you got

1    the baseball bat, right?

2    A.    I had the bat.

3    Q.    And a large hunting knife, right?

4    A.    Yes.

5    Q.    Four guys start down one of the main streets in East

6    Boston with two machetes, a baseball bat, and a hunting knife?

7    A.    I recall having said one machete.  I don't recall more.

8    Q.    So one person didn't have anything.  That would have been

9    Cesar who didn't have any type of weapon in your story, right?

11:36AM 10    A.    Cesar is the one who had the machete.

11    Q.    And you're not disputing that you're all walking down the

12    main street of East Boston carrying these weapons?

13    A.    There were two -- it was two and two.

14    Q.    So two guys with weapons on one side, two guys with

15    weapons on the other side?

16    A.    Yes.

17    Q.    Kind of carrying the machete and the baseball bat over

18    your shoulder in East Boston, and who cares?

19    A.    The things we carry in here and I had the bat in here.

11:37AM 20    (Indicating)

21    Q.    You had the bat where, sir, the baseball bat where?

22    A.    I had put it in here. (Indicating)

23    Q.    So you're walking with the baseball bat very slowly

24    because you couldn't move your leg with the baseball bat in it?

25    A.    You can figure that out.  You can imagine.

60

1    Q.   Well, sir, a baseball bat would go from your hip to your

2    ankle, right?

3    A.   It depends on how big the baseball bat is.

4    Q.   Perhaps you were carrying one of those souvenir bats?

5    It's your story, sir, you can do whatever you want.

6         THE COURT:  Hold on.  Strike that.  Let him answer

7    your question.

8    A.   It was like this. (Indicating)

9    Q.   A small bat, right?

11:38AM 10   A.   Immigration took the bat.  They have it.

11   Q.   And were the machetes and the knives kind of small, too?

12   A.   The machete was about this big. (Indicating)

13   Q.   Bigger than your bat?

14   A.   They are different sizes.

15   Q.   You would know, sir, because you're experienced with them,

16   right?

17   A.   Everyone in MS-13 knows that because that's what they use.

18   Q.   Now, you approach the station in your story, and the

19   people you're looking for, according to you, don't get off the

11:39AM 20   bus, right?

21   A.   We got only to the corner.  We didn't go all the way to

22   the station, and we told him to walk towards where we were.

23   Q.   But, sir --

24   A.   The ones that didn't get off the bus were the chavalas.

25   Q.   Well, you said that you were living in East Boston.

1    Maverick Street is the last stop on that bus line, right?

2    A.    Yes, I know that well.

3    Q.    Okay.  And the police station is real close by as well,

4    correct?

5    A.    On Meridian, yes.

6    Q.    And at some point in time then, according to your story,

7    you get into a fight with at least one of these gentlemen,

8    right?

9    A.    There were two, one ran away and one was caught.

11:40AM 10   Q.    Okay.  And you told us that you hit him with the little

11   souvenir bat, right?  Did you hit him with the bat?

12   A.    We all hit him, not just me.

13   Q.    So guys were chopping at him with the machete, guys were

14   hitting, stabbing him with the knife?  And, sir --

15          THE COURT:  We need an answer to that.

16   A.    They didn't use the knives, some were kicking him.  And

17   the taxi pulled up there and started honking the horn.

18   Q.    So you brought the weapons along for show only?

19   A.    When we got back, Checha said that there was blood on his

11:42AM 20   machete.

21   Q.    That isn't what I asked you, sir.  The question was so you

22   brought the weapons for show only, correct?

23   A.     If that had been so, we wouldn't have hit him, and Checha

24   would not have had blood on his machete if it was just showing

25   off.

1    Q.   So, sir, you believe that damage was done to the young man

2    on the street?

3    A.   Yes, because afterwards, when we locked ourselves into

4    Checcha's house, the detectives arrive --

5    Q.   Sir, I'll ask you the next question.

6         THE COURT:  Well, hold on.  You asked him a question.

7    He should answer it.  You asked him he believes the damage was

8    done to the man on the street.

9         MR. NORKUNAS:  Yes or no, answer.

11:43AM 10    THE COURT:  Just because you say doesn't mean he has

11   to answer yes or no.  He can answer.

12   A.   The detectives arrived and started knocking on the door.

13        MR. NORKUNAS:  Judge, if I may pose another question.

14   It's not responsive.  It's a bad question.

15        THE COURT:  Go ahead.

16   Q.   So you had told us before that you believed this was done

17   on Chelsea Street in East Boston, right?

18   A.   Yes, it was on Chelsea Street.

19   Q.   And you only had to go two blocks from the Maverick Street

11:43AM 20   Station in your story where you say Cesar Martinez lived,

21   correct?

22   A.   Something like that.

23   Q.   So, in your story, there's a major confrontation with

24   weapons in the middle of one of the major streets in East

25   Boston, correct?

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   And then four people with -- strike that for a minute. |
| 3 | And what did you do to that person, sir? |
| 4 | A.   We beat him up.  I hit him with a bat, and I also kicked |
| 5 | him.  We left him because the taxi, because of the taxi driver |
| 6 | that started honking his horn. |
| 7 | Q.   So, how big are you, sir?  What's your height? |
| 8 | A.   I don't know. |
| 9 | Q.   Six feet? |
| 11:44AM 10 | A.   I don't know. |
| 11 | Q.   200 pounds? |
| 12 | A.   I don't know.  I haven't weighed myself. |
| 13 | Q.   And according to all that you said here at this trial as |
| 14 | MS-13, you wanted to really beat that person, perhaps even kill |
| 15 | that person, right? |
| 16 | A.   I couldn't hit him hard because there were other dudes |
| 17 | there also hitting. |
| 18 | Q.   So you only gave him little taps with the bat? |
| 19 | A.   When you beat somebody up, you're not going to hit him |
| 11:45AM 20 | while feeling sorry for him.  If you cut somebody with a |
| 21 | machete, you don't know if you're going to kill him or only |
| 22 | wound him. |
| 23 | Q.   So now according to your story, all four of you run the |
| 24 | remaining distance back to the house? |
| 25 | A.   Yes. |

         1    Q.   And you believe the police come immediately, correct?

         2    A.   Yes, because the other one that ran away ran towards the

         3    police station.

         4    Q.   Which is very close to that area, right?

         5    A.   Yes.

         6    Q.   And then the police come up to the house looking for the

         7    four armed men in your story who just did a major assault on a

         8    young man, correct?

         9    A.   Yes.

11:46AM 10    Q.   And you don't know from these weapons whether there were

        11    drops of blood on the front steps or not, right?

        12    A.   It was the first floor.

        13    Q.   And they politely ring the bell, the police?

        14    A.   Yes.

        15    Q.   Looking for the four armed men who just ran away from a

        16    major assault, right?

        17    A.   Yes.

        18    Q.   Is the grill still going?

        19    A.   No, we were already inside the house.

11:47AM 20    Q.   And you know the grill had been shut off, right?

        21    A.   I imagine it was off.

        22    Q.   And the police, nobody immediately answers the door, and

        23    they politely leave, according to your story, right?

        24    A.   They were knocking at the door for a long while, and they

        25    also had a female police woman talking and ringing the bell.

1    We all, we had turned off all the lights, and we were all

2    inside quietly.

3    Q.    Well, at some point in time you said you then leave and

4    get a ride home, right?

5    A.    Yes, but not to the house.

6    Q.    And there's no police officer outside still, right?

7    A.    No, but I left through the back, not through the front.

8    Q.    And the police would never think that someone might leave

9    through the back, right?

11:48AM 10    A.    I don't know that.

11    Q.    Sir, you indicated that -- that was 2008, you believe; is

12    that correct, sir?

13    A.    Before I was deported.

14    Q.    And you were deported when, sir?

15    A.    I was deported in 2009.

16    Q.    But you were arrested before you were deported, right?

17    A.    Yes.

18    Q.    And you were held in custody for a while, right?

19    A.    I don't remember.

11:50AM 20    Q.    Have you been in jail so often, sir, that you can't

21    remember when you were in custody and when you weren't?

22    A.    Immigration took me at once.  I don't remember how long I

23    was in jail.

24    Q.    All right.  And then you indicated at some point in time

25    you're over at the garage and you thought Crazy, Brujo and some

1    others were with you, correct?

2    A.    We have many times at the garage.

3    Q.    But it's also a particular evening when you believed

4    Vida Loca was looking for Crazy to bring him a gun, correct?

5    A.    Yes.

6    Q.    Now, Crazy couldn't come in the garage at any point in

7    time when the owner was there because he hated him, right?

8    A.    I don't know that.

9    Q.    Well, according to your story in relation to this, Crazy

11:51AM 10    had a handgun, right?

11    A.    Yes.

12    Q.    Was that your clique gun?

13    A.    Not that I know of because Crazy is not from our clique.

14    Q.    Okay.  Is Vida Loca from your clique?

15    A.    No.

16    Q.    So, those are two guys that you don't really have any need

17    to assist or help, right?

18    A.    That doesn't matter because we're all MS-13.

19    Q.    So if you don't help an MS-13 guy when he asks for help,

11:52AM 20    you could get beaten?

21    A.    Yes.

22    Q.    And on this particular evening, according to you, you're

23    then looking to see how you could get over with Crazy, Brujo to

24    see Vida Loca, right?

25    A.    I wasn't looking to get to Vida Loca.

1    Q.    Well, to your knowledge, how did Crazy get to the garage

2    that night?

3    A.    I don't know how he got there.

4    Q.    Well, how did Brujo get there?

5    A.    Brujo lived there.

6    Q.    At the garage, right?  How did Danger get there?

7    A.    He was with Crazy.

8    Q.    And you don't know whether they drove over or not, right?

9    A.    I don't know how they got there.

11:53AM 10    Q.    How did you get there?

11    A.    On the bus.

12    Q.    And according to you, at some point in time then,

13    Cesar Martinez shows up, and you told him that he was going to

14    have to drive you someplace, correct?

15    A.    Checha got there because he had the car.  Since he was the

16    only one there with a car, we had been waiting for a taxi that

17    never arrived.

18    Q.    Sir, the question was you told him he was going to have to

19    drive the group, right, in your story?

11:54AM 20    A.    I've never told Checha to drive.  I don't recall saying

21    that.

22    Q.    Well, sir, you testified the other day in regard to this

23    matter, correct, back on the 7th day of February, 2018, and on

24    page 92, you indicated that --

25           MR. POHL:  Judge, if that could be shown.  I think

1    it's testimony of a witness.

2          THE COURT:  No, just ask him about it.

3    Q.   Okay.  You told -- in response to a question, "Well, since

4    Checha just arrived, we told Checha to bring us."

5    A.   I told Checha to drop me off at my house.  I didn't go to

6    bring the gun to --

7    Q.   Sir, I just asked you that was your testimony the other

8    day that "We told Checha to bring us," correct?

9    A.   Yes.

11:56AM 10    Q.   And then according to you, everybody gets in the car,

11    correct?

12    A.   Yes.

13    Q.   And at that point in time, you decide you're going to go

14    home in violation of MS-13 rules, correct?

15    A.   I told them to drop me off at my house.

16    Q.   And your house is where, sir?

17    A.   I live in Revere.

18    Q.   And where did you believe they were going to meet

19    Vida Loca?

11:56AM 20    A.   Chelsea.

21    Q.   So, there was no hurry to get there, correct?

22    A.   I don't know that.  I just told them to drop me off first.

23    Q.   So, despite the MS-13 rules that you've told us about, the

24    group first has to take you home in Revere?

25    A.   I told them to take me to the house because I had told

1    Crazy that Vida Loca might be drunk, and if a dude from MS-13

2    is drunk, I can't bring him a gun.  That's why I didn't go.

3    Q.   So, according to you, sir, they bring you home and then

4    the only source of information you have is what Brujo tells you

5    a week or so later, right?

6    A.   It wasn't a week later, it was within days that he told

7    me.

8    Q.   Pardon me, it was what?

9    A.   Days, just days later he told me.

11:58AM 10         MR. NORKUNAS:  If I could have the -- for the witness

11   only.

12   Q.   Sir, showing you a copy of your proffer agreement from

13   June 9, 2016 to the government?

14         THE COURT:  I think you misspoke.  It's not an

15   agreement.

16         MR. NORKUNAS:  I'm sorry, Judge.  It's a session, my

17   apologies.

18   Q.   And, sir, did you tell them that approximately -- if you

19   read that, sir, the second paragraph, did you tell them that

11:59AM 20   approximately one week later, Brujo talked to you?

21         THE INTERPRETER:  Should the interpreter read that

22   paragraph?

23         MR. NORKUNAS:  Yes, please.

24         Just that top paragraph, Madam Interpreter.

25         THE INTERPRETER:  I'm on my way there.  I'm done.

1  Q.   Sir, having had that read to you now, does that refresh

2  your memory that in June of 2000 -- June 9, 2016, you told

3  agents and members of the U.S. Attorney's Office that it was a

4  week later that Brujo talked to you?

5  A.   I don't remember having said that.

6  Q.   Do you recall, sir, telling them at that point in time,

7  Brujo told you that what took place took place at a restaurant

8  in Chelsea?

9  A.   Brujo at no time told me that it was a restaurant.

12:01PM 10  Q.   So, if someone had listed a restaurant, it would have been

11  incorrect, you never would have said that; is that correct?

12       THE INTERPRETER:  I'm sorry.

13  Q.   If it was listed as a restaurant, that would have been

14  incorrect as to what he said?

15  A.   As far as I recall, I never would have said restaurant

16  because it wasn't a restaurant.  It was a place where they sell

17  beer at night, a house.

18  Q.   But in this particular presentation, sir, it repeats the

19  word "restaurant" several times, correct?

12:02PM 20  A.   That's what it says, but as far as I know, I never said

21  restaurant because it didn't happen in a restaurant.

22  Q.   And it says "Brujo stepped into the restaurant," according

23  to you, "and stepped right back out," correct?

24  A.   I didn't say any of that.

25  Q.   Then in October --

1          THE COURT:  Sorry to interrupt.  Do you all want a

2     12:00 break?  Yes, I'm seeing some nods.  All right.

3          THE CLERK:  All rise.

4          (JURORS EXITED THE COURTROOM.)

5          (A recess was taken.)

6          THE CLERK:  All rise for the jury.

7          (JURORS ENTERED THE COURTROOM.)

8          THE CLERK:  Thank you.  You may be seated.  Court is

9     now back in session.

12:17PM 10          THE COURT:  Mr. Norkunas.

11          MR. NORKUNAS:  Judge, I just have a few more

12     questions, if I may.

13     Q.   So, back in October, when you were again asked about

14     Vida Loca and the murder in the home, you at that point in time

15     then told the agents that Vida Loca actually lived in the house

16     where the young man died; do you remember that?

17     A.   Brujo had told me that he had lived up on the second

18     floor.

19     Q.   He, being Vida Loca?

12:17PM 20     A.   Yes.

21     Q.   And so did you ever receive a beating for not going to

22     assist Vida Loca?

23     A.   No.

24          MR. NORKUNAS:  If I could have Exhibit 49.2, please,

25     page 2.  And if we could highlight just the first paragraph,

1    blow that up for me.  Thank you.  Could I get the next

2    paragraph, close that one.  Right there.  Thank you.

3    Q.   Mr. Hernandez Miguel, you understand that in this

4    particular case, the issue of who makes a determination of

5    whether you're going to get any help is the U.S. Attorney's

6    Office; is that correct?

7    A.   Yes.

8    Q.   And they've used a term called "substantial assistance" is

9    what they're going to look at and determine how much weight to

12:19PM 10    put to that to make a recommendation to the Court for your

11    sentencing, correct?

12           THE INTERPRETER:  Could you highlight, please.

13           MR. NORKUNAS:  Pardon me?

14           THE INTERPRETER:  Could you point to that?

15           MR. NORKUNAS:  I'm not asking him to read it.

16           THE INTERPRETER:  I'm sorry, could you repeat the

17    question again.

18    Q.   The people that make a determination, the folks that make

19    a determination sit over here, correct, the U.S. Attorney's

12:20PM 20    Office?

21    A.   Yes.

22    Q.   Now, sir, you're a person that has substantially harmed a

23    lot of people in your life, right?

24    A.   Yes.

25    Q.   And you've done that to enhance your status, correct?

1  A.  Everyone in MS-13 does the same thing.

2  Q.  I didn't ask about everyone, sir, I asked about you.

3  A.  Everyone in MS-13, we all do the same thing.

4      MR. MURPHY:  Objection, your Honor, motion to strike.

5      THE COURT:  I'll sustain it and strike the answer.

6  The question was about you.

7  Q.  The question is about you, Hernandez Miguel.  You did

8  that, you did the substantial harm to increase your stature in

9  MS-13, right?

12:21PM 10  A.  Yes.

11  Q.  And now, sir, you know that the determination of whether

12  you're going to get away with all of that harm you did to other

13  people depends upon, again, a weight of substantial assistance,

14  right?

15      MR. POHL:  Objection.

16      THE COURT:  I'll sustain it in that form.

17  Q.  Sir, you now are trying once again to harm other

18  people --

19      MR. POHL:  Objection.

12:21PM 20      THE COURT:  Sustained.

21  Q.  Sir, you know by putting forward, you've placed in harm's

22  way, by your testimony, other people in this case, right?

23      MR. POHL:  Objection.

24      THE COURT:  Sustained.

25  Q.  Sir, you know the most important aspect of this agreement

1    is whether you get substantial assistance or not, correct?

2         MR. POHL:  Objection.

3         THE COURT:  I'll allow that.

4    A.   Yes.

5    Q.   And you're not here to testify about your harm, you're

6    here to testify about what you claim other people may have done

7    so you can gain something, correct?

8         MR. POHL:  Objection.

9         THE COURT:  Sustained in that form.

12:22PM 10         MR. NORKUNAS:  I have nothing further, Judge.

11   Thank you.

12         THE COURT:  Mr. Murphy.

13         MR. MURPHY:  Thank you, your Honor.

14                    CROSS-EXAMINATION

15   BY MR. MURPHY:

16   Q.   Good afternoon, sir.

17   A.   Good afternoon.

18   Q.   My name is Marty Murphy, and I represent Mr. Sandoval.

19   Now, sir, you testified last week that you joined MS-13 in

12:23PM 20   Los Angeles when you were in high school, correct?

21   A.   I was with the Surenos at that time, and then I joined

22   MS-13.

23   Q.   When you were in high school, sir, correct?

24   A.   Yes.

25   Q.   Who were the Surenos?

1    A.    They are also a gang that flashes 13.

2    Q.    And, sir, you met with the government, the prosecution

3    team, for the first time in this case on May 19, 2016, correct?

4    A.    Yes.

5    Q.    And that was upstairs in this building, correct?

6    A.    I don't know where it was, but it was here.

7    Q.    And it was in the U.S. Attorney's Office, correct?

8    A.    Yes.

9    Q.    There were two prosecutors there, correct?

12:24PM 10   A.    Yes.

11   Q.    An FBI agent?

12   A.    Yes.

13   Q.    And a state trooper, correct?

14   A.    Yes.

15   Q.    And Ms. Huacuja was also there, correct?

16   A.    Yes.

17   Q.    And she was translating for you just the way that she has

18   been during this trial, correct?

19   A.    Yes.

12:25PM 20   Q.    And before you spoke to the prosecution team for the first

21   time on May 19, 2016, you signed an agreement, correct?

22   A.    Yes.

23          MR. MURPHY:  And may we see Exhibit 48 for the

24   witness, please.

25   Q.    I'd ask you to take a look at the screen, sir, and ask

1    whether you can identify what's been marked as Exhibit 48.

2    A.    Yes.

3    Q.    And is that the first agreement that you signed with the

4    prosecution?

5            THE COURT:  Hold on, is this in?

6            MR. POHL:  No.

7            THE CLERK:  It's not being shown to the jury.

8            THE COURT:  Oh, isn't?  Okay.  I'm sorry.  I thought

9    it was.  Go ahead.

12:26PM 10    Q.    Is that the first agreement that you signed with the

11    prosecution team?

12    A.    Yes.

13    Q.    And if we could turn to page 2, is that your signature?

14    A.    Yes.

15    Q.    And is that the signature of your lawyer?

16    A.    Yes.

17    Q.    And that's Mr. Barron, correct?

18    A.    Yes.

19    Q.    Who is here in the courtroom?

12:26PM 20    A.    Yes.

21    Q.    And before you signed this agreement, sir, Ms. Huacuja

22    translated it for you in Spanish, correct?

23    A.    Yes.

24    Q.    And that's true, sir, of all of the agreements that we've

25    been talking about, correct?

1    A.    Yes.

2          MR. MURPHY:  If we could see 49.1, please.

3    Q.    That's your plea agreement, sir?

4    A.    Yes.

5    Q.    And before you signed that, Ms. Huacuja translated that

6    for you into Spanish, correct?

7    A.    Yes.

8          MR. MURPHY:  And if we could see Exhibit 49.2, please.

9    Q.    That's your cooperation agreement?

12:27PM 10    A.    Yes.

11    Q.    And Ms. Huacuja also translated that document into Spanish

12    for you before you signed it, correct?

13    A.    Yes.

14          MR. MURPHY:  We'd offer Exhibit 48, your Honor.

15          MR. POHL:  No objection.

16          THE COURT:  It's admitted, 48.

17          (Exhibit No. 48 received into evidence.)

18          MR. MURPHY:  Now, could we turn back to Exhibit 48,

19    please, thank you.  And may that be shown to the members of the

12:28PM 20    jury.

21          THE CLERK:  It is.

22          MR. MURPHY:  Thank you.

23    Q.    Now, if we turn first to page 2, that again so the jury

24    can see it, that's your signature, correct?

25    A.    Yes.

1    Q.   And the signature of your lawyer, correct?

2    A.   Yes.

3    Q.   And if we go back to the first page, if we look at the

4    second line, that states that you are agreeing to provide

5    information that was accurate and complete, correct?

6    A.   Yes.

7    Q.   And you understood, sir, that accurate meant that you had

8    to tell the truth, correct?

9    A.   Yes.

12:29PM 10    Q.   And complete meant that you had to leave nothing out,

11    correct?

12    A.   Yes.

13    Q.   Now, at the very beginning of your very first meeting with

14    the prosecution team, they asked you some questions about your

15    background, correct?

16    A.   Yes.

17    Q.   And you told them that you had entered the United States

18    in 2001, correct?

19    A.   Yes.

12:29PM 20    Q.   And they asked you whether you had been a member of a gang

21    in Los Angeles, correct?

22    A.   Yes.

23    Q.   And which you told the prosecution team on May 19, 2016

24    was that you attended high school in Los Angeles and was always

25    getting in fights with members of MS-13 and 18th Street because

1    you were not a member of either gang, correct?

2    A.   I never said that.

3         MR. MURPHY:  If I could show you what's been -- for

4    the witness only.

5         THE CLERK:  Document camera.

6    Q.   It's your testimony, sir -- let me ask if Ms. Huacuja

7    could read to the witness the sentence that begins, "Hernandez

8    Miguel."

9    A.   I don't recall having said that.

12:31PM 10  Q.   You acknowledge, sir, that's what the report says however,

11   correct?

12   A.   The report says that, but I do not recall having said

13   that.

14   Q.   And what the report says is that you told the government

15   you weren't a member of MS-13 when you were in Los Angeles,

16   correct?

17        MR. POHL:  Objection.

18        THE COURT:  Overruled.

19   A.   I had told them that first I met the Surenos and

12:32PM 20  afterwards, I had met the MS-13 dudes.

21   Q.   Now, sir, you -- there's no question pending, sir.  Now,

22   May 19, 2016 was only the first time that you met with the

23   government, correct?

24   A.   Yes.

25   Q.   You met with them again on June 19 -- I'm sorry, June 9,

1    2016?

2    A.    I think so.

3    Q.    Well, let's see if this helps you remember.

4         MR. MURPHY:  I'd like it for the witness only.

5    Q.    I'd ask you to direct your attention to the screen.  If I

6    point here, sir, does that help you remember that you met with

7    the government on June 9, 2016?

8    A.    Yes.

9         THE COURT:  Let me, if I can, just explain to the jury

12:33PM 10  something.  What typically happens and what apparently happened

11   here is the witness meets with the FBI and FBI agent, one or

12   more FBI agents take notes and then write up a report.  So it's

13   not the witness' -- it's not a verbatim transcript, it's not a

14   recording, and the witness can either, you know, agree or

15   disagree that that's what he said or didn't say or that the

16   notes were accurate, but the point is it's the FBI agent's

17   report that has been written up that we're showing the witness.

18   Continue.

19        MR. MURPHY:  Thank you, your Honor.

12:34PM 20  Q.    Sir, you met with the prosecution team a third time on

21   July 15, 2016, correct?

22   A.    Yes.

23   Q.    And you met with the prosecution team for a fourth time on

24   October 14, 2016, correct?

25   A.    Yes.

1    Q.   And you met with the prosecution team for a fifth time on

2    November 10, 2016, correct?

3    A.   Yes.

4         MR. MURPHY:  And for the witness only from the

5    document camera.

6    Q.   Do you recognize that, sir, as a list of the meetings that

7    we just talked about?

8    A.   Yes.

9         MR. MURPHY:  Your Honor, I'd ask that this be

12:35PM 10    displayed to the jury simply as a chalk.

11         THE COURT:  Yes.

12    Q.   Now, in each of those meetings, you had promised to be

13    truthful, correct?

14    A.   Always.

15    Q.   And in each of those meetings, you had promised to be

16    complete, correct?

17    A.   Yes.

18    Q.   And as you testified, that meant that you understood that

19    you were not supposed to leave anything out, correct?

12:35PM 20    A.   Yes.

21    Q.   And it's a fact, sir, isn't it, that at every one of those

22    meetings, the prosecution team asked you questions about

23    Mr. Sandoval?

24    A.   Yes.

25    Q.   And at no time from the first meeting on May 19th to the

1      last one that we have a report about on November 10, 2016, did

2      you tell the prosecution team that you had asked Mr. Sandoval

3      for permission to get your MS-13 tattoos?

4      A.    To do them, to make them, yes.

5      Q.    At no time during any of those meetings did you tell the

6      prosecution team that, did you, sir?

7      A.    No.  I don't recall having said that.

8      Q.    Thank you, sir.  Now, you told us last week that the first

9      time you met Mr. Sandoval, he came by the house where you were

12:37PM 10   staying and picked you up?  Do you recall that, sir?

11     A.    Yes.

12     Q.    It's a fact, sir, is it not, that on May 31st -- I'm

13     sorry, on May 19, 2016, the day that you first met with the

14     government, you told the prosecution team that you met

15     Mr. Sandoval while you were playing soccer in Somerville?

16     A.    I don't recall.

17             MR. MURPHY:  If I could show you -- for the witness

18     only, please, on the document camera.  If I could ask

19     Ms. Huacuja to read the paragraph where my pen is to the

12:38PM 20   witness, please.

21     Q.    And, sir, does that refresh your memory that when you

22     spoke to the prosecution team back on May 19, 2016, the first

23     time you met with them, you told them that you had met Sandoval

24     for the first time while playing soccer in Somerville?

25     A.    As far as I can recall, I never said that because I didn't

1   play soccer with Casper.  I met Casper when he came to pick me

2   up on Eutaw Street in Boston.

3   Q.   You agree, sir, that what the report that the FBI agent

4   who is interviewing say is that you met him for the first time

5   while you were playing soccer in Somerville?

6        MR. POHL:  I object because that's not what it says.

7   Q.   Well, let me read it, sir.  "However, Hernandez Miguel

8   soon met Casper and several other members of ESLS while playing

9   soccer in Somerville, Massachusetts."

12:40PM 10       You agree, sir, that that's what you told the FBI,

11   correct?

12   A.   No.  I said that I first met Casper when he came to pick

13   me up on Eutaw Street in East Boston, which was where I first

14   lived when I came here.  I never played soccer with Casper.

15   Q.   And you agreed, sir, that the business about Eutaw Street

16   is not in the report that we just saw, correct?

17   A.   It's not there.

18   Q.   And there's nothing about that, sir, you'd agree, in the

19   reports from your meetings of May 19th, June 9th, July 15th,

12:41PM 20   October 14th or November 10th?

21   A.   I don't remember.

22   Q.   Now, sir, you testified last week and I think a little bit

23   earlier today about a conversation that you say you had with

24   Mr. Larios after you were arrested.  Do you recall that?

25   A.   Yes.

84

1    Q.   And you agree, sir, that you were arrested at the end of

2    January, 2016, correct?

3    A.   Yes.

4    Q.   And you say that it was after your arrest that you had a

5    conversation with Mr. Larios about Pelon, correct?

6    A.   Yes.

7    Q.   How long after your arrest, sir?

8    A.   About one month to one month and a half later, but I'm not

9    sure.

12:42PM 10    Q.   Okay.  So, some time February or March of 2016, correct?

11    A.   I don't remember exactly.

12    Q.   Around then?

13    A.   Could be.

14    Q.   And you were having a conversation with Mr. Larios,

15    correct?

16    A.   We were in the same cell.

17    Q.   Mr. Sandoval was not there?

18    A.   No.

19    Q.   And you and Mr. Larios, according to you, were talking

12:43PM 20    about something that happened a year earlier, correct?

21    A.   What we were talking about was that Lobo told me that he

22    had asked for a green light to kill Pelon, and he told me that

23    had Casper given him the green light, only one dude would be in

24    jail instead of all of us.

25    Q.   And, sir, if we could try to stick with my questions.  My

1    question was you were talking about something that happened a

2    year earlier, correct?

3    A.    I don't understand the question.

4    Q.    It's your testimony that Mr. Larios was -- and that's

5    Lobo, correct?

6    A.    Yes.

7    Q.    Was talking to you about something that happened shortly

8    after the police took the clique gun from him, correct?

9    A.    Yes.

12:44PM 10    Q.    And you know, sir, that the police took the gun from

11    Mr. Larios, that is, Lobo, in January of 2015, correct?

12    A.    I think it was then.  I'm not sure.

13    Q.    And according to your testimony, a year later Mr. Larios

14    is talking with you about a conversation that he had with

15    Mr. Sandoval back in January 2015, shortly after the gun was

16    taken from Mr. Larios, correct?

17    A.    I don't know when they had the conversation.  That's what

18    Lobo told me.

19    Q.    But he told you it was shortly after the gun had been

12:46PM 20    taken from him, correct?

21    A.    What Lobo told me is that he had requested the green light

22    because Lobo was sure that Pelon was a snitch and that he had

23    snitched on him at Casa Mariachi.  He never told me at what

24    date or time or year he had asked for the green light.

25    Q.    But you knew it was before -- according to you, this

1  conversation took place before anyone was arrested in the case,

2  correct, sir?

3  A.    Yes.

4  Q.    And, sir, what you say Lobo told you was that he asked

5  Mr. Sandoval for permission to green light Pelon, correct?

6  A.    Yes.

7  Q.    And according to you, what Lobo was told by Mr. Sandoval

8  was that no, unless there's clear evidence, correct?

9  A.    Yes.

12:48PM 10  Q.    Now, last week, we talked about a clique meeting that took

11  place on February 8, 2015?

12       MR. MURPHY:  If we could look at Exhibit 23.

13  Q.    And that was a meeting on February 8th where there was a

14  discussion with Lobo about his having had the gun taken away

15  from him by the police, correct?

16  A.    Yes.

17  Q.    And Pelon was there for that meeting, correct?

18  A.    Yes.

19  Q.    And during that meeting, Mr. Sandoval and others asked

12:49PM 20  Mr. Larios, Lobo, questions about what happened, correct?

21  A.    Yes.

22  Q.    And Mr. Larios never said anything in that meeting about

23  believing that Mr. Pelon was an informant, correct?

24  A.    No.

25  Q.    And that's what happened in the clique, is if somebody

1    broke the rules, they were called to task for what they did in

2    clique meetings, correct?

3    A.   Yes.

4    Q.   And that's what was happening to Mr. Larios on February 8,

5    2015 at the meeting that we're looking at now in Exhibit --

6    pardon me, Exhibit 23, correct?

7    A.   I didn't understand the question.

8    Q.   Sure.  Mr. Larios was being questioned about losing the

9    clique gun to the police during the meeting on February 8th,

12:50PM 10   correct?

11   A.   Yes.

12   Q.   It's fair to say, sir, that Pelon attended many clique

13   meetings between February 2015 to January 2016, when the

14   arrests were made?

15   A.   Yes.

16   Q.   And he attended clique meetings right up until the time

17   that you were arrested, correct?

18   A.   Yes.

19   Q.   And, sir, it's fair to say that at no time during any of

12:51PM 20   those meetings was Pelon questioned about whether he was an

21   informant the way Lobo was questioned about why he lost the

22   gun, correct?

23   A.   No.  I asked Lobo why he hadn't spoken.  I asked him why

24   he hadn't told me that supposedly he thought Pelon was a

25   snitch, and he told me that they hadn't said anything to me

1    because I would stick up for Pelon, and that's why they hadn't

2    said anything.

3    Q.    But my question, sir, was whether at any of the clique

4    meetings anyone had questioned Pelon?

5    A.    No.

6    Q.    Right.  And at no point after February 2015 until the

7    arrests in January, 2016 did Mr. Sandoval attempt or any other

8    member of ESLS attempt to search Pelon, correct?

9    A.    I don't know.

12:53PM 10    Q.    Not at any clique meeting you attended, that's something

11    you would remember, correct?

12    A.    Yes.  Lobo never told me that he was going to kill Pelon,

13    Lobo told me that --

14          MR. MURPHY:  Your Honor, I'd ask the response be

15    stricken as unresponsive.

16          THE COURT:  All right.  That will be struck.  Put

17    another question to the witness.

18    Q.    Now, let me ask you briefly, sir, before we break for the

19    day, about the events of May 12, 2015.  That was the day that

12:54PM 20    you ended up at Highland Park in Chelsea, correct?

21    A.    Yes.

22    Q.    And you started the beginning of these events with Pelon,

23    correct?

24    A.    Of that event?

25    Q.    Yes.

1    A.   Yes.

2    Q.   And you were together in Pelon's car, correct?

3    A.   Yes.

4    Q.   And that was the car that you later learned was the car

5    that was used to record conversations, correct?

6    A.   Yes.

7    Q.   What kind of car was it?

8    A.   I think it was a Toyota Camry.

9    Q.   And the other folks who were involved that day were at the

12:55PM 10   park, Highland Park in Chelsea, correct?

11   A.   Yes.

12   Q.   And that was Brujo, Vago, and Vampiro, correct?

13   A.   Yes.

14   Q.   And the other person who got involved was a person named

15   Domingo, correct?

16   A.   Yes.

17   Q.   And so he was the person who was at home and who had the

18   knife, correct?

19   A.   Yes.

12:55PM 20        MR. MURPHY:  So if I were to show the witness --

21   witness only on the document camera.

22   Q.   Does that show who was where when you first received the

23   telephone call that led you to eventually head to Highland Park

24   in Chelsea?

25        THE INTERPRETER:  May the interpreter read it?

1          MR. MURPHY:  Please, thank you.

2          THE WITNESS:  Yes.

3          MR. MURPHY:  If that may be shown as a demonstrative,

4     as a chalk, your Honor, to the jury?

5          THE COURT:  Yes.

6     Q.   So you and Pelon started off at the garage, correct?

7     A.   Yes.

8     Q.   And decided to go get something to eat for lunch, correct?

9     A.   I don't know if it was for lunch, but we were going to eat

12:57PM 10     something.

11    Q.   Okay.  Fair enough, sir.  You were going to eat somewhere,

12    you were going to go to eat, correct?

13    A.   Yes.

14    Q.   And it's true, isn't it, sir, that you received a call

15    from Brujo who was at the park, correct?

16    A.   I didn't understand the question.

17    Q.   You were with Pelon and you received a call from Brujo,

18    correct?

19    A.   Yes.

12:57PM 20    Q.   And Brujo told you that he and Vega had seen some 18th

21    Street members at the park in Chelsea, correct?

22    A.   Vago had gone in to buy marijuana, and he had seen the 18s

23    there, and they had said things to him.

24    Q.   And he wanted you to come to the park to help, correct?

25    A.   Yes.

1    Q.    You did not want to go, did you, sir?

2    A.    Because I had nothing on me.

3    Q.    No weapons, correct?

4    A.    No.

5    Q.    And it was also true that you believed you'd be

6    outnumbered by the 18th Street gang members, correct?

7    A.    Yes.

8    Q.    And Pelon talked you into going, isn't that correct, sir?

9          MR. POHL:  Objection.

12:59PM 10          THE COURT:  Overruled.

11    A.    I don't remember.

12    Q.    I'd like to take -- ask you to take a look at what's on

13    the document camera for the witness only.  You told the FBI

14    about this set of events on July 15, 2016, correct?  Is that

15    correct, sir?

16    A.    Yes.

17    Q.    And do you see here there's a set of events under the

18    heading "Stabbing in Chelsea, Massachusetts"?

19    A.    Yes.

12:59PM 20    Q.    If I could turn to page 2.

21          MR. MURPHY:  And ask you to read, Ms. Huacuja, the

22    sentence that begins "Hernandez Miguel" that I've just pointed

23    to.

24          MR. POHL:  Is this just for the witness, your Honor?

25          THE CLERK:  Yes.

1        MR. MURPHY:  Ms. Huacuja, I'm sorry.  I only wanted

2  the first sentence.

3        THE INTERPRETER:  Okay.

4        MR. MURPHY:  I apologize.

5        THE INTERPRETER:  Okay.  It's done.

6  Q.   Sir, does that help you remember that you did not want to

7  go because you thought you would be outnumbered and because --

8  but you went because Pelon talked you into going?

9  A.   No, what I told him was not to go because we had nothing

01:01PM 10  on us, and so that's why we called Domingo to bring something

11  from his house.  We were not going to attack them, we just were

12  going to see what was up because they had tried to attack Vago.

13        THE COURT:  Can I steal just a few minutes of

14  everyone's time, maybe four minutes and keep going?  Okay.  I

15  just want to make up for some lost ground.

16        Go ahead, Mr. Murphy.

17  Q.   You'd agree, sir, what you told the FBI on July 15, 2016

18  was that Pelon talked you into going, correct?

19        MR. POHL:  Objection.  It's been asked and answered.

01:02PM 20        THE COURT:  Overruled.

21  A.   No one talked me into anything.

22  Q.   But you'd agree, sir, that that's what the report states,

23  correct?

24  A.   I don't know.

25  Q.   Did you just read that, sir?

1    A.    I heard the interpreter read it to me.

2    Q.    And that's what it said, correct?

3    A.    No one talks me into anything.  I do things for my own --

4    on my own account.

5    Q.    Well, sir, my question is, is that what the report says?

6    A.    I don't understand.

7    Q.    Ms. Huacuja just read you that sentence from the report,

8    correct?

9    A.    But I don't understand what you want to know.

01:03PM 10    Q.    I want to ask you whether you agree, sir, that the FBI's

11    report of their interview with you states that you told the FBI

12    on July 15, 2016 that Pelon talked you into going.  Is that

13    what the report says, sir?

14    A.    Yes, that's what the report says.

15          MR. MURPHY:  Should I continue, your Honor?

16          THE COURT:  We may as well break there for the day.

17    Thank you, ladies and gentlemen.  Remember my cautions not to

18    discuss the case among yourselves or with anyone else and to

19    ignore any media reports, and hopefully we will get started

01:04PM 20    promptly at 9:00 tomorrow.

21          THE CLERK:  All rise.

22          (JURORS EXITED THE COURTROOM.)

23                      - - - -

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12             Dated this 12th day of February, 2018.

13                        s/s Valerie A. O'Hara

14             _____

15                  VALERIE A. O'HARA

16                  OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25