1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3

UNITED STATES OF AMERICA           )
4                                  )
vs.                                )  Criminal Action
5                                  )
HERZZON SANDOVAL,                  )  No. 15-10338-FDS
6  EDWIN GUZMAN,                   )
CESAR MARTINEZ,                    )
7  ERICK ARGUETA LARIOS,          )
                  Defendants       )
8


9

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11
                        JURY TRIAL DAY 13
12

13

14          John Joseph Moakley United States Courthouse
                        Courtroom No. 2
15                       1 Courthouse Way
                        Boston, MA 02210
16
                        February 15, 2018
17                         8:35 a.m.

18

19

20

21

22

23                       Valerie A. O'Hara
                      Official Court Reporter
24       John Joseph Moakley United States Courthouse
                   1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                  E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by CHRISTOPHER J. POHL,
     ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;
5
     For the Defendant Herzzon Sandoval:
6
         Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
7    MADELEINE K. RODRIGUEZ, ATTORNEY,
     155 Seaport Boulevard, Boston, Massachusetts 02210;
8
     For the Defendant Edwin Guzman:
9
         Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
10   88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11   For the Defendant Erick Arueta Larios:

12       THOMAS J. IOVIENO, ESQ., 345 Neponset Street
     Canton, MA 02021;
13
     For the Defendant Cesar Martinez:
14
         Stanley W. Norkunas, 11 Kearney Square,
15   Howe Building, Suite 202, Lowell, Massachusetts 01852.

16       ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
     Stoneham, Massachusetts 02180.
17

18

19

20

21

22

23

24

25

1                          I N D E X

2      WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

3       MAURICIO SANCHEZ
         By Ms. Lawrence            12
4        By Mr. Lopez                      76

5

6

7      EXHIBITS                           FOR I.D.  IN EVIDENCE

8       22                                              31
        105.1                                           56
9       105.2 and 105.3                                 56
        114                                             59
10      115                                             60
        116                                             65
11      202                                             31
        229                                             79
12      230                                            104
        231                                            104

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                PROCEEDINGS

2              THE CLERK:  All rise.  Thank you.  Please be seated.

3    Court is back in session.

4              THE COURT:  All right.  Good morning, everyone.  Two

5    things, first, the letter from Defendant Guzman, I had it sent

6    to Magistrate Judge Kelley who reported back to me that she had

7    read the letter before and that she had dealt with it before

8    and in her opinion that there was nothing more to be done.

9    That was done informally at high speed.

08:35AM 10             It's not a written report or recommendation or ruling,

11   but under the circumstances, that's what I expect to do, and I

12   guess I would caution the defendant not to be writing to the

13   Judge in the middle of the trial when he's represented by

14   counsel.

15             On the defendant expert, I guess overnight, counsel

16   for Sandoval filed a motion to exclude.  I was just handed the

17   government's response, but, obviously, I haven't had a chance

18   to read it, which I will do and make a ruling.  I'll hear

19   anyone who wants to be heard on it.

08:36AM 20             I will tell you that my instinct is that this is not

21   an issue of prejudice in the sense of it's overwhelmingly large

22   or that the defendants can't have a fair chance to respond it

23   but an issue of rule, in other words, we have rules, we have

24   rules for a reason, and they normally ought to be enforced, but

25   let me read what the government has to say, and I'll also hear

1    what anyone want to say.

2            Mr. Murphy, it's your motion, anything further on

3    that?

4            MR. MURPHY:  I'm sorry, your Honor.

5            THE COURT:  I'm sorry.

6            MR. MURPHY:  I heard everything except the last

7    sentence, your Honor.

8            THE COURT:  I'm asking if you want to be heard further

9    on the motion?  Is there anything you want to supplement?

08:36AM 10       MR. MURPHY:  No, your Honor, I think the one point

11   that I would make that we tried to make, I tried to make in the

12   filing was that I think in a case like this, there is a

13   practical problem, which is how are defense counsel faced with

14   thousands of hours of recording supposed to deal with it, and

15   what we tried to do is use essentially a rule of reason that if

16   there was some flag in the discovery, either a debriefing

17   report or a draft transcript that suggested we should pay

18   particular attention to the recording, we did that.

19           In this case, there was a debriefing report, which

08:37AM 20   we've attached.  There was no FBI preliminary transcript as

21   there was for most of the others, and I think that is a context

22   for our motion here.

23           I think we did not, and, frankly, we don't think it

24   would be practical to think that we would need to have a

25   Spanish-speaking listener listen and to describe all the

1   recordings in a case like this, and the rule that requires the

2   government to disclose the transcripts, final transcripts of

3   what it intended to use is in addition to a question of rule

4   following that we suggest a practical way in cases like this

5   for defense counsel to make sure that they're focused on the

6   correct issues.

7          THE COURT:  All true for evidence that the government

8   offers in its case in chief.  What if it's rebuttal evidence of

9   some sort, in other words, what about that?  I mean, I

08:38AM 10  certainly take your point about the practical problem, but

11  there's also the issue if, you know, defendant raises point X

12  and the government wants to rebut it, it's not part of the

13  government's case in chief like a part of a rebuttal case?

14  What about that?  What's your response there?

15         MR. MURPHY:  I understand the Court's point, your

16  Honor, and I understand the government's point on that.  What I

17  would say is that the stated reason for putting this transcript

18  in is to suggest, to state that the clique members were

19  essentially thinking about transferring loyalty from the East

08:39AM 20  Coast Program, which they either quit or not, depending on what

21  you believe about the evidence to the Hollywood Program, the

22  only evidence that I'm aware of that in the case comes from

23  Special Agent Wood who testified that that was the case.

24         I did not cross-examine Special Agent Wood on that.  I

25  think it's essentially the only evidence in the case that was

1   offered is what is in this transcript was the case.

2          That came from Special Agent Wood, and I would also

3   say, your Honor, that the only thing, the only part of the

4   transcript that really is relevant to that issue is the last --

5   is the last bit on page 3.  There it is, they just got into the

6   program.

7          There's nothing about the Hollywood Program before

8   that, and, your Honor, in addition, I would say that having now

9   spent time with this audio, there is some prejudice simply

08:40AM 10   because of the timing, and I respect the Court's views on what

11   you said earlier, you know, but there are parts of the

12   transcript where Mr. Sandoval says, "We aren't super heros, we

13   all have families."  There's a dispute between him and Muerto,

14   should they go out in the street, should they not?

15          Mr. Sandoval says something on the lines of you -- I'm

16   not going to tell anybody to go kill anybody because if that

17   happens, you could end up in jail and if somebody comes looking

18   for me or somebody wants to take care of your family, I'm not

19   going to do that.

08:40AM 20          If this had been part of the government's initial

21   disclosures, we would have had an opportunity to prepare

22   transcripts of other excerpts of other parts of the transcript

23   that would have put the matter more in context.

24          THE COURT:  Okay.  Ms. Lawrence.

25          MS. LAWRENCE:  Your Honor, I just note that I believe,

1       well, I believe what Mr. Murphy was quoting from as far as the

2       other parts of the recording were transcripts that were

3       provided to us by Mr. Lopez about a week and a half ago, and

4       those were the transcripts that prompted us to listen to the

5       entire recording in anticipation of him using those or trying

6       to use those as cross-examination of Mr. Hernandez Miguel, and

7       we recognize that he did not use those, but in listening to the

8       recording in full, we discovered that there was more to it, and

9       the part we provided is a different part of the recording that

08:41AM 10      we would use to rebut the defense that Mr. Murphy raised in his

11      opening statement and I believe has attempted to develop

12      throughout the trial, and I'm not sure if Mr. Murphy

13      cross-examined Agent Wood about this particular topic, but I

14      believe that Mr. Iovieno did, and that was the part of the

15      cross-examination where they were discussing did you quit and

16      then you rejoined and then you quit and you rejoined, and that

17      was definitely put before the jury that that was an issue is

18      whether the clique had resigned from the East Coast Program and

19      whether that was material.

08:42AM 20              And I believe it was also asked of Mr. Hernandez

21      Miguel whether they had quit the program, the East Coast

22      Program or not, so in our view this is just directly rebutting

23      that defense to the extent it's been raised throughout trial.

24              MR. POHL:  Just to be clear --

25              THE COURT:  Mr. Pohl.

1           MR. POHL:  -- Mr. Hernandez Miguel was asked on

2      February 8th at page 69 of the transcript whether they had

3      instead of -- in lieu of being in the East Coast Program, had

4      they talked about joining another program, and they said the

5      Hollywood Program.

6           MS. LAWRENCE:  And I would add, your Honor, that one

7      of the transcripts we have noticed following the rules and

8      providing this to defense counsel is a recording on

9      January 2nd, 2016, where CW-11 or Mr. Sanchez who will be

08:43AM 10  testifying again today talks to Mr. Hernandez Miguel and

11      says -- talks about the paros and the chequeos and the ones

12      they want to bring in and says we're running with the

13      Hollywoods now, we talked about that at the meeting, do you

14      remember?  So there is already some notice that that is part of

15      the recordings we intended to admit at trial.

16           THE COURT:  And if you offer it, who is going to

17      authenticate it, again, I'm sorry, to use the street names,

18      Tigre was not a participant, correct?

19           MS. LAWRENCE:  He was present at that meeting.  As

08:43AM 20  your Honor asked us not to put the people present in the

21      header, but Tigre was present at this meeting when this topic

22      was discussed.

23           THE COURT:  So you would expect if you do use it to

24      have him be the one who authenticates it?

25           MS. LAWRENCE:  Yes.  He reviewed the recording with

1    Ms. Huacuja, and he identified the voices, a similar process to

2    what Mr. Hernandez Miguel did with the other hearings and

3    transcripts.

4         THE COURT:  All right.  Let's do this.  I want to read

5    the government's opposition and reread the transcript and

6    Defendant Sandoval's motion.  My presumption is going to be

7    that the government cannot use this in its case in chief,

8    meaning the direct examination of Sanchez, that depending on

9    how the cross-examination goes or what topics are raised or

08:44AM 10   whether other portions of this transcript are offered, I may

11   permit it on redirect, but let me think about that.  That's

12   again shooting from the hip here, and I want to reflect on that

13   at least a few minutes.

14        Anything else that we have to talk about?  Mr. Lopez.

15        MR. LOPEZ:  Yes, your Honor.  There's the outstanding

16   motion with respect to the newly disclosed attempted murder and

17   the uncorroborated 10-year-old murder and specifically the

18   2003, 2004 machete attack.

19        THE COURT:  Yes.  Is that going to come up with this

08:45AM 20   witness?

21        MS. LAWRENCE:  Your Honor, while we believe that

22   evidence would be relevant and admissible, I don't intend to

23   inquire about those specific incidents.  The way it came up in

24   the proffer session, which is why we disclosed it was the

25   question was simply what had these particular leaders done to

1    achieve their status as leaders in the clique, and I can

2    perhaps ask a general question that doesn't get into specifics.

3              THE COURT:  All right.  Let's leave it there, and if

4    you do for some reason intend to elicit it, let me make my

5    ruling first, okay, don't elicit it.

6              MR. LOPEZ:  Thank you, your Honor.

7              THE COURT:  We had some technical issues with the

8    translation.  I want to make sure that Mr. Guzman heard what I

9    said.  Mr. Lopez, do you want to check with him and see what I

08:46AM 10   said at the beginning about referral to the Magistrate Judge

11   Kelley?

12             MR. LOPEZ:  Yes, your Honor, he did understand.

13             THE COURT:  All rise.

14             (A recess was taken.)

15             THE CLERK:  All rise.

16             (JURORS ENTERED THE COURTROOM.)

17             THE COURT:  Good morning, everyone.  Ms. Lawrence, are

18   you ready?

19             MS. LAWRENCE:  I'm ready, your Honor.  Thank you.

09:02AM 20   THE COURT:  And, Mr. Sanchez, do you understand that

21   you're still under oath?

22             THE WITNESS:  Yes.

23             THE COURT:  All right.  Go ahead.

24

25

| | |
|---|---|
| 1 | MAURICIO SANCHEZ, RESUMED |
| 2 | DIRECT EXAMINATION |
| 3 | BY MS. LAWRENCE: |
| 4 | Q.   Good morning, Mr. Sanchez. |
| 5 | A.   Good morning. |
| 6 | Q.   Yesterday you testified that you were a member of MS-13? |
| 7 | A.   Yes. |
| 8 | Q.   When did you become a member of MS-13? |
| 9 | A.   2013. |
| 09:03AM 10 | Q.   What is a member of MS-13 called? |
| 11 | A.   Homeboy. |
| 12 | Q.   How is MS-13 organized? |
| 13 | A.   In cliques. |
| 14 | Q.   And does each clique have a leader? |
| 15 | A.   Yes. |
| 16 | Q.   What is that leader called? |
| 17 | A.   Runner or first word. |
| 18 | Q.   And which MS-13 clique are you a member of, Mr. Sanchez? |
| 19 | A.   Eastside. |
| 09:03AM 20 | Q.   Does the Eastside clique, did you hold meetings to discuss |
| 21 | MS-13 business? |
| 22 | A.   Yes. |
| 23 | Q.   Did you attend some of those meetings? |
| 24 | A.   Several. |
| 25 | Q.   And did you spend time with other MS-13 Eastside clique |

1    members outside of meetings?

2    A.   Yes.

3    Q.   And what did you do when you spent outside of meetings

4    with your fellow clique members?

5    A.   Go out on weekends to the bars to look for chavalas.

6         MS. LAWRENCE:  May I have admitted Exhibit 2, please.

7    Q.   Who is this, Mr. Sanchez?

8    A.   Casper.

9    Q.   Who is Casper?

09:04AM 10   A.   He's the first word of the clique.

11   Q.   Do you see Casper here in court today?

12   A.   Yes.

13   Q.   Can you point him out, please, and describe what he's

14   wearing?

15   A.   He's wearing a pink shirt, a pinkish shirt.

16        MS. LAWRENCE:  May the record reflect that the witness

17   has identified defendant, Herzzon Sandoval?

18        THE COURT:  Yes.

19   Q.   When did you first meet Casper?

09:05AM 20   A.   The day that I was jumped in.

21   Q.   All right.  Since that time, have you talked to Casper in

22   person?

23   A.   Yes.

24   Q.   Have you talked to him on the phone?

25   A.   Yes.

```
 1    Q.   Have you heard him speak at clique meetings?

 2    A.   Yes.

 3    Q.   Are you familiar with his voice?

 4    A.   Yes.

 5         MS. LAWRENCE:  May I have Exhibit 3, please, in

 6    evidence.

 7    Q.   Who is this, Mr. Sanchez?

 8    A.   Playa.

 9    Q.   Who is Playa?

10    A.   He's the second word of the clique.

11    Q.   What is the second word?

12    A.   That is a person that if the first word is not there, then

13    he can make decisions for the clique.

14    Q.   Okay.  Do you see Playa here in court today?

15    A.   Yes.

16    Q.   Can you point him out, please, and describe what he's

17    wearing?

18    A.   The fifth person down from you.

19         MS. LAWRENCE:  And may the record reflect that the

20    witness has identified the defendant, Edwin Guzman?

21         THE COURT:  Yes.

22    Q.   When did you first meet Playa?

23    A.   At work.

24    Q.   Where did you work?

25    A.   At a company that collects garbage for the city.
```

```
 1    Q.   Have you talked to Playa in person since you've met him?

 2    A.   Yes.

 3    Q.   Have you talked to him on the phone?

 4    A.   Yes.

 5    Q.   Have you heard him speak at clique meetings?

 6    A.   Yes.

 7    Q.   Are you familiar with his voice?

 8    A.   Yes.

 9         MS. LAWRENCE:  Can I have Exhibit 4, please, in

10    evidence.

11    Q.   Who is this, Mr. Sanchez?

12    A.   Checha.

13    Q.   Who's Checha?

14    A.   He's a member of the Eastside clique.

15    Q.   Do you see Checha here in court today?

16    A.   Yes.

17    Q.   What is he wearing?

18    A.   A white shirt and black tie.

19         MS. LAWRENCE:  May the record reflect that the witness

20    has identified the defendant, Cesar Martinez?

21         THE COURT:  Yes.

22    Q.   When did you first meet Checha?

23    A.   I met him through Lobo.

24    Q.   Since you met him, have you spoken to him in person?

25    A.   Yes.
```

1    Q.   On the phone?

2    A.   Yes.

3    Q.   Have you heard him speak at clique meetings?

4    A.   Yes.

5    Q.   Are you familiar with his voice?

6    A.   Yes.

7         MS. LAWRENCE:  May I have Exhibit 5, please.

8    Q.   Who's this?

9    A.   Lobo.

09:08AM 10   Q.   And who is Lobo?

11   A.   A member of the Eastside clique.

12   Q.   When did you first meet Lobo?

13   A.   2010 at work.

14   Q.   And I believe you identified Lobo in court yesterday?

15   A.   Yes.

16   Q.   Since you met Lobo, have you talked to him in person?

17   A.   Yes.

18   Q.   Have you heard him speak at clique meetings?

19   A.   Yes.

09:09AM 20   Q.   Are you familiar with his voice?

21   A.   Yes.

22        MS. LAWRENCE:  And admitted Exhibit 6, please.

23   Q.   Who is this, Mr. Sanchez?

24   A.   Muerto.

25   Q.   Who is Muerto?

```
 1    A.    He's one of the most solid homeboys in the clique.

 2    Q.    What do you mean by solid?

 3    A.    He's one of the people that has the most respect in MS-13.

 4    Q.    How long have you known Muerto?

 5    A.    Since the time I've been in the MS-13.

 6    Q.    And have you talked to him in person?

 7    A.    Yes.

 8    Q.    On the phone?

 9    A.    Yes.

09:09AM 10    Q.    At clique meetings?

11    A.    Yes.

12    Q.    Are you familiar with his voice?

13    A.    Yes.

14          MS. LAWRENCE:  May I have Exhibit 8, please.

15    Q.    Who is this, Mr. Sanchez?

16    A.    Brujo.

17    Q.    Who is Brujo?

18    A.    A member of the Eastside clique.

19    Q.    Okay.  Have you talked to Brujo in person since you've

09:10AM 20    known him?

21    A.    Yes.

22    Q.    Actually when did you meet him?

23    A.    When I was jumped in in 2013.

24    Q.    Okay.  Have you talked to him on the phone?

25    A.    Yes.
```

|   |    |                                                           |
|---|----|-----------------------------------------------------------|
| 1 | Q. | At clique meetings?                                       |
| 2 | A. | Yes.                                                      |
| 3 | Q. | Are you familiar with his voice?                          |
| 4 | A. | Yes.                                                      |
| 5 |    | MS. LAWRENCE:  Can I have Exhibit 9, please.              |
| 6 | Q. | Mr. Sanchez, who is this?                                 |
| 7 | A. | Animal.                                                   |
| 8 | Q. | How long have you known Animal?                           |
| 9 | A. | I met him in 2015.                                        |

09:10AM 10  Q.   And who is Animal?

11  A.   He was a chequeo with the Everetts.

12  Q.   And he was a chequeo.  What did he become later?

13  A.   He became a homeboy with the Eastside.

14  Q.   Do you talk to Animal in person?

15  A.   Yes.

16  Q.   On the phone?

17  A.   Yes.

18  Q.   Did he attend any of your clique meetings?

19  A.   Not while I was present.

09:11AM 20  Q.   Okay.  Are you familiar with his voice?

21  A.   Yes.

22       MS. LAWRENCE:  May I have Exhibit 10, please.

23  Q.   Who is this, Mr. Sanchez?

24  A.   Chentino.

25  Q.   Do you know him by another gang name?

```
 1    A.    I only know him as Chentino.

 2    Q.    How long have you known Chentino?

 3    A.    I met him in 2012.

 4    Q.    Have you talked to him in person?

 5    A.    Yes.

 6    Q.    On the phone?

 7    A.    Yes.

 8    Q.    And at clique meetings?

 9    A.    Yes.

09:12AM 10    Q.    Are you familiar with his voice?

11    A.    Yes.

12          MS. LAWRENCE:  Exhibit 11, please.

13    Q.    Mr. Sanchez, who is this?

14    A.    Caballo.

15    Q.    Who is Caballo?

16    A.    Another one of the most solid homeboys in the clique.

17    Q.    When did you meet Caballo?

18    A.    In 2013, when I was jumped in.

19    Q.    And have you talked to him in person?

09:12AM 20    A.    Yes.

21    Q.    On the phone?

22    A.    Yes.

23    Q.    At clique meetings?

24    A.    Yes.

25    Q.    Are you familiar with his voice?
```

1    A.    Yes.

2    Q.    Mr. Sanchez, as a member of MS-13, were there rules that

3    you had to follow?

4    A.    Yes.

5    Q.    What were those rules?

6    A.    The first rule is when you're jumped in and you're placed

7    in the center to get a beating, a kicking.

8    Q.    What is that like?  Can you describe that a little more?

9    A.    It's at the meeting when you get jumped and there has to

09:13AM 10   be a minimum number of homeboys, not all of them, like at least

11   four or five.  Mainly the runners have to be there.  The

12   runners indicate who is going to kick him, and they count to 13

13   seconds.

14   Q.    How many people typically do the kicking or beating?

15   A.    Three.

16   Q.    Okay.  And you were jumped in in 2013, you said?

17   A.    Yes.

18   Q.    And were you present at other meetings when other homeboys

19   were jumped into your clique?

09:14AM 20   A.    Yes.

21   Q.    So that's one rule.  What were some other rules?

22   A.    Attend the meetings.

23   Q.    Okay.  Were there others?

24   A.    Not let a homeboy down.

25   Q.    Anything else?

1  A.   Represent through colors and represent being solid with

2  the MS-13.

3  Q.   Okay.  You said earlier what it means to be solid with the

4  gang, that it was someone -- you said, if someone is solid, the

5  person has respect?

6  A.   Yes.

7  Q.   How do you earn that respect?

8  A.   Doing hits on the rivals and the chavalas.

9  Q.   Who were your rivals?

09:15AM 10  A.   The main ones are the 18s.

11  Q.   And how would someone in the clique know if you had done a

12  hit on a chavala?

13           MR. LOPEZ:  Objection.

14           THE COURT:  Hold on.  Sustained in that form.

15  Q.   Did you, Mr. Sanchez, participate in hits on chavalas?

16  A.   Yes.

17  Q.   And did you earn respect for doing hits on chavalas?

18           MR. LOPEZ:  Objection.

19           THE COURT:  Overruled.

09:16AM 20  A.   In a certain way, yes.

21  Q.   Okay.  How did you tell -- how did other members of the

22  clique give you respect?

23  A.   I don't understand the question.

24  Q.   Okay.  Were you alone when you did hits on chavalas?

25  A.   No.

```
 1    Q.   Who were you with?
 2              MR. LOPEZ:  Objection, your Honor.
 3              THE COURT:  Overruled.
 4              MR. LOPEZ:  Time frame?
 5              THE COURT:  All right.  Let's have a time frame on
 6    that.
 7              MS. LAWRENCE:  Actually, I'll ask a different
 8    question, your Honor.  That's fine.
 9    Q.   How did you communicate with members of your clique?
10    A.   With signs.
11    Q.   And what were those signs?
12    A.   Should I show you?
13    Q.   Yes, please.
14    A.   The MS. (Indicating)
15    Q.   Okay.  Were there any others?
16    A.   Yes.
17    Q.   Can you show us those?
18    A.   Just flashing signs like this.  (Indicating)
19    Q.   And when would you do that, when would you flash signs?
20    A.   Mainly when we'd see a rival.
21    Q.   Did you also -- I think you said you communicated with
22    your own members of the clique that way?
23    A.   Yes, when we would meet.
24    Q.   Okay.  And you also mentioned wearing colors.  What does
25    that mean?
```

09:17AM 10

09:17AM 20

```
 1    A.   We were not allowed to use red.

 2    Q.   What were you allowed to use?

 3    A.   Blue and white.

 4         MS. LAWRENCE:  Could we have Exhibit 18, please.

 5    Q.   Mr. Sanchez, do you recognize the man in this photograph?

 6    A.   Yes.

 7    Q.   Who is it?

 8    A.   Lobo.

 9    Q.   What is he doing with his hands in this photograph?

09:18AM 10  A.   Flashing MS.

11    Q.   Okay.  Are there any other ways that members of your MS-13

12    clique or the gang would identify themselves as gang members?

13    A.   You mean with the Eastsides?  Each clique has a name.

14    Q.   Yes.  How would you show yourselves to other members of

15    MS-13 or rivals as a member of the Eastside or as a member of

16    MS-13?  You use hand signs, you use colors.  Are there other

17    ways that you would show yourself?

18    A.   By saying "Here is Mara Salvatrucha."

19    Q.   You would do that to rivals?

09:20AM 20  A.   Yes.

21    Q.   Mr. Sanchez, do you have a tattoo?

22    A.   No.

23    Q.   Do other members of your clique have tattoos?

24    A.   Yes.

25         MS. LAWRENCE:  May I have Exhibit 13, please.
```

| | |
|---|---|
| 1 | Q.   Mr. Sanchez, who is this a picture of? |
| 2 | A.   Muerto. |
| 3 | Q.   And what are those markings on his chest? |
| 4 | MR. MURPHY:  Objection, your Honor. |
| 5 | THE COURT:  Overruled. |
| 6 | A.   MS. |
| 7 | Q.   MS.  What does that stand for? |
| 8 | A.   Mara Salvatrucha. |
| 9 | MS. LAWRENCE:  Can I have Exhibit 16?  This is in |
| 09:20AM 10 | evidence. |
| 11 | Q.   Who is this a picture of? |
| 12 | A.   Playa. |
| 13 | Q.   And what are the markings on his arm? |
| 14 | A.   MS-13. |
| 15 | MS. LAWRENCE:  Can I have admitted Exhibit 17, please. |
| 16 | Q.   Who is this a picture of? |
| 17 | A.   Brujo. |
| 18 | Q.   What are the markings on his arm? |
| 19 | A.   The clique initials. |
| 09:21AM 20 | MS. LAWRENCE:  Can I have Exhibit 126, please. |
| 21 | Q.   Mr. Sanchez, do you recognize these photographs? |
| 22 | A.   Yes. |
| 23 | Q.   What are they? |
| 24 | A.   Two figures.  One is forming an M and the other one an S. |
| 25 | Q.   Okay.  And what are the initials next to the figure? |

1              THE INTERPRETER:  I'm sorry.

2    Q.    What are the initials, markings next to the figure?

3    A.    The Eastside clique initials.

4    Q.    Do you know whose body these markings are on?

5    A.    Casper.

6    Q.    Mr. Sanchez, you said earlier that your clique has

7    meetings to discuss MS-13 business.  How often did you meet?

8    A.    Every two or three months.

9    Q.    Who called the meetings?

09:22AM 10   A.    The runners.

11   Q.    And the runners for your clique were?

12   A.    Casper and Playa.

13   Q.    When you had your clique meetings, where did you meet?

14   A.    At a shop in Everett or at a parking lot in Cambridge.

15   Q.    Can I have Exhibit 1.1, please.  Do you recognize this

16   photograph, Mr. Sanchez?

17   A.    Yes, we would meet there.

18   Q.    Okay.  What did you do at the meetings?

19   A.    We would discuss problems, what was going on internally in

09:23AM 20   the clique and also in MS-13 at large.

21   Q.    And what kind of problems did you talk about?

22   A.    Such as we would discuss serious problems such as when

23   Chentino refused to participate in the murder committed by

24   Vida Loca.

25   Q.    Okay.  And you said you also discussed things that were

1    happening with the gang?

2    A.    Yes.

3    Q.    What do you mean by that?

4    A.    What was happening with other cliques, how they were

5    running, and what were they doing.

6    Q.    Did you talk about activities that you, the clique

7    members, were doing?

8    A.    Yes.

9             MR. LOPEZ:  Objection.

09:24AM 10             THE COURT:  Overruled.

11    Q.    Did you also have to contribute money to the clique?

12    A.    Yes.

13    Q.    Did you have to do that at every meeting?

14    A.    Yes.

15    Q.    How much did you have to pay?

16    A.    $30.

17    Q.    And who collected the money?

18    A.    Playa.

19    Q.    And why Playa?

09:25AM 20    A.    He was a more serious person and he was trusted with the

21    money.

22    Q.    What was the money that you gave to the clique used for?

23    A.    To help homeboys that were down below in El Salvador, to

24    buy guns, to pay the money for the program, or in an emergency

25    if a homeboy was arrested and something serious would happen to

1    him to help him out.

2    Q.    Okay.  What is a program, Mr. Sanchez?

3    A.    It's an organization of MS-13 with the older leaders and

4    the cliques have to report and to pay a certain amount of money

5    and reporting activities to members of MS-13 to remain active.

6    Q.    What kind of things was the clique required to report?

7    What kinds of activities?

8    A.    That the members are attacking the rivals and doing more

9    hits.

09:26AM 10   Q.    Who was required to report -- to make that report to the

11   program?

12   A.    The runners.

13   Q.    How did the runners know what to report?

14   A.    Each homeboy would report what he had done.

15   Q.    To the runners?

16   A.    Yes.

17   Q.    When would you have to report that?

18   A.    Well, for instance, the day that I committed the attempted

19   murder with Animal, the following day I reported that to

09:27AM 20   Casper.

21   Q.    So you're supposed to report soon after you've done

22   something?

23            MR. MURPHY:  Objection, your Honor.  Leading.

24            THE COURT:  All right.  Sustained as to the leading.

25   Q.    You said that you used some of the clique money to help

1    out deported members who were down below.  By down below, what

2    do you mean?

3    A.    That they have been deported.

4    Q.    To what country, where?

5    A.    To El Salvador.

6    Q.    Okay.  Do you know how the money got from your clique to

7    El Salvador?

8    A.    Through money orders.

9    Q.    Okay.  Do you know who sent the money?

09:28AM 10   A.    Playa is the person who had the money.

11   Q.    Okay.  Mr. Sanchez, did you have to go to every meeting of

12   your clique?

13   A.    It was mandatory.

14   Q.    What happened if you didn't go to a meeting?

15   A.    You would have to have a very good excuse such as being

16   sick and not able to walk or being at work.

17   Q.    What if you didn't have a good excuse and you missed a

18   meeting?

19   A.    You were put under observation.  Maybe the first time it

09:29AM 20   would be allowed to pass by, but if it happened again, then

21   you'd be put in the center.

22   Q.    What does that mean to be put in the center?

23   A.    To be corrected and so that the person would understand

24   that that must be respected.

25   Q.    What does that correction entail?

```
 1    A.    Receive a 13-second kicking.

 2    Q.    Mr. Sanchez, were you asked to listen to some recordings

 3    before you came to court?

 4    A.    Yes.

 5    Q.    Where did you listen to those recordings?

 6    A.    In a room, a conference room.

 7    Q.    Here in the courthouse?

 8    A.    Yes.

 9    Q.    Who was with you when you listened to the recordings?

10    A.    The prosecutors, some agents, and the interpreter.

11    Q.    Okay.  How did you listen to the recordings?

12    A.    Through a computer.

13    Q.    When you were listening to the recordings, what were you

14    asked to do?

15    A.    Recognize a voice and what was being spoken about.

16    Q.    Okay.  And was that something you did with the

17    interpreter?

18    A.    Yes.

19    Q.    Okay.  And how exactly did that work?

20    A.    I don't understand the question.

21    Q.    You listened to the recordings with the interpreter.  Did

22    you tell her who was speaking as you were listening to the

23    recordings?

24    A.    Yes.

25    Q.    And did you also tell her what was being said?
```

1    A.    Yes.

2    Q.    Okay.  When you listened to a recording and identified who

3    was speaking, as you just described, did you do anything to the

4    disk of the recording?

5    A.    Yes, I wrote my initials.

6          MS. LAWRENCE:  Could I have the document camera for

7    the witness, please.

8    Q.    Mr. Sanchez, I'm showing you a disk.  It's been marked as

9    Exhibit 202 of a recording that was made on June 14, 2014.  Did

09:32AM 10   you listen to the recording on this disk?

11   A.    Yes.

12   Q.    How do you know?

13   A.    How do I know?

14   Q.    How do you know you listened to it, to this disk and this

15   recording as opposed to another one?

16   A.    Because of the date.

17   Q.    And did you also mark the disk?

18   A.    Yes.

19         MS. LAWRENCE:  Your Honor, the disk that has been

09:33AM 20   marked as Exhibit 202 goes with the transcript that has been

21   marked as Exhibit 22, which I believe Ms. Huacuja testified

22   about making the transcript.

23         THE COURT:  I'm sorry, what was the last?

24         MS. LAWRENCE:  Exhibit 22, which I believe Ms. Huacuja

25   testified about having prepared the transcript.

1            THE COURT:  All right.

2            MS. LAWRENCE:  And now that we've authenticated the

3      voices, I move to admit both the disk, Exhibit 202 of the

4      recording, and the transcript, Exhibit 22 into evidence.

5            MR. MURPHY:  Same objection as to the last round.

6            THE COURT:  I'll give you a standing objection,

7      assuming there's a set of transcripts here, I'll give you a

8      standing objection.

9            MR. MURPHY:  Thank you.

09:33AM 10           THE COURT:  All right.  Overruled.  It's admitted.

11     Exhibit 22.

12           (Exhibit No. 22 received into evidence.)

13           MS. LAWRENCE:  And the disk, also, please, your Honor.

14     Exhibit 202.  We'd like to admit the recording of this as well.

15           THE COURT:  202 is admitted.

16           (Exhibit No. 202 received into evidence.)

17     Q.   Mr. Sanchez, you testified a minute ago that you were

18     present at Eastside clique meetings when new members were

19     jumped in?

09:34AM 20     A.   Yes.

21     Q.   Was someone jumped in at an ESLS clique meeting on

22     June 14, 2014?

23     A.   Extrano.

24           MS. LAWRENCE:  Could I have Exhibit 22.  Could I ask

25     the jury to pull your transcript binders out and turn to tab

1    22.  We're going to play a clip of the recording that was just

2    admitted and the transcript portion that corresponds is in the

3    middle of the page.  We're not going to read the transcript,

4    we're going to play the recording.

5          THE  INTERPRETER:  What page did you say?

6          MS. LAWRENCE:  Tab 22 in the middle of page 2, then on

7    page 3 at the top.

8    Q.   Mr. Sanchez, where did the ESLS meeting take place when

9    Extrano was jumped in?

09:35AM 10    A.   At the garage in Everett.

11    Q.   Okay.  I'm going to play a clip of that meeting and ask

12    you to listen to it.

13          (Video played.)

14    Q.   The part we're playing correspond to the transcript on

15    page 3.  Starting below the first ellipsis, please.

16          (Video played.)

17    Q.   Okay.  Mr. Sanchez, what just happened there?

18    A.   When he was jumped in.

19    Q.   Okay.  Do you remember who did the beating?

09:37AM 20    A.   Myself, Brujo, and Flaco.

21          MS. LAWRENCE:  Can I have Exhibit 22 on the screen.

22    Q.   And, Mr. Sanchez, I'm going to read part of this

23    transcript and ask you some questions about it.  Starting on

24    page 1.

25          Playa:  "Hey, dude for those who don't know, we gave

1    the money that was there, Sinzon.  After that I gave him 400,

2    how much was it you told me.  You said 430, right?  From the

3    last that we did (unintelligible), owes me 100 bucks, right?

4    Because the dude still hasn't paid the money for Sinzon and

5    there was 100 bucks that we sent two times to, a hundred to

6    (unintelligible), then the other dude was the one that asked

7    me, please give me 50 pesos, the same deal and because Duke'

8    gave me 40 during the day."

9         Mr. Sanchez, do you know who Sinzon is?

09:38AM 10   A.   He was a member of the Eastsides.

11   Q.   Do you know why Playa was talking about giving him money?

12   A.   Because he wanted to come to the United States.

13   Q.   Okay.  And what else is Playa doing here, he's talking

14   about owing people money?

15   A.   He was collecting the money.

16   Q.   Okay.  And on page 2, please, toward the bottom.

17         Playa says, "We need to help the dudes directly rather

18   than through the program."

19         Then Risa:  "About that issue with the money, I don't

09:39AM 20   know.  It has not been explained clearly to me.  I mean --"

21         Casper:  We are to give 30 bucks each time we meet."

22         Checha:  "Every time a dude gets deported, we give

23   $100 to help him."

24         Risa:  "And that is for when the dude is locked up?"

25         Casper:  "Uh-huh, no, for when I told you.  I said to

1    help the dudes who have family here, near where they're locked

2    up, to give money to his wife, to his family, once in a while

3    to put money in his canteen, or to send it to (unintelligible),

4    or to use it for (unintelligible).  It's Roca's decision."

5          Playa:  "That money is there in case there is a cheap

6    gun around or something.  We need it."

7    Q.    Who is Risa?

8    A.    He was the one that was jumped in.

9    Q.    You said that person's name was Extrano, though?

09:40AM 10    A.    Yes, but he was called Risa at the previous clique that he

11    belonged to.

12    Q.    And he took a new name when he jumped into your clique?

13    A.    Yes.

14    Q.    So what are Casper and Playa and Checha talking to Risa

15    about in that passage we just read?

16    A.    About the amount of money that's given each time that we

17    meet.  And that each time a homeboy is deported and needs money

18    to come back, each homeboy gives $100.

19    Q.    And you also -- when Playa says, "We can use that money

09:41AM 20    for a gun"?

21    A.    Yes.

22    Q.    Mr. Sanchez, you also said earlier you were present when

23    other members of your clique were beaten for not following

24    clique rules?

25    A.    Yes.

1              MS. LAWRENCE:  Okay.  Can we have Exhibit 20.

2    Q.   Mr. Sanchez, there was a clique beating on January 25,

3    2014.  Did you review a recording of this meeting prior to your

4    testimony here today?

5    A.   Yes.

6    Q.   And were you present for this meeting?

7    A.   Yes.

8              MS. LAWRENCE:  Page 3.  We're on tab 20 now in the

9    binder on page 3, please.  We're going to start at the top of

09:42AM 10   the page.

11             Casper:  "Another issue I wanted to discuss is the

12   issue with cocaine.  You said that the coke use was going to

13   stop to an indefinite date.  I felt bad because the dude was

14   telling me that it had been said that it was just for two

15   months.  We're going to fix that issue here, because I know the

16   dudes who used the cocaine.  Chentino, get in the center.  The

17   rules impose it on you.  Now comes the issue.  You, Chentino,

18   did you do it?"

19             Chentino:  "Yes."

09:43AM 20             Casper:  "There are rules, homeboy.  If you fucked up,

21   you fucked up, so into the middle for a beating."

22             Casper:  "Ready?  1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

23   12, 13.  Stop."

24   Q.   Mr. Sanchez, what do you understand Casper to be talking

25   about there with Chentino?

A.   We had said a rule that people weren't allowed to use

cocaine.

Q.   And Chentino did use cocaine?

A.   Yes.

Q.   So what happened to him?

A.   He was corrected.

Q.   And the counting?  Was he corrected by a beating?

A.   Yes.

Q.   Okay.  Were you ever beaten for using cocaine?

A.   The same day.

Q.   Okay.  Before we talk about that, I want to read a little

bit more down the page that we were just reading on page 3.

        Muerto:  "Everyone talks big, but when it's time to go

out to the street to do something, no one shows up.  That

pisses me off."

        Tigre:  "No one is in the street."

        Muerto:  "Here, we are thinking about things like

that, dude.  Everyone has to participate at the party, dude.

There's nothing more important than going out like that in the

street."

        Casper:  "No one has made rules that we all have to go

every day into the street like that.  We all have to go out,

but on different days.  So everyone goes out, but they go out

on different days.  We can't go out in groups."

        Casper:  "How are you to know who's going out and who

1    isn't?"

2           Muerto:  "Fuck, that's the first thing I'm going to

3    find out, dude."

4           Casper:  "I also know who goes out and who doesn't.

5    But I do.  Like I'm telling you, I go out with them and to get

6    drunk, too.  I know who goes out and who doesn't."

7           Chacon:  "It looks bad that Flaco just comes to talk

8    at meetings, but --"

9           Playa:  "Look, Flaco, try to get out in the street

09:45AM 10   more.  I'm out in the street all the time, and all the dudes

11   know that."

12          Mr. Sanchez, what do you understand -- what were you

13   discussing during this part of the meeting?

14          MR. MURPHY:  Objection, your Honor.

15          THE COURT:  I'll allow him to give his interpretation

16   of the conversation.  He was present.  Overruled.

17   A.   This is when I was kicked by -- people that beat me were

18   Flaco and Chamuco, and we were talking about that they hardly

19   go out on the weekends.  They just come to meetings to kick

09:46AM 20   homeboys and Muerto is saying that people have to go out.

21   Q.   Okay.  What is your understanding of what Casper meant

22   when he said, "Everybody goes out, but they go out on different

23   days, we can't go out in groups?"  What was he talking about?

24          MR. MURPHY:  Objection.

25          THE COURT:  Overruled.  I'll give you a standing

1    objection to this.

2              MR. MURPHY:  Thank you, your Honor.

3              THE INTERPRETER:  I'm sorry.  Could you repeat the

4    question?

5    Q.    What do you understand Casper to have meant when he said,

6    "So everyone goes out but on different days?"

7    A.    That we would go out on weekends to different bars in

8    different groups.

9    Q.    Okay.  And when Casper says, "I also know who goes out and

09:47AM 10   who doesn't," what do you know -- how did Casper know?

11   A.    All the homeboys had to keep reporting to the runners.

12   Q.    All right.

13             MS. LAWRENCE:  Could we have Exhibit 28, please.

14   Q.    This is another transcript, tab 28 in the binder.

15   Mr. Sanchez, this is a clique meeting on October 24, 2015.  Did

16   you review the recording of this meeting prior to your

17   testimony today?

18   A.    Yes.

19   Q.    Okay.  I'm going to start reading on the first page

09:47AM 20   towards the bottom.

21             Casper:  "Pay attention, dudes.  We're going to

22   discuss the problem, homeboys.  To begin with, if someone

23   calls, it's not necessary to keep on talking on the phone.  The

24   less we talk about the same subject, the better.  So we will

25   make one single call.  The person calls you and tells you what

1    time to come and go and that's all.  We already know at what

2    time it is.  Then we have a problem with this.  You know, what

3    you're getting."

4              Master:  "Yes."

5              Casper:  "This dude is getting the beating, dudes.  We

6    had ordered him to be on the wagon, and he failed, as you all

7    know, dudes.  So I don't know what decisions you will make

8    after you give this dude the beating, if he will continue the

9    same or what, but that we will decide after the beating.  We

09:48AM 10   will talk about the subject, because I will go over point by

11   point, you know."

12             Master:  "You also have a beating, dude.  The dudes

13   sentenced you with that for disappearing.  A fucking lot of

14   time that we hadn't heard from you, doggie.  Whenever one is

15   out of touch, doggie, for more than a month, two months, dude,

16   then you've fucked up."

17             You were at this meeting, correct?

18   A.   Yes.

19   Q.   Okay.  Who was Casper talking about getting a beating for

09:49AM 20   falling off the wagon?

21   A.   To me.

22   Q.   Okay.  And who's Master?

23   A.   One of the members of Eastside.

24   Q.   And Casper ordered him to get a beating, too, for

25   disappearing?

1    A.    Yes, he had not reported for a long time.

2    Q.    Okay.

3          MS. LAWRENCE:  Could we have admitted Exhibit 29,

4    please.

5    Q.    This is a clip of the same meeting that we were just

6    talking about on October 24, 2015.  I'd like to play that,

7    please.

8          (Video played.)

9    Q.    Mr. Sanchez, who received the beating just then?

09:51AM 10   A.    Me.

11         MS. LAWRENCE:  Can we continue?

12         (Video played.)

13   Q.    And the second person who got the beating was Master?

14   A.    Yes.

15   Q.    Do you remember who beat you that day?  Do you remember

16   who beat you that day?

17   A.    Playa, Rebeldon, and Negro.

18   Q.    And do you remember who beat Master?

19   A.    Lobo, Checha.  That's all I remember.

09:54AM 20   Q.    Okay.  Mr. Sanchez, earlier you mentioned a meeting where

21   someone was punished for not helping a fellow homeboy.

22         THE INTERPRETER:  I'm sorry, could you repeat the

23   question?

24   Q.    You mentioned a meeting where you were present where

25   someone was beaten for not helping another homeboy?

1    A.    Yes.

2    Q.    And who was the person who was punished?

3    A.    Chentino.

4    Q.    Do you remember when that meeting was?

5    A.    No.

6    Q.    You said earlier that he was punished because he hadn't

7    come to someone's aid?

8              MR. MURPHY:  Objection, your Honor.

9              THE COURT:  Overruled.

09:55AM 10              MR. MURPHY:  Leading.

11              THE COURT:  It was from prior testimony, so overruled.

12    Q.    Why was Chentino punished at that meeting?

13    A.    For letting someone down because he didn't participate

14    with Brujo and Vida Loca when they asked him to.

15    Q.    When did they ask him to help?

16    A.    It was a problem that Vida Loca had with the guy that he

17    killed.  He had been present there and he had seen how

18    everything went down, and Vida Loca had said that he had told

19    him that the person that he later killed was a chavala.

09:56AM 20    Q.    And "he" in your sentence is Chentino that you're talking

21    about?

22    A.    Yes.

23    Q.    So Chentino was there, and he saw what was going on, and

24    Chentino didn't help Vida Loca?

25    A.    Correct.

1    Q.   Okay.  How did the clique decide to punish Chentino at the

2    meeting?

3              MR. LOPEZ:  Objection.

4              THE COURT:  Do you mean the form of the punishment?

5              MS. LAWRENCE:  No.

6    Q.   I mean, who at the meeting recommended that Chentino be

7    punished or asked that Chentino be punished?

8    A.   First Casper put it on the table and also Crazy was

9    brought in later to give his version.

09:57AM 10             MS. LAWRENCE:  Can I have admitted Exhibit 13, please.

11   Q.   Mr. Sanchez, who is this?

12   A.   Crazy.

13   Q.   Is this the Crazy you just referred to being at the

14   meeting?

15   A.   Yes.

16   Q.   And who is Crazy?  Why was he at your meeting?

17   A.   Because he was present when Vida Loca killed that guy.

18   Q.   Crazy was.  Is Crazy a member of your clique?

19   A.   No, he's from the Everett clique.

09:58AM 20             MS. LAWRENCE:  Could I have Exhibit 40, please.

21   Q.   Who is this, Mr. Sanchez?

22   A.   Vida Loca.

23   Q.   Was Vida Loca a member of your clique?

24   A.   No.

25   Q.   Do you know what clique he was a member of?

1    A.   Chelsea.

2    Q.   Okay.  So you said Casper put on the table that Chentino

3    should be punished, and Crazy was also there?

4    A.   Yes.

5    Q.   Crazy wanted Chentino to get a beating?

6    A.   Yes, he was in agreement.

7    Q.   Do you remember who did the beating?

8    A.   Chacon, Brujo, and Checha.

9    Q.   Mr. Sanchez, you testified earlier that some of the money

09:59AM 10   collected at clique meetings from ESLS members was used to buy

11   guns?

12   A.   Yes.

13   Q.   Did you talk about that at clique meetings?

14   A.   Yes, almost always.

15   Q.   Did the clique buy guns?

16   A.   Yes.

17   Q.   Why did the clique buy guns?

18   A.   To be armed and have protection.

19   Q.   Did you ever see or possess a clique gun?

10:00AM 20   A.   Yes.

21        MS. LAWRENCE:  Okay.  May I approach, your Honor?

22        THE COURT:  Yes.

23   Q.   Okay.  Mr. Sanchez, I'm showing you what has been marked

24   as Exhibit 69.  Do you recognize this?

25   A.   Yes.

```
 1    Q.    What is it?

 2    A.    It's a gun that I bought.

 3    Q.    Okay.  When did you buy it?

 4    A.    I bought it in December 2014.

 5    Q.    Was it your own personal gun?

 6    A.    I had it for a period of time.

 7    Q.    What happened after?

 8    A.    I had it on me while I was drunk, so I was like a crazy

 9    person, and I did not know what I was doing, so I took it to

10    the shop, and I was showing it around to everybody like an

11    idiot.  So Casper noticed that and he came and took it away

12    from me.

13    Q.    Do you know what happened after Casper took it away from

14    you?

15    A.    He kept it for a while.

16    Q.    And then what?

17    A.    Then a decision was made after Lobo had a problem with

18    some 18s at a bar.  He said that he had been shot at, and,

19    therefore, he needed something to protect himself with.

20    Q.    Did Lobo keep that gun?

21    A.    Casper gave it to him.

22    Q.    Okay.

23          THE COURT:  I'm sorry, can I get you to go back to the

24    podium?

25          MS. LAWRENCE:  Oh, yes.  Sorry.
```

1    Q.    Do you know how long Lobo had possession of the gun?

2    A.    Two or three months.

3    Q.    What happened after that?

4    A.    He went -- he took it into a bar in Chelsea and the police

5    saw him with it.

6    Q.    Did he keep it?  Did he keep the gun?  Did Lobo keep the

7    gun after the police saw him with it?

8    A.    No, they took it from him.

9    Q.    Okay.  What happens when a clique member loses a clique

10:03AM 10    gun?

11              MR. LOPEZ:  Objection.

12              THE COURT:  I'll allow him to testify as to his

13    understanding.

14    A.    It has to be that he did a hit or fired at a rival.  It

15    can't be that he's just like hanging, having it in his waist

16    and walking around like that.

17              MR. LOPEZ:  Motion to strike, your Honor, as

18    unresponsive to the question.

19              THE COURT:  Okay.  It is nonresponsive.  I'll strike

10:04AM 20    it.  Ask again, Ms. Lawrence.

21    Q.    After Lobo had the gun taken from him by the police, did

22    he replace that gun that he had lost and given a new one to the

23    clique?

24    A.    We had a meeting to discuss that.  He had to explain how

25    he had lost it.

         1    Q.   Okay.

         2    A.   And it was decided that he either had to pay for the gun

         3    or return it.

         4    Q.   Did he do either of those things?

         5    A.   He said he was going to replace it, and he brought a gun,

         6    but it didn't work.

         7    Q.   You said that was your gun originally.  Where did you get

         8    it?

         9    A.   I got it from a guy called Pelon.

10:05AM 10     Q.   Was that Pelon a member of the Eastside MS-13 clique?

        11    A.   No.

        12    Q.   Was there a member of the Eastside MS-13 clique named

        13    Pelon?

        14    A.   Yes.

        15    Q.   So you knew two people named Pelon?

        16    A.   Yes.

        17         MS. LAWRENCE:  Permission to approach, your Honor?

        18         THE COURT:  Yes.

        19    Q.   Showing you what's been marked as Exhibit 51, do you

10:06AM 20    recognize this?

        21    A.   Yes.

        22    Q.   What is it?

        23    A.   This is the gun that was bought by the clique.

        24    Q.   Okay.  And how did the clique get this gun?

        25    A.   Through Negro.  He had a friend that was selling it.

1   Q.   And who --- had you ever used that clique gun for any

2   hits?

3   A.   I had it one time when I was going to go and murder -- I

4   was going to go with Animal to get Gallo.

5   Q.   Who is Gallo?

6   A.   A member of the 18th Street gang.

7   Q.   When -- how did you get the clique gun?  Who had it?

8   A.   Muerto.

9   Q.   And did you murder Gallo?

10:07AM 10   A.   No.

11   Q.   What did you do with the gun after your mission?

12   A.   I returned it to Muerto.

13        MS. LAWRENCE:  Okay.  May I approach, your Honor?

14        THE COURT:  Yes.

15   Q.   Mr. Sanchez, I'm showing you Exhibit 82.1.  Do you

16   recognize this?

17   A.   Yes.

18   Q.   What is it?

19   A.   That's Caballo's gun.

10:08AM 20   Q.   Was this Caballo's own gun or a clique gun?

21   A.   It was his personal gun.

22   Q.   Do you know where he got it?

23   A.   Through Checha.

24        MS. LAWRENCE:  May I approach again, your Honor?

25        THE COURT:  Yes.

```
 1              MR. IOVIENO:  Judge, can we approach sidebar briefly?
 2              THE COURT:  Yes.
 3              (THE FOLLOWING OCCURRED AT SIDEBAR:)
 4              MR. IOVIENO:  Your Honor, I understand the government
 5         is putting in this gun evidence, but I would instruct a
 6         limiting instruction once again.
 7              THE COURT:  Okay.  I've given it twice.  I'm going to
 8         give it at the end of the trial.  I think that's enough.
 9              MR. POHL:  Thank you.
10:08AM 10      (SIDEBAR CONFERENCE WAS CONCLUDED)
11         Q.   Mr. Sanchez, this is marked as Exhibit 46.1.  Do you
12         recognize that?
13         A.   Yes.
14         Q.   What is it?
15         A.   That's a .380 gun.  I was with Crazy in Lawrence, and I
16         introduced him to the guy who sold it to me.
17              THE COURT:  I'm sorry, what exhibit number was that?
18              MR. POHL:  46.1, your Honor.
19              THE COURT:  Thank you.
10:09AM 20      MS. LAWRENCE:  I'm sorry, I didn't hear the end of
21         the --
22         A.   It's a gun -- it's a .380 gun.  It was with Crazy in
23         Lawrence, and the guy that sold it to Crazy also had shown it
24         to me and asked me if I wanted to buy it.
25         Q.   Okay, but Crazy bought it instead of you?
```

1   A.   Yes.

2   Q.   Okay.  Mr. Sanchez, I'd like to turn your attention to

3   December 27, 2015.  Did you go out on a mission to find rival

4   18th Street members that day?

5          MR. MURPHY:  Objection.  Leading.

6          THE COURT:  Sustained in that form.

7   Q.   Okay.  What do you remember happening that day on

8   December 27, 2015?

9   A.   I called Animal to hang out for a while, and afterwards I

10:10AM 10  told him to come out with me to look for culeros.

11  Q.   Okay.  Could I have -- did you and Animal go alone, just

12  the two of you?

13  A.   No, he called the kids that were with him as well.

14  Q.   Do you know who those kids were?

15  A.   Yes.

16  Q.   Who were they?

17  A.   Luis, David, and Sergio.

18  Q.   Were they MS-13 members?

19  A.   No.

10:11AM 20  Q.   Who were they?

21  A.   They were in observation.

22  Q.   With your clique?

23  A.   At that time, we were discussing that with the clique.  We

24  wanted to bring them into the clique.

25  Q.   Before we go further into the events of December 27, I

```
 1      would like to ask you when did you first meet Animal?

 2      A.    October of 2015.

 3      Q.    Do you remember who introduced him to you?

 4      A.    Brujo.

 5      Q.    And what did you know about Animal when you met him or

 6      what did you learn?

 7                 MR. MURPHY:  Objection, your Honor.

 8                 THE COURT:  Sustained.

 9      Q.    At the time that you met Animal, was he a member of MS-13?

10      A.    He hadn't been jumped in yet.

11      Q.    Okay.  Was he hanging around with your clique?

12      A.    Yes.

13      Q.    When you met him in October he was -- or later?

14      A.    It was later.

15      Q.    Okay.  What clique was he hanging out with before yours?

16      A.    With the Everetts.

17      Q.    Okay.  And at some point did Animal become a homeboy in

18      the Eastside clique?

19      A.    Yes.

20      Q.    Who invited him to join?

21      A.    It was through Pelon and Muerto.

22      Q.    Okay.  and who decided in the end whether he would be made

23      a homeboy?

24                 MR. MURPHY:  Objection, your Honor.

25                 THE COURT:  Overruled.
```

1  A.    We had a meeting with Casper and Playa and everyone in the

2  clique.

3  Q.    You were at that meeting when you talked about Animal

4  becoming a homeboy?

5  A.    Yes.

6  Q.    And why did you make Animal -- why did you decide to make

7  Animal a homeboy?

8          MR. MURPHY:   Objection, your Honor.

9          THE COURT:   Why don't you rephrase.   It was a group

10:14AM 10  meeting?

11          MS. LAWRENCE:   Group meeting.

12  Q.    What did the clique members -- you were present for the

13  meeting?

14  A.    Yes.

15  Q.    You heard other members of your clique talking about

16  making Animal a homeboy?

17  A.    Yes.

18  Q.    What is your understanding of the reasons why your clique

19  had decided to make Animal a homeboy?

10:14AM 20          MR. MURPHY:   Objection, your Honor.

21          THE COURT:   Overruled.

22  A.    For the hit he had carried out in East Boston.

23  Q.    All right.   I'd like to go back to December 27, 2015.

24          MS. LAWRENCE:   Can I have Exhibit 111, please, in

25  evidence.

1    Q.   You said you were with Animal and you wanted to go out and

2    look for 18th Street members.  Where did you start that day?

3    Where were you when you met with Animal?

4    A.   I invited him over to the house.

5    Q.   And where did you go after you left your house?

6    A.   We went to Everett Avenue.

7    Q.   Okay.  And do you recognize the area depicted on this map?

8    A.   Yes.

9    Q.   Is Everett Avenue on this map?

10:15AM 10   A.   Yes.

11   Q.   And is that the place that you were that day with Animal?

12   A.   Yes.

13   Q.   So you can point on the screen to show us where you were

14   and where you walked with Animal that day.

15   A.   With my finger?

16   Q.   Yes, please.

17   A.   We were at this street.  We went to Third and went into

18   Cherry Street, and at this point we met up with Luis and David,

19   and there we saw another guy from the 18th Street gang, so we

10:17AM 20   flashed the MS sign, and we said, "Here is Mara Salvatrucha,"

21   so the guy went and locked himself in the house again.  We went

22   back to Third Street.  At the corner with Broadway, we split.

23   Q.   Just a moment there.  Where did you split?  What did you

24   mean by split?

25   A.   Right at the corner of Broadway and Third.

1    Q.    And how did you split up?

2    A.    Animal went with Luis and David, and I remained behind

3    with Sergio.

4    Q.    Were you on the same side of the street?

5    A.    Yes.

6    Q.    So one group slightly ahead and one behind?

7    A.    Yes.

8    Q.    Why did you do that?

9    A.    So that we wouldn't call attention to ourselves as a large

10:18AM 10   group.

11   Q.    Okay.  What time of day was this, do you recall?

12   A.    It was 4 p.m.

13   Q.    Okay.  So can you continue to show us on the screen where

14   you went from the corner of Broadway and Third Street.

15   A.    Around this point, I saw that Animal flashed MS to some

16   people that were at this other, point and Animal started

17   chasing them, as did I, and I told the others to follow.

18         At this point here, Animal caught him and beat him

19   with a chain that he had in his backpack.

10:19AM 20   Q.    Did you also beat him at that point?

21   A.    Not at that point.

22   Q.    What happened next?

23   A.    I went by him and said that we should follow him, that we

24   had to beat him.

25   Q.    I'm sorry, did he -- Animal hit him with the chain.  But

1    did he get away, is that what you mean?

2    A.    Yes.

3    Q.    Okay.  So you followed him and then what happened?

4    A.    He turned at this corner and stopped at this building and

5    knocked at the door.

6    Q.    Did he go inside?

7    A.    No, at that point Animal caught him again and started

8    beating him again.

9    Q.    Did you beat him at that point?

10:20AM 10   A.    Yes.

11   Q.    What else happened to that person you were beating?

12   A.    He got away from me under my hand.  He was a small guy, so

13   he crossed the street at this corner.  And at that corner, Luis

14   arrived and lifted him up like this with his hand.  He stopped

15   him, and all of us beat him.  I hit him on the head, and we

16   were all beating him.  I saw that the guy was on the floor, on

17   the ground.

18   Q.    Did you kill him?

19   A.    No, but he looked like he was in bad shape.

10:21AM 20   Q.    Did you stop beating him?

21   A.    Yes.

22   Q.    Why?

23   A.    There were a lot of people around.  It was early in the

24   day.

25   Q.    What did you do when the people arrived?

1    A.   We crossed Hawthorne Street, and there were people staring

2    at us, so we went into this building.

3    Q.   Did you stay there?

4    A.   I stayed there for one minute, but I noticed that there

5    were a lot of police were arriving, so I told them that we

6    should leave and go through Chelsea Street.

7              THE INTERPRETER:  I'm sorry, not Chelsea, Chester

8    Street.

9    Q.   And did you leave?

10:22AM 10   A.   I left with Animal and we went into that market.

11   Q.   What happened to the other guys, David, Luis and Sergio?

12   A.   As we left, we saw that the police was knocking at the

13   door where they were.

14   Q.   Do you know what happened to them after that?

15   A.   They were arrested.

16             MS. LAWRENCE:  Okay.  Can I have Exhibit 105.1,

17   please.  It's in evidence.

18             THE CLERK:  What was it?

19             MR. POHL:  105.1.

10:23AM 20             MS. LAWRENCE:  It's just for the witness, sorry.

21   Q.   Mr. Sanchez, do you recognize the person in this

22   photograph?

23   A.   David.

24   Q.   Is this the David that you were with on December 27, 2015?

25   A.   Yes.

1           MS. LAWRENCE:  I move to admit 105.1, please.

2           THE COURT:  All right.  It's admitted, 105.1.

3           (Exhibit No. 105.1 received into evidence.)

4           MS. LAWRENCE:  Can I publish it to the jury, please.

5    Q.   And again, Mr. Sanchez, the individual in the photograph

6    is who?

7    A.   David.

8           MS. LAWRENCE:  Okay.  May I have 105.2 for the

9    witness, please, and 105.3 for the witness.

10:24AM 10   Q.   Do you recognize the person in these two photographs?

11   A.   Luis.

12   Q.   Is this the same Luis you were with on December 27, 2015?

13   A.   Yes.

14          MS. LAWRENCE:  Your Honor, I move to admit Exhibits

15   105.2 and 105.3 into evidence.

16          THE COURT:  All right.  They're admitted.

17          (Exhibit No. 105.2 and 105.3 received into evidence.)

18   Q.   Okay.  And these two photographs, Mr. Sanchez, are

19   photographs of who?

10:24AM 20   A.   Luis.

21   Q.   Okay.  Mr. Sanchez, I think you said earlier, but I want

22   to make sure.  Did you report this attempted murder that you

23   committed with Animal to anyone after you did it?

24          MR. MURPHY:  Objection, your Honor.

25          THE COURT:  Sustained.  Rephrase.

1    Q.   Did you tell anyone about what you did with Animal after

2    you did it?

3    A.   Yes.

4    Q.   Who did you tell?

5    A.   First we went to Mecha's house.

6    Q.   Who is Mecha?

7    A.   He's a member of the Everett clique.

8    Q.   Okay.  Did you tell anyone other than Mecha?

9    A.   And Enano.

10:25AM 10    Q.   Who's Enano?

11    A.   A member of the Everetts.

12    Q.   And anyone else?

13    A.   The following day, I informed Casper.

14    Q.   And when you informed Casper, what did you tell Casper?

15    A.   That we had beaten up a chavala on Broadway in Chelsea.

16    Q.   Why did you tell Casper about this?

17    A.   Because one has to tell the things that one does to one's

18    runners.

19    Q.   I think you said earlier that you met Animal through

10:26AM 20    Brujo; is that right?

21    A.   Yes.

22    Q.   Do you know, did you see Animal and Brujo spending time

23    together?

24    A.   Yes.

25    Q.   Do you know if Animal and Brujo went out to attack

```
 1    chavalas like you did with Animal?

 2              MR. MURPHY:  Objection, your Honor.

 3              THE COURT:  He can testify as to what they said, if it

 4    was disclosed, but he wasn't there.

 5    Q.    Did Brujo or Animal tell you about any attacks on rival

 6    gang members that they committed?

 7    A.    Yes.

 8    Q.    Do you know when that -- well, what did they tell you?

 9    A.    On January 1, 2016, we were at the house of the owner of

10:27AM 10   the garage, we gathered there to eat and to drink beer, and

11    that's when Brujo told me what they had done, that they had

12    stabbed a guy on Chestnut.

13    Q.    Okay.  Was it just any guy?

14    A.    No, an 18.

15    Q.    Okay.  Mr. Sanchez --

16              MS. LAWRENCE:  Could I have the document camera for

17    the witness, please, Madam Clerk.

18    Q.    This disk, which is marked Exhibit 218 is a recording made

19    on January 1, 2016.  Mr. Sanchez, did you review this recording

10:28AM 20   before you came to court to testify today?

21    A.    Yes.

22    Q.    And did you mark that recording with your initials?

23    A.    Yes.

24    Q.    When you listened to that recording, did you go through

25    the process that we talked about earlier listening to the
```

1    voices and talking with the interpreter about who was speaking?

2    A.   Yes.

3          MS. LAWRENCE:  Your Honor, the disk that's been marked

4    as Exhibit 218 goes with the transcript that's been marked

5    Exhibit 114.  At this time I move to admit Exhibit 114 into

6    evidence.

7          THE COURT:  Exhibit 114 is admitted.

8          MR. MURPHY:  Standing objection, your Honor?

9          THE COURT:  Yes, overruled.

10:29AM 10          (Exhibit No. 114 received into evidence.)

11   Q.   Okay.  Mr. Sanchez, this is a disk of a recording made on

12   January 2, 2016.  It's marked as Exhibit 219 for

13   identification.  Did you review this recording before you came

14   to court today?

15   A.   Yes.

16   Q.   And did you mark your initials on this disk after you

17   reviewed it?

18   A.   Yes.

19   Q.   And when you listened to the recording, did you tell the

10:30AM 20   interpreter who was present, who was speaking and what was

21   being said?

22   A.   Yes.

23          MS. LAWRENCE:  Your Honor, this disk, the recording on

24   this disk, 219 --

25          THE COURT:  I thought you said 218.

1          MS. LAWRENCE:  That was the prior one.  This is 219,

2     I'm sorry, goes with the transcript that's been marked as

3     Exhibit 115, and I'd move to admit Exhibit 115 now.

4          THE COURT:  All right.  It's admitted, 115.

5          (Exhibit No. 115 received into evidence.)

6          THE COURT:  Why don't we take our break?

7          MS. LAWRENCE:  Yes.

8          THE CLERK:  All rise.

9          (JURORS EXITED THE COURTROOM.)

10         (A recess was taken.)

11         (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

12         THE COURT:  All right.  Quickly, on the December 17,

13    2015 transcript that we were talking --

14         (SIDEBAR CONFERENCE WAS CONCLUDED.)

15         THE COURT:  You can take the witness out.

16         (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

17         THE COURT:  The transcript of the December 17, 2015

18    recording, the selected portion of the transcript is three plus

19    pages long.  It's an excerpt from longer meetings.  Standing

20    alone, the excerpt is not difficult to understand, and if it

21    were simply standing alone, I think any unfair prejudice would

22    be quite minor.  Of course, it is part of a larger recording,

23    and if -- the defense should have a fair opportunity to listen

24    to the context, examine the translation and so forth.

25         What basically happened here is the government

1    produced voluminous recordings, all of which were in Spanish.

2    They were required by various court orders to produce

3    recordings, preliminary transcripts, final transcripts,

4    identify exhibits and so according to various timetables.

5           My understanding is this excerpt was not identified as

6    an exhibit.  It was produced as a recording.  No preliminary

7    transcript was produced.

8           Apparently what I think is a form 1023, it's like a

9    302, was produced kind of summarizing the recording, and my

10   understanding on February 5th, which was 10 days ago, counsel

11   for Guzman, not Mr. Murphy, provided notice that he might want

12   to use a different part of that transcript.  And it was not, in

13   fact, used, and the government three days later on February 8th

14   provided it's own notice that it was going to use the disputed

15   excerpts, all that by way of background.

16          Certainly, we have -- I have a strong preference for

17   the truth, that is, to permit all relevant and admissible

18   evidence to be heard.  There are also countervailing interests

19   of fairness and an orderly procedure that need to be observed,

20   and that's particularly true in a case of this complexity.

21          As a general proposition, the government not having

22   identified it as a potential exhibit, they cannot use it in

23   their case in chief.  The question is really whether they can

24   use it in rebuttal, and rebuttal has a lot of different

25   meanings in this context.

1          It could mean in response to an actual defense case.

2     That is, the government puts on its case, the defense puts on a

3     case and the government rebuts.  That's one possible meaning.

4     Another is a redirect of a specific witness as to an issue

5     raised on cross-examination.  That's a second interpretation.

6     Or a third interpretation is a response to issues raised in

7     opening statements and in cross-examination generally.

8          Here, I think there's no real question that the

9     defendants or some of them have clearly stated or suggested in

10:34AM 10    their openings and their cross that defendants were unhappy

11    with the East Coast Program, either wanted out or didn't want

12    to join, and that they were older men who were not, in some

13    fashion or another, buying into MS-13 or wanted to be calmados

14    or otherwise have a lesser involvement with the gang.

15          This, I think, is directly responsive to that.  There

16    is certainly a good argument that in the broader sense this is

17    rebuttal, so it's a more complicated issue to me than it

18    otherwise might appear.

19          What I'm going to do is this:  I'm going to at least

10:35AM 20    in the first instance adhere to the requirement that the

21    government, not having identified it in its case in chief,

22    can't introduce it in its case in chief, by which I mean with a

23    witness on direct examination.

24          It's not entirely clear to me that that ruling is

25    correct, but I'm going to so hold.  As an aside, for the sake

1    of efficiency, I will permit them to authenticate the

2    transcript in the sense of asking the witness to identify the

3    voices and so on, which, of course, can be done without

4    revealing the content, and that's strictly an efficiency

5    standpoint so that if this witness is the identifying or

6    authenticating witness, we don't have to bring him back.

7         Clearly, if this issue is raised on cross with this

8    witness, the door is opened, and I think it can be rebutted.

9    If a different witness either on cross or called by the defense

10:36AM 10   opens the door, I think this can be admitted in rebuttal, and

11   I'm going to leave the door ajar even if there's no further

12   door opening by the defendants.  I'm going to decide before the

13   government rests whether it should come in based on what has

14   happened thus far.

15        I'm not entirely sure what the appropriate response

16   is, again, given the defense arguments and cross-examination,

17   but effectively I'm going to defer that decision, so this is

18   something of a cobbled together solution here.

19        But, in short, I will not permit the government to

10:37AM 20   elicit testimony about this transcript from this witness on

21   direct except to the extent necessary to authenticate voices,

22   again, for the sake of efficiency only in case it does come in.

23        And, clearly, it seems to me if the defense raises

24   these issues on cross with this witness or another witness or

25   through a defense witness on their own direct that that may

1       open the door, and this is allowable, and I'll make a final

2       decision before the government rests.

3              Okay.  Ms. Lawrence.

4              MS. LAWRENCE:  I'd like to clarify that prior to

5       producing -- offering this transcript specifically, the

6       government did put on its exhibit list a transcript of a

7       recording made on January 2, 2016, when the witness who is on

8       the stand now talking to Muerto says, "We're part of the --

9       we're running with the Hollywoods now, right?  Remember, we

10:38AM 10   talked about it at the meeting."  I had always intended to ask

11      that witness what he meant by that.

12             THE COURT:  Well, if it's on your list, it's on your

13      list, and --

14             MS. LAWRENCE:  I just want to be clear that that's

15      proper to do without --

16             THE COURT:  Yes.  And it's one of the reasons -- the

17      reason I'm leaving the door ajar is I don't know whether this

18      is cumulative.  I don't know, you know, what else is going to

19      be suggested by other direct or cross.  I want to wait until

10:38AM 20   the end and make a final decision, but, you know, we do have

21      the rule, you're supposed to disclose your exhibits as part of

22      your case in chief.  Your direct examination is your case in

23      chief, and I'm -- at least at this stage, I'm going to enforce

24      that rule.

25             MS. LAWRENCE:  Thank you.

1          THE COURT:  Okay.  Let's take a break.

2          THE CLERK:  All rise.

3          (A recess was taken.)

4          THE CLERK:  All rise for the jury.

5          (JURORS ENTERED THE COURTROOM.)

6          THE CLERK:  Thank you.  You may be seated.  Court is

7     now back in session.

8     Q.    Okay.  Mr. Sanchez --

9          MS. LAWRENCE:  Could I have the document camera for

10:52AM 10   the witness, please.

11    Q.    -- I'm showing you a disk of a recording made on

12    January 2, 2016.  It's been marked for identification as

13    Exhibit 220.  Did you review this recording and use the process

14    that we described earlier to identify the voices for the

15    interpreter?

16    A.    Yes.

17    Q.    And are those your initials on the disk, sir?

18    A.    Yes.

19         MS. LAWRENCE:  Okay.  Your Honor, Exhibit 220, the

10:53AM 20   recording goes with the transcript that has been marked as

21    Exhibit 116, and I'd like to move Exhibit 116 into evidence

22    now.

23         THE COURT:  Okay.  It's admitted.

24         (Exhibit No. 116 received into evidence.)

25    Q.    And Exhibit 228 is a disk that has been marked for

1   identification.  It contains a recording made on December 17,

2   2015.  Did you listen to this recording and identify the voices

3   for the interpreter using the process we described earlier?

4   A.   Yes.

5          MS. LAWRENCE:  Your Honor, the recording on

6   Exhibit 228 goes with the transcript that has been marked for

7   identification as 127.

8          THE COURT:  All right.  Are you offering 127?

9          MS. LAWRENCE:  Not at this time, your Honor.

10:54AM 10  Thank you.

11         Could I have Exhibit 114 on the screen, please.

12  Q.   Mr. Sanchez, we're going back to the recording made on

13  January 1, 2016 that we just talked about briefly.  I'm going

14  to read just a portion and then ask you some questions about

15  that.

16         THE INTERPRETER:  Which transcript?

17  Q.   This is on page 1 and we are on tab 114.  114 in your

18  binders.  Starting with Animal:

19         "What's up is that we want to report a hit, doggie."

10:55AM 20  CW-1:  "What the fuck happened?"

21         Animal:  "Brujo, and I just did an awesome hit, dog."

22         CW-1:  "What do you mean?"

23         Animal:  "That we got a chavala with Brujito.  We got

24  off a truck and we got out to stab a chavala, and there is

25  evidence here that we stabbed him, dude."

1          CW-1:  "So what happened?  What do you mean?"

2          Animal:  "We got a chavala, doggie.  I was holding

3     him, doggie, and dangling him while the homeboy stabbed with a

4     knife, and when the culero tried to run, he would scream and

5     hang on him, and this homeboy would lunge at him with the knife

6     and here is the evidence here.  I have the knife and here is of

7     the blood, doggie."

8          CW-1:  "Where are you guys?"

9          Animal:  "We're making some soup here with the Mara

10:55AM 10     family, dog.  Celebrating, dog."

11          And then I'm going to continue down toward the middle

12     of the page starting with Brujo.

13          Brujo:  "Hey, Pelon, Pelon."

14          CW-1:  "What's up, dude?"

15          Brujo:  "I struck that son of a bitch with a knife

16     and --"

17          Animal:  "I captured him and tied him up and set him

18     up for him and then the homeboy lunged at him with the blade,

19     dog.  For real, dog."

10:56AM 20          Mr. Sanchez do you know what Animal and Brujo are

21     talking about in this recording?

22     A.    Yes.

23     Q.    What are they talking about?

24     A.    They're talking about what they also told me when we met

25     with them.  I was at that meeting.

1   Q.   And when Animal says, "We're making some soup here with

2   the Mara family," is that what you were talking about earlier

3   when you were getting together to have dinner?

4   A.   Yes.

5          MS. LAWRENCE:  Okay.  Could I have Exhibit 115,

6   please.

7   Q.   I'd like to read part of this transcript and I'll be

8   starting on page -- sorry, 5.  Thank you.

9          CW-1:  "So who got wet, Brujo?"

10:57AM 10          Animal:  "I was killing him, punching and kicking and

11   I would drag him and leave him in the middle of the street

12   where the cars were.  Then Brujo arrived with everything with a

13   knife and he went and the guys blood."

14          CW-1:  "That's awesome.  Was it just you and Brujo or

15   were the other homeboys, there, too?"

16          Animal:  "Chico, Vago, and Luis."

17          CW-1:  "Luis was there, too?"

18          Animal:  "Yes.  When Luis I want to see, but there was

19   someone who came with everything, too.  Oh, and we got that guy

10:57AM 20   there who was attacked and said I told you that the Mara and

21   the guy was saying I've had it for years, that apparently was

22   when --"

23          CW-1:  "That's how you know that Luis was activated

24   already."

25          Animal.  "That's right.  The day we were out with

1   Tigre he was the one who knocked the guy down."

2          CW-1.  "We'll see if Luis has already done stuff, too,

3   you know, maybe everyone will get in."

4          Animal:  "Brujo told Luis that yes.  That he didn't

5   think there would be a problem and that he should and

6   everything.  Yes, no problem he told me.  That dude told him

7   there that if a dude asked him what's going on, quote 'tell him

8   that there's no problem, that I told you to jump in.'"

9          CW-1:  "That's good because if there were homeboys

10:58AM 10   that saw what happened, they'll know what's going on, you

11   know?"

12          Animal:  "Yes, and Chico, too."

13          CW-1:  "Because I -- if he reports to me quickly, then

14   I'll report it and like that, you know, and say it was like

15   this and like this.  I'll tell Muerto, and after Muerto, and I

16   say it, it's done, you know.  No one can accuse you of any

17   bullshit."

18          Turning the page.

19          Animal:  "Yes.  So, Vago, Brujo, and Chico were

20   there."

21          CW-1:  "That's awesome, because with Tigre there was

22   some doubt, but after Tigre said yes, then it's the guy's word,

23   you know."

24          Animal:  "Yes."

25          All right.  The first question I have, Mr. Sanchez,

CW-1 starts off by asking, "So who got wet?"

        THE INTERPRETER:  Who got what?

Q.   Wet.  What does that mean to you?

A.   That means to also participate.

Q.   Okay.  In what, participate in what?

A.   In a hit.

Q.   Okay.  And down at the bottom, CW-1 is talking about after Muerto, "And I say it, it's done, you know."  What does that mean, "it's done?"

        MR. MURPHY:  Objection, your Honor.

Q.   What do you understand it's done to mean?

        THE COURT:  I'll allow it.  Overruled.

A.   At that time, they wanted to separate from the Eastside, from the Mara Eastside.  They wanted to do things their way, so because Muerto is a solid member of MS-13, the other dudes would not oppose it.

Q.   And on the next page, when you say with Tigre, there was some -- I'm sorry, not you say.  It is said, "Tigre, there was some doubt, but after Tigre said yes, then it's the guy's word, you know."

        What do you understand that to mean?

A.   I spoke the next day with Muerto and Pelon about what I had done with Animal and I told them the guy had stood up well and that he would be a good homeboy to jump in.

Q.   The guy being Animal?

```
 1    A.   Yes.
 2    Q.   And so do you understand this to be saying that if you
 3    stand up and say that and Muerto and Pelon do, too, then he
 4    would become a homeboy in your clique?
 5              MR. MURPHY:  Objection, your Honor.  Leading.
 6              THE COURT:  Sustained.
 7    Q.   Do you know why -- do you know why Animal and CW-1 are
 8    talking about Luis in this conversation?
 9              MR. MURPHY:  Objection.
10              THE COURT:  I'll sustain it in that form.
11    Q.   Can you tell me what you understand the phrase "activated"
12    means when they're talking about Luis?
13    A.   To make them homeboys.
14    Q.   But Luis, you said earlier, was not yet a homeboy; is that
15    correct?
16    A.   Yes.
17    Q.   And Luis was with you when you attacked a rival member,
18    gang member on December 27, 2015?
19              MR. MURPHY:  Objection, your Honor, leading.
20              THE COURT:  Overruled.
21    A.   Yes.
22    Q.   Okay.  And he was also with Animal when he did a mission
23    or did a hit?
24    A.   Yes.
25              MS. LAWRENCE:  Okay.  May I have Exhibit 116, please.
```

1    Q.    This is a transcript of a recording made on January 2,

2    2016, and you testified earlier that you had reviewed this

3    recording before you came to court today?

4    A.    Yes.

5    Q.    Were you present when this recording was made?

6    A.    Yes.

7    Q.    I'm going to read part of the transcript starting on page

8    2.

9           Tigre:  "There, like that, man.  The chavalas ran, and

11:03AM 10   we were chasing after them, homeboy.  You can imagine how I

11   looked little as I am, but I didn't give a shit, homie.  A huge

12   beast after those little culeros, but you can imagine."

13          CW-1:  "No, but they are real sons of bitches.  If you

14   are not careful, they will stab you."

15          Tigre:  "No, homie.  He had some shit in his hand and

16   with one kick, Animal kicked it out of his hand right away.  I

17   had the knife like that in my hand, dude, and when the woman

18   saw it, homeboy, police, police.  The burglar is going to kill

19   him she said.  There were a lot of fucking people, homeboy,

11:03AM 20   yelling it out there in front of all the people, homie.  Fuck,

21   but you know that he was left there all fucked up."

22          Muerto:  "That boy."

23          Tigre:  "And they picked him up there.  The ambulance

24   picked up that culero."

25          CW-1:  "Oh, yes."

1          Tigre:  "Precisely, homie.  He was beaten up, dude.

2    Homeboy, Luis, that kid, he had the knife like this, hidden

3    like this, dude.  He was going to like this, bloop, homeboy.

4    And I was -- when he was on the ground, I was hitting his head

5    with my foot, dude, I was saying, fuck, the Maras is here, son

6    of a bitch, you can imagine."

7          CW-1:  "You have to be careful, dude.  Because now,

8    like I said to Animal, they are going to put a price on Animal,

9    you'll see."

11:04AM 10        Tigre:  "That is exactly what I told him.  He is a

11   treasure."

12         Mr. Sanchez, in that conversation, are you referring

13   to the attack you described earlier that happened on

14   December 27, 2015?

15   A.   Yes.

16   Q.   Okay.  and what do you understand -- what did you mean

17   when you said that Animal is a treasure?

18   A.   That he had done a lot already, that he had killed a

19   chavala in East Boston and he had done that with me and he had

11:05AM 20   done some other things as well.  And he would tell me that he

21   had contact with and would message with culeros.  He would make

22   fun of them and say I really beat somebody up and they hadn't

23   done anything.

24   Q.   I'm going to continue reading on page -- I'm going to

25   continue reading on the bottom of page 3.

1    Tigre:  "And paros, solid paros from down below, from

2    the Hollywoods they come, and we are running with the

3    Hollywoods, homeboy.  We talked about that at the meeting.  You

4    remember, right?"

5    Muerto:  "Uh-huh."

6    Tigre:  "That we have to get paros, or get chequeos,

7    right?"

8    Muerto:  "That's what it's about, dude."

9    Okay.  What were you talking about with Muerto there

11:06AM 10    when you said we need to get paros and chequeos?

11    A.   I met two paros from the Hollywoods when I was hanging out

12    with the Everetts, and I told one of them to come by and hang

13    out with us, and he said no, he was fine with the Everetts, and

14    that is what I was referring to.

15    Q.   Okay.  And when you said we are running with the

16    Hollywoods, homeboy, we talked about that at the meeting.  What

17    did you mean by that?

18    A.   At that time we were out of the East Coast Program.

19    Q.   Who is "we"?

11:07AM 20    A.   That we had gotten -- that the Eastside had left the East

21    Coast Program.

22    Q.   And what -- you can continue.

23    A.   So the cliques always have to be affiliated with a

24    program.  A clique can't just run like that, just like that.

25    The program is like the high command of the MS.  For instance,

1    when somebody was deported like Eastside had Psycho and

2    Loquillo in El Salvador.  When they were -- when they were

3    found over there, they had to report from which clique they

4    were in order to get the protection, to be protected by the MS

5    down there.

6    Q.    Okay.  Why were you trying to recruit paros or chequeos

7    from the Hollywood or the Everett clique?

8    A.    To do more hits.

9    Q.    Why did you need paros and chequeos to do more hits?

11:09AM 10   A.    Because they're kids, they're young.  That want to be part

11   of the MS-13, and it's easier for them to move through the

12   streets than a person who's 30 years old.

13   Q.    Okay.  And you said earlier that Animal was under

14   observation?

15   A.    Yes.

16   Q.    By your clique?

17   A.    Yes.

18   Q.    And Luis and David, too, you were thinking about making

19   them members?

11:09AM 20        MR. MURPHY:  Objection, your Honor, leading.

21        THE COURT:  Overruled.

22   A.    Yes.

23   Q.    Okay.  And when you said you were recruiting paros from

24   the Hollywood, did you mean the clique, the Hollywood clique?

25   A.    No, just people that run with MS-13.  They're just doing

1   favors, and they don't say hello the same way that a homeboy

2   does.

3   Q.   Okay.  So the Hollywood is a program.  When you referred

4   to Hollywood, you meant program, not clique?

5   A.   Yes.

6   Q.   Okay.  Mr. Sanchez, did the Eastside Locos Salvatrucha

7   clique make Animal a homeboy?

8   A.   Yes.

9   Q.   When did that happen?

11:11AM 10   A.   I don't recall the date.  I wasn't present.

11   Q.   Why weren't you present?

12   A.   I was drinking with some other homeboys.

13          MS. LAWRENCE:  One moment, your Honor.

14   Q.   One more question, Mr. Sanchez.  When you said we are

15   running with the Hollywoods, was the Eastside clique part of

16   the Hollywood program?

17   A.   Yes, at that point we had discussed that several times at

18   meetings.

19          MS. LAWRENCE:  Okay.  All right.  Nothing further at

11:12AM 20   this time, your Honor.

21          THE COURT:  All right.  Cross-examination.  Mr. Lopez.

22          MR. LOPEZ:  Thank you, your Honor.

23                      CROSS-EXAMINATION

24   BY MR. LOPEZ:

25   Q.   Good morning, Mr. Sanchez.

1    A.   Good morning.

2    Q.   My name is Scott Lopez.  I represent Edwin Guzman.  And we

3    have never met before, right?

4    A.   No.

5    Q.   Now, when were you arrested in this case?

6    A.   January 29, 2016.

7    Q.   And I thought I heard you testify yesterday that you've

8    been in prison since you pled guilty in this case.  Is that

9    what you said?

11:13AM 10   A.   Yes.

11   Q.   But that's not true, right?

12   A.   I've been in jail since 2016 and I pled guilty the same

13   year.

14   Q.   But you said that you've been in prison since you've pled

15   guilty?

16   A.   That's how I understood the question, and that's why I

17   responded in that way.

18   Q.   But, in fact, you didn't plead guilty until September of

19   2016?

11:14AM 20   A.   Yes.

21   Q.   And you were arrested in January of 2016?

22   A.   Correct.

23   Q.   And you've been in jail since you were arrested?

24   A.   Yes, sir.

25   Q.   You were not let out on bail?

1    A.   No.

2    Q.   And before this case, had you ever been in jail before?

3    A.   No.

4    Q.   Do you recall how long you were in jail before you decided

5    to talk to the government?

6    A.   About two months.

7    Q.   Are you sure about that?

8    A.   Yes.

9    Q.   Was it more like two weeks?

11:15AM 10  A.   I'm talking about when I came to see them.

11   Q.   Do you recall when you signed your proffer agreement?

12   A.   I don't remember the date.

13   Q.   Well, do you remember entering into a proffer agreement?

14   A.   Yes.

15   Q.   But you don't remember the date?

16   A.   It was the first day that I came to see them.  I don't

17   remember the date.

18         MR. LOPEZ:  Your Honor, could I have the document

19   camera just for the witness?

11:16AM 20  Q.   Do you see what I've put on the Elmo?

21   A.   Yes.

22   Q.   Do you recognize that?

23   A.   Yes.

24   Q.   And do you see your name?

25   A.   Yes.

1    Q.   And do you see your lawyer's name?

2    A.   Yes.

3    Q.   And do you see the date?

4    A.   Yes.

5    Q.   And turning to the second page, is that your signature?

6    A.   Yes.

7    Q.   And did you date it?

8    A.   No.

9    Q.   The date that's written there, you didn't write that?

11:17AM 10    A.   Yes, I did.

11    Q.   And your lawyer's signature?

12    A.   Yes.

13    Q.   And he also put in the date?

14    A.   Yes.

15    Q.   So, would you agree that this is the proffer agreement

16    that you signed in this case?

17    A.   Yes.

18              MR. LOPEZ:  Your Honor, I move that this be admitted

19    as the next exhibit.

11:18AM 20              THE COURT:  What number?

21              THE CLERK:  228.

22              THE COURT:  228?  All right.  It's admitted 228.

23              (Exhibit No. 229 received into evidence.)

24              MR. LOPEZ:  May I show that to the jury, your Honor?

25              THE COURT:  Yes.

1    Q.   So you entered into a proffer agreement on February 16,

2    2016?

3    A.   Yes.

4    Q.   Right?

5    A.   Yes.

6    Q.   And that -- and I think you said you were arrested on

7    January 29, 2016?

8    A.   Yes.

9    Q.   So roughly 18 days after you were arrested, you started

11:19AM 10    talking to the government?

11    A.   Yes.

12    Q.   And you understood from your proffer agreement that

13    anything you said could not be used against you, right?

14    A.   Yes.

15    Q.   But you did understand that your proffer had to be

16    accurate?

17    A.   Yes.

18    Q.   And what did you understand to mean when something is

19    accurate?

11:19AM 20    A.   That it be exact information.

21    Q.   That it be true?

22    A.   Yes.

23    Q.   That it not be a lie?

24    A.   Yes.

25    Q.   And you understood that it had to be complete?

1    A.    Yes.

2    Q.    And what did you understand by the word "complete"?

3    A.    That I shouldn't say only halfway, but conclusively.

4    Q.    So when you were talking to the government you should tell

5    them everything you knew about anything they asked you about,

6    right?

7    A.    Yes.

8    Q.    And you understood that you could tell the government

9    anything, right?

11:20AM 10    A.    Not anything, only the truth.

11    Q.    You would agree that you could tell them anything so long

12    as it was true and whatever you told them, they could not use

13    against you, right?

14    A.    Yes.

15    Q.    Now, looking at paragraph 2 of the agreement, that reads,

16    "No statements made or other information provided by Mauricio

17    Sanchez will be used by the U.S. Attorney directly against

18    him."

19         Did I read that correctly?

11:21AM 20    A.    Yes.

21    Q.    "Except to rebut any evidence offered or factual

22    assertions made by or on behalf of Mauricio Sanchez at any

23    stage of a criminal or civil proceeding including but not

24    limited to detention hearing, trial, or sentencing which is

25    inconsistent with or contrary to the statements made during the

1    proffer, or in a prosecution of Mauricio Sanchez based on false

2    statements made or false information provided by Mauricio

3    Sanchez."

4         Did I read that correctly, sir?

5    A.   Yes.

6    Q.   So, you understood, sir, that you were protected from harm

7    as long as you did not change what you said to the government

8    in your proffer at a later date, right?

9    A.   Yes.

11:23AM 10   Q.   So if you lied to the government in your proffer, you had

11   to continue to repeat that lie in the future to prevent any

12   harm coming to you, right?

13   A.   I don't understand the question.

14   Q.   Well, let me try it again.  If you told a lie during one

15   of your proffers, you understood that you had to say the same

16   thing at a later time so the government couldn't use the lie

17   against you, right?

18   A.   Yes.

19   Q.   So you understood if you said something later that was

11:24AM 20   different, you might not be protected by this proffer

21   agreement?

22        MS. LAWRENCE:  Objection, your Honor.

23        THE COURT:  Sustained.

24   Q.   And the people present for your first proffer in

25   February of 2016, do you recall who was there?

```
  1    A.    Yes.

  2    Q.    Do you recall meeting Assistant U.S. Attorney

  3    Peter Levitt?

  4    A.    Yes.

  5    Q.    Special Agent Benjamin Wallace?

  6    A.    Yes.

  7    Q.    Massachusetts State Trooper Mario Millett?

  8    A.    Yes.

  9    Q.    Ms. Huacuja?

 10    A.    Who is that?

 11    Q.    The interpreter?

 12    A.    Yes.

 13    Q.    And your attorney Liam Scully?

 14    A.    Yes.

 15    Q.    And you were interviewed?

 16    A.    Yes.

 17    Q.    And Ms. Huacuja translated what you said?

 18    A.    Yes.

 19    Q.    And agents -- the agents were taking notes?

 20    A.    Yes.

 21    Q.    And they were taking notes as you spoke and Ms. Huacuja

 22    interpreted what you said?

 23    A.    Yes.

 24    Q.    And you knew the proffer was important?

 25    A.    Yes.
```

11:25AM (line 10)
11:25AM (line 20)

1    Q.   Now, before I get into your proffer, I want to talk to you

2    a little bit your mental health.  Are you currently on any

3    medications?

4    A.   Yes.

5    Q.   What are you taking on a daily basis?

6    A.   I take medication for an obsessive compulsive disorder,

7    for lack of sleep, for anxiety.

8    Q.   Anything else?

9    A.   For suicidal thoughts.

11:27AM 10    Q.   Now, are you familiar with a medication called

11    Risperidone?

12    A.   Yes.

13    Q.   Is that one of the medications you're on?

14    A.   Yes.

15    Q.   And Luvox?

16    A.   Yes.

17    Q.   And Mirtazapine?  You're not familiar with that one?

18    A.   I'm not taking that one.

19    Q.   Let me strike that.  Do you recall an examination that you

11:27AM 20    had, a mental health assessment in June of -- June 30, 2017?

21    A.   Yes.

22    Q.   And there was a follow-up -- there was a psychiatric

23    consultation on July 12, 2017?

24    A.   Yes.

25    Q.   And then there was a further mental health assessment on

1    December 5, 2017?

2    A.    Yes.

3    Q.    And then most recently on December the 6th, 2017, you had

4    a psychiatric consultation; is that correct?

5    A.    Yes.

6    Q.    Now, when you were assessed in June of 2017, did you

7    report to the healthcare provider that you met with that you

8    were having hallucinations?

9    A.    Yes, I was imagining things.

11:29AM 10  Q.    And that you had not slept for five days?

11   A.    Yes.

12   Q.    And that you didn't feel real good about yourself?

13   A.    Yes.

14   Q.    And did you tell her that you tried cutting yourself when

15   you were 16?

16            MS. LAWRENCE:  Objection, your Honor.

17            THE COURT:  I'll allow it.

18   A.    No.

19   Q.    Do you recall telling her that your mother was shot by a

11:29AM 20  gang member?

21   A.    I didn't say gang member.

22   Q.    But you told her that your mother was shot?

23   A.    Yes, sir.

24   Q.    And that you felt responsible for it?

25   A.    Yes.

```
 1   Q.   And did you tell her that you started abusing cocaine at
 2   age 15?
 3   A.   Yes.
 4   Q.   And you started abusing alcohol at age 15?
 5   A.   Yes.
 6   Q.   And you were subsequently seen by a psychiatrist by the
 7   name of Paul McGuire?
 8   A.   At Wyatt, yes.
 9   Q.   And you understood he was a psychiatrist?
11:31AM 10   A.   Yes.
11   Q.   And you saw him in July of 2017?
12   A.   No.  No, I saw the psychiatrist after I was arrested in
13   2016.
14   Q.   Do you recall being evaluated by a Paul McGuire in July of
15   2017?
16   A.   Yes.
17   Q.   And after you met with him, is that when you started
18   taking Risperidone?
19   A.   Yes.
11:32AM 20   Q.   And prior to him prescribing Risperidone, did you complain
21   of anxiety?
22   A.   Yes.
23   Q.   Did you complain of panic attacks?
24   A.   Yes.
25   Q.   Hostility towards others?
```

```
        1    A.   Yes.

        2    Q.   Paranoid feelings?

        3    A.   Yes.

        4    Q.   You thought people were talking about you?

        5    A.   Yes.

        6    Q.   You thought they were putting you down?

        7    A.   Yes.

        8    Q.   And you told him you were having disturbing thoughts?

        9    A.   Yes.

11:32AM 10    Q.   Inside your head?

       11    A.   Yes.

       12    Q.   You told him you were hearing voices?

       13    A.   No, not voices.

       14    Q.   You didn't tell him that you were hearing voices that were

       15    telling you to do things?

       16    A.   No, my mind would indicate that to me, but not voices.

       17    Q.   So you were -- your mind was telling you to do things?

       18    A.   Yes.

       19    Q.   Like it was telling you to strike other people?

11:33AM 20    A.   Yes.

       21    Q.   To spit on other people?

       22    A.   Yes.

       23    Q.   To fight with others?

       24    A.   Yes.

       25    Q.   In fact, you told him you wanted to walk out of the shower
```

```
  1    naked to draw attention to yourself, right?
  2    A.    Yes.
  3    Q.    And you also told him you were having visual
  4    hallucinations?
  5    A.    Yes.
  6    Q.    You were seeing things?
  7    A.    Yes.
  8    Q.    And you also told him that you had a history of alcohol
  9    dependence?
 10    A.    Yes.
 11    Q.    And that you had previously been diagnosed with obsessive
 12    compulsive disorder?
 13    A.    Yes.
 14    Q.    And you had -- you told him you had a history of cocaine
 15    abuse?
 16    A.    Yes.
 17    Q.    And you told him you were very upset?
 18    A.    Yes.
 19    Q.    And that you felt like you were going to lose control?
 20    A.    Yes.
 21    Q.    And so he prescribed you Risperidone, right?
 22    A.    Yes.
 23    Q.    Now, do you know whether Risperidone is an antipsychotic
 24    medication?
 25    A.    No, he did not say anything.  He just prescribed it.
```

```
         1    Q.   Did he also prescribe you Luvox?

         2    A.   Yes.

         3    Q.   And do you know why he prescribed you Luvox?

         4    A.   That's for the obsessive compulsive disorder.

         5    Q.   And what about Mirtazapine?

         6    A.   I haven't taken that.

         7    Q.   Okay.  Well, were you prescribed any anti-depressant

         8    medication?

         9    A.   Yes.

11:35AM  10    Q.   And were you prescribed any anti-anxiety medication?

        11    A.   Yes.

        12    Q.   Now, you had a follow-up with Dr. McGuire in December of

        13    2017, right?

        14    A.   Yes.

        15    Q.   And did you complain to him that you didn't feel like the

        16    psychiatric medications you were taking were actually working?

        17    A.   Yes.

        18    Q.   Did you discuss the antipsychotic affects of Risperidone?

        19    A.   Yes.

11:36AM  20    Q.   And did you tell him that you were still struggling with

        21    anxiety?

        22    A.   Yes.

        23    Q.   Panic attacks?

        24    A.   Yes.

        25    Q.   Poor sleep?
```

1    A.    Yes.

2    Q.    Obsessive compulsive symptoms?

3    A.    Yes.

4    Q.    And, in fact, you talked to him at length about your OCD

5    diagnosis, right?

6    A.    Yes.

7    Q.    And he increased your Luvox?

8    A.    Yes.

9    Q.    Do you currently have a follow-up appointment with

11:37AM 10    Dr. McGuire scheduled?

11    A.    No.

12    Q.    Have you taken all your medications today?

13    A.    I only take them at night.

14          MR. LOPEZ:  Could you pull up Exhibit 110.2.

15    Q.    I show you what's been admitted into evidence as

16    Exhibit 110.2.  Do you recognize that?

17    A.    Yes.

18    Q.    What do you recognize that to be?

19    A.    It's the cooperation agreement.

11:38AM 20    Q.    Well, look at it, okay.  Let me go back.  Pull up 110.1.

21          MR. LOPEZ:  I apologize, your Honor.

22    Q.    Do you recognize that?

23    A.    Yes.

24    Q.    And do you recognize that as your plea agreement?

25    A.    Yes.

1    Q.   And looking at the second paragraph, could you -- the

2    first paragraph of paragraph 2, could you increase that.  Now,

3    you understand that the potential maximum penalty that you're

4    facing for pleading guilty in this case is incarceration for 20

5    years?

6    A.   Yes.

7    Q.   But you're hoping that based on your substantial

8    assistance that you're going to get a much lower sentence; is

9    that fair to say?

11:39AM 10   A.   Yes.

11          MR. LOPEZ:  And could you -- the first sentence of the

12   next paragraph regarding immigration status?

13   Q.   And you are not an American citizen, right?

14   A.   Yes.

15   Q.   So you understand that if you had pled guilty without a

16   plea agreement or without a cooperation agreement, when you

17   were done serving your sentence, you would have been deported?

18   A.   Yes.

19   Q.   And you're hoping that based on your assistance here that

11:40AM 20   you're not going to be deported?

21   A.   Yes.

22          MR. LOPEZ:  Now, could you go to page 4, the very

23   first -- through subparagraph A of the U.S. Attorney.

24   Q.   And under the plea agreement that you have with the

25   government, the U.S. Attorney's Office has agreed to recommend

1    a sentence to the Court for incarceration within the guideline

2    sentencing range as calculated by the Court at sentencing

3    excluding departures.  What do you understand that provision to

4    mean?

5    A.    I don't understand the question.

6    Q.    Well, under your plea agreement, you're pleading guilty to

7    a crime that carries a potential sentence of incarceration of

8    20 years?

9          MS. LAWRENCE:  Objection, your Honor.

11:42AM 10      THE COURT:  Overruled.

11   Q.    And the U.S. Attorney's Office agrees to recommend a

12   sentence of incarceration within the guideline sentencing range

13   as calculated by the Court at sentencing, so my question is --

14   A.    Yes.

15   Q.    So my question is what is the government giving you in the

16   plea agreement, or what is your understanding of what the

17   government is agreeing to in your plea agreement?

18   A.    A lower sentence.

19   Q.    A sentence lower than 20 years?

11:43AM 20   A.    Yes.

21         MR. LOPEZ:  Now, can I put up Exhibit 110.2.

22   Q.    Now, Exhibit 110.2 is the cooperation agreement, right?

23   A.    I don't understand the question.

24   Q.    Well, is Exhibit 110.2 your cooperation agreement?

25   A.    Yes.

1          MR. LOPEZ:  And can you blow up the first five lines

2    of paragraph 1 starting with "defendant."

3    Q.    Now, in this cooperation agreement, you agree to

4    "cooperate fully with law enforcement agents and government

5    attorneys.  You must provide complete and truthful information

6    to all law enforcement personnel, and if your testimony is

7    requested, you must testify truthfully and completely before

8    any grand jury and at any hearing and trial.  And you also must

9    answer all questions posed by any law enforcement agents and

11:45AM 10  government attorneys and you must not withhold any

11   information?"

12   A.    Yes.

13   Q.    What do you understand that to mean?

14   A.    That I have to tell the truth about the things that I have

15   done, that I did with the gang and the things that I saw and

16   heard other people do as well.

17   Q.    And if you don't tell the truth, you understand that you

18   would be in violation of this agreement?

19   A.    Yes.

11:46AM 20        MR. LOPEZ:  The second page, beginning of the second

21   full paragraph starting with the words "to ensure."

22   Q.    Now, the agreement also provides that, "To ensure that the

23   Court has all relevant sentencing information, you waive any

24   rights to a prompt sentencing and you'll join in any request by

25   the U.S. Attorney that sentencing must be postponed until

1      defendant's cooperation is complete."

2      A.    Yes.

3      Q.    What do you understand that paragraph means?

4      A.    That I have to wait until the conclusion of the case and

5      that I cannot be sentenced until all the -- until the

6      defendants have finished.

7      Q.    So when you signed this agreement, did you understand that

8      you wouldn't be sentenced until you testified in this case?

9      A.    Yes.

11:48AM 10    Q.    And do you understand what substantial assistance is?

11     A.    Yes.

12     Q.    And in your own words, what does substantial assistance

13     mean?

14     A.    It's giving help.

15     Q.    Giving help to the government?

16     A.    Yes.

17     Q.    And paragraph 2 reads, "Should defendant provide

18     substantial assistance in the investigation or prosecution of

19     another person who has committed a criminal offense, the

11:49AM 20    U.S. Attorney agrees that at or before sentencing, the U.S.

21     Attorney will file a motion under United States Sentencing

22     Guidelines Section 5K1.1 to recommend that the Court impose a

23     sentence below the advisory guideline sentencing range."

24            So under this provision, did you understand that it

25     was totally up to the U.S. Attorney's Office to determine

1    whether or not you provided substantial assistance in their

2    investigation or prosecution of another person?

3    A.   Yes.

4    Q.   So if they decide that you haven't provided substantial

5    assistance, you understood that you would potentially receive a

6    sentence within the sentencing guideline range, right?

7    A.   Yes.

8         MR. LOPEZ:  And the next paragraph beginning "the

9    determination" and ending with "or trial."

11:51AM 10   Q.   And the next paragraph reads, "The determination whether

11   defendant has provided substantial assistance rests solely in

12   the discretion of the U.S. Attorney and is not subject to

13   appeal or review.  The U.S. Attorney will make this

14   determination based on the truthfulness and value of

15   defendant's assistance regardless of the outcome or result of

16   any proceeding or trial."

17         So you understand that whether or not you are

18   determined to be telling the truth here in this trial is solely

19   up to the discretion of the U.S. Attorney's Office, right?

11:53AM 20   A.   Yes.

21   Q.   And with respect to the sentencing recommendation, the

22   cooperation agreement further provides, "If defendant provides

23   substantial assistance, subject to the provisions of paragraph

24   1 and 2 above," which we just went over, "the U.S. Attorney

25   will advise the Court of the full nature, extent, and value of

1    the assistance provided by the defendant."

2         And then it goes on to read, "In such an event the

3    U.S. Attorney reserves the right to recommend a particular

4    sentence" -- top of page 3 -- "reserves the right to recommend

5    a particular sentence or sentencing range, or to make no

6    recommendation at defendant's sentencing subject to the

7    requirements of paragraph 2 above."

8         So do you understand that even if they determine that

9    your testimony was truthful and they determine that it provided

11:55AM 10  substantial assistance, they're not agreeing to any particular

11   sentence, or sentencing range, or to make any recommendation at

12   all.  Do you understand that?

13   A.   Yes.

14   Q.   So, basically you're totally at their discretion?

15        MS. LAWRENCE:  Objection, your Honor.

16        THE COURT:  Sustained.

17   Q.   Now --

18        MR. LOPEZ:  Can you go to page 4 and the paragraph

19   regarding immigration status.

11:56AM 20  Q.   And the paragraph 6 as to immigration status provides that

21   "Should the U.S. Attorney conclude that you provided

22   substantial assistance as discussed in paragraph 2 above, the

23   U.S. Attorney will consider supporting an application on

24   defendant's behalf by the Federal Bureau of Investigation, or

25   Homeland Security Investigations, or so-called deferred action,

1   an S Visa, or other appropriate relief from removal from the

2   United States, so long as the FBI or his determines in its

3   discretion that such an application is appropriate."

4          Do you understand what that means, sir?

5   A.   Yes.

6   Q.   What does that mean to you?

7   A.   That according to my cooperation, so long as I tell the

8   truth, the prosecutors would make a recommendation for me not

9   to be deported.

11:58AM 10   Q.   That's what you think that paragraph says?

11   A.   Yes.

12   Q.   Are you hoping that's what the paragraph says?

13   A.   I don't understand the question.

14   Q.   Well, you agree to plead guilty?

15   A.   Yes.

16   Q.   You agreed to cooperate?

17   A.   Yes.

18   Q.   And I think you testified that you are hoping to get a

19   lower sentence?

11:58AM 20   A.   Yes.

21   Q.   And you're hoping that you won't be deported?

22   A.   Yes.

23   Q.   But would you agree with me that the plea agreement and

24   the cooperation agreement don't say that?

25          MS. LAWRENCE:  Objection, your Honor.

1          THE COURT:  I'm sorry, was there an --

2          MS. LAWRENCE:  Objection.

3          THE COURT:  Overruled.

4    A.    Could you repeat the question?

5    Q.    You're hoping that you'll get a lower sentence and you're

6    hoping that you won't be deported by testifying in this case,

7    right?

8    A.    Yes.

9    Q.    But the agreements that you signed don't say that you

12:00PM 10   will, in fact, receive a lower sentence, right?

11   A.    Yes.

12   Q.    Or that you won't be deported, right?

13   A.    Yes.

14   Q.    So, again, that's totally up to the discretion of the U.S.

15   Attorney's Office?

16          MS. LAWRENCE:  Objection, your Honor.

17          THE COURT:  Sustained.

18          MR. LOPEZ:  Your Honor, is this a good time to break?

19          THE COURT:  Yes.

12:00PM 20          THE CLERK:  All rise.

21          (JURORS EXITED THE COURTROOM.)

22          (A recess was taken.)

23          THE CLERK:  All rise for the jury.

24          (JURORS ENTERED THE COURTROOM.)

25          THE CLERK:  Thank you.  You may be seated.  Court is

```
  1    now back in session.

  2              THE COURT:  Mr. Lopez.

  3              MR. LOPEZ:  Thank you, your Honor.

  4    Q.   Now, Mr. Sanchez, I think you said earlier today that you

  5    came here to --

  6              THE INTERPRETER:  I'm sorry, the interpreter cannot

  7    hear you.

  8    Q.   I think you said earlier today that you came here when you

  9    were 20 years old?

12:17PM 10   A.   Yes.

 11    Q.   And you are currently 30 years old?

 12    A.   Yes.

 13    Q.   And you claim that you were jumped into the Eastside

 14    clique in 2013?

 15    A.   Yes.

 16    Q.   Do you remember what month that was?

 17    A.   No.

 18    Q.   Do you remember the season?

 19    A.   It was winter.

12:18PM 20   Q.   And I think you said -- so at the time you were allegedly

 21    jumped in, you were 27?

 22    A.   Yes.

 23    Q.   And I think you said that when you came here to the

 24    United States, you came here illegally?

 25    A.   Yes.
```

1    Q.   And you used a coyote?

2    A.   Yes.

3    Q.   And your mother paid for it?

4    A.   Yes.

5    Q.   Now, you also testified that the day you jumped in was the

6    day you met Mr. Sandoval, right?

7    A.   Yes.

8    Q.   So, prior to that day, who did you know from the Eastside

9    clique?

12:19PM 10   A.   I knew Playa, Lobo, and Checha and also Brujo.

11   Q.   And what about Pelon?

12   A.   No.

13   Q.   And so it's your testimony that Mr. Sandoval allowed you

14   to be jumped in to the clique having never met you before that

15   evening; is that correct?

16        MS. LAWRENCE:  Objection, your Honor.

17        THE COURT:  Overruled.

18   A.   That was the first time I saw him.

19   Q.   Now, you also mentioned that Caballo was a solid homeboy?

12:20PM 20   A.   Yes.

21   Q.   And you said that Muerto was a solid homeboy?

22   A.   Yes.

23   Q.   Did you consider yourself a solid homeboy?

24   A.   Me?

25   Q.   Yes.

A.   Somewhat, yes.

Q.   And did you consider some cliques more solid than other cliques?

A.   Yes.

Q.   Now, was there a certain clique that you thought was the most solid in the Boston area?

A.   The Everetts.

Q.   The Everetts?

A.   Yes.

12:21PM  Q.   And why did you think that they were the most solid in the Boston area?

A.   They were the ones that did the most hits and that went out in the street to look for chavalas the most.

Q.   And they also were the clique that also had a clique down in El Salvador, right?

A.   Yes.

Q.   And do you recall having a conversation with Pelon about the Everett clique in July of 2015?

THE INTERPRETER:  I'm sorry, could you repeat the

12:22PM  question?

Q.   Yes.  Do you recall having a conversation with Pelon in July of 2015 regarding the Everett clique?

A.   I don't remember that very clearly.

MR. LOPEZ:  I'm going to show the witness an audio file.

```
 1              THE CLERK:  Is it on your computer?

 2              MR. LOPEZ:  It's on the -- I have the disk here.

 3              THE CLERK:  I'll get the document camera.

 4              THE COURT:  Before you ask that question and before I

 5    forget, in our last session we inadvertently marked the proffer

 6    agreement as 228, it should be 229 because we already had a

 7    228.

 8              MR. LOPEZ:  That's been corrected, your Honor.

 9              Your Honor, with the Court's permission, I would like

12:23PM 10    to begin the audio portion of this audio file so that the

11    witness can listen to it.

12              THE COURT:  All right.  It's in Spanish, I assume?

13              MR. LOPEZ:  It is, your Honor.

14              THE COURT:  All right.  Go ahead.

15              (Audio played)

16              THE COURT:  What we really need here, ladies and

17    gentlemen, is a 10 year-old kid to figure this out.  You can

18    play it on your iPad?

19              MR. LOPEZ:  I can play it.

12:27PM 20              THE COURT:  Why don't you come up here where he can

21    listen to it.

22              MR. LOPEZ:  Let's try that.  Sorry, all.  May I

23    approach, your Honor?

24              THE COURT:  Yes.

25              (Video played in Spanish)
```

```
 1    Q.   Do you recognize that voice?

 2    A.   Yes, that's Pelon.

 3    Q.   Do you recognize that voice?

 4    A.   That's me.

 5              MR. LOPEZ:  Your Honor, with that, can I introduce the

 6    translation?

 7              MS. LAWRENCE:  Objection.  Foundation for the

 8    translation, your Honor.

 9              THE COURT:  All right.  Sustained unless it's agreed

10    on.

11              MR. LOPEZ:  Well, your Honor, may I approach?

12              THE COURT:  Yes.

13              (THE FOLLOWING OCCURRED AT SIDEBAR:)

14              THE COURT:  Go ahead.

15              Let me hear the objection first.

16              MS. LAWRENCE:  The objection was the foundation for

17    the translation.

18              THE COURT:  Do you have the translation?

19              MS. LAWRENCE:  We have the translation.  I know you

20    put your personal translator on the witness list.  I know we

21    discussed it.  I just want to be clear that every one of these

22    you've given us are the ones you gave us before and not new

23    ones last night, but with the changes that you noted.

24              MR. LOPEZ:  The one, but for the changes, correct.

25    The one I gave you last night had some minor changes, which I
```

```
 1    identified for you.  Otherwise, you've had all of these

 2    previously.

 3              MS. LAWRENCE:  All -- no brand new ones?

 4              MR. LOPEZ:  No brand new ones.

 5              MS. LAWRENCE:  Okay.  Then we're fine.

 6              THE COURT:  So for the sake of efficiency, just let it

 7    in.

 8              MR. MURPHY:  May I inquire that it's the government's

 9    position that this is going to open the door --

10              MS. LAWRENCE:  Some of them might, but this one in

11    particular doesn't seem to.

12              MR. MURPHY:  All right.  We'll take them one at a

13    time.

14              MS. LAWRENCE:  Yes, one at a time.

15              (SIDEBAR CONFERENCE WAS CONCLUDED.)

16              THE COURT:  I'll admit the transcript, which is 230.

17              (Exhibit No. 230 received into evidence.)

18              MR. LOPEZ:  Could we also mark the audio clip for

19    identification purposes?

20              THE COURT:  That will be 231.

21              (Exhibit No. 231 received into evidence.)

22    Q.   Now, Mr. Sanchez, I've put before you a transcript, and I

23    want to read it to you.

24              Pelon:  "(Unintelligible), not many may want to bother

25    also."
```

12:29PM (line 10)
12:30PM (line 20)

1    Tigre:  "This dog, this is an Everett dude.  That dog,

2  he is the only one when I call.  That guy responds to me, dude.

3  He told me, look, dog, I like you.  I love you like a brother.

4  You heard?  He told me I love you like a brother.  He loves my

5  like a brother."

6    Pelon:  "I didn't like."

7    Tigre:  "There are (unintelligible) the same side.

8  There are two leaders Everetts there, dude.  What happens is

9  that they among them, you understand.  There is a

12:31PM 10  Tigre El Mecha Immenso, but they -- he told me I love you like

11  my brother, he tells me, look, I love you like a brother.  I

12  like people like you do.  I look at them in the face, dude."

13    THE INTERPRETER:  I'm sorry, could you raise the

14  transcript?

15    MR. LOPEZ:  I'm sorry, I apologize.

16  Q.   "I like people like you do.  I look at them in the face,

17  dude.  I know that he can, two or three of them, dudes.  He

18  will fuck them up.  Look, Pelon.  Look, Pelon.  Pelon, listen

19  to this.  Look, dog, I know.  I hang out with all the cliques.

12:32PM 20  To me it is the most solid clique.  The most solid clique here

21  in Boston.  In all of Boston?  Boston and in Salva because it

22  is the only clique that has a clique in Salva.  That's why,

23  look, dude when you want to go to the street."

24    Did I read that correctly, sir?

25  A.   Yes.

1    Q.   So you were talking to Pelon, and you were telling him

2    about the cliques that you thought were solid?

3    A.   Yes.

4    Q.   And you thought that the Everett clique was the most solid

5    because they would respond to you and they would go out and do

6    Mara related activities, right?

7    A.   Mostly because I saw them acting in the street but not

8    because I went out to do things with them.

9    Q.   Well, you would agree with me that at least during that

12:33PM 10    conversation, you didn't say that the Eastside clique was a

11    solid clique, right?

12    A.   No.

13    Q.   Now, in your testimony, you were asked about the rules

14    that you were asked to follow when you became a member of

15    Eastside.  Do you remember that testimony?

16    A.   Yes.

17    Q.   And I think you said that the first rule was that you had

18    to be beat in, the second rule was to attend meetings, right?

19    A.   Yes.

12:34PM 20    Q.   The third rule was to not let a homeboy down, and the

21    fourth rule was to show your colors.  And, sir, those were the

22    rules when you were brought into the Eastside clique; is that

23    correct?

24    A.   Yes.

25    Q.   So you weren't required to do anything for the Eastside

1    clique before you were beat into the Eastside clique, correct?

2    A.   Yes.

3    Q.   Now, sir, do you have any tattoos?

4    A.   No.

5    Q.   So it's not a requirement of MS-13 to have tattoos, right?

6    A.   That's up to each person.

7    Q.   And people get tattoos for many reasons, right?

8    A.   But there are some tattoos that not just anybody can have.

9    Q.   I understand, but my question is that, you know, like

12:36PM 10   sailors get tattoos all the time.  It's not because they're in

11   the Navy, right?

12           MS. LAWRENCE:  Objection, your Honor.

13           MR. LOPEZ:  I'll strike that, your Honor.

14           THE COURT:  All right.

15   Q.   You weren't required to get a tattoo in order to join

16   MS-13, right?

17   A.   Yes.

18   Q.   Now, you also testified that meetings were every two or

19   three months, right?

12:36PM 20   A.   Yes.

21   Q.   So you would agree that they weren't every month, right?

22   A.   That would depend on what was going on.

23   Q.   But as a general rule, they were every two or three

24   months?

25   A.   There was no general rule.  If there was something that

1    was going on with the clique or something that was going on

2    with MS-13, the runners could call a meeting for the following

3    day.

4    Q.   But on direct exam, you were asked an open-ended question

5    how often were meetings.  Do you recall being asked that?

6    A.   Yes.

7    Q.   And do you recall that your response was every two or

8    three months?

9    A.   Yes.  That was approximately, not exact.

12:38PM 10   Q.   Now, you also said that it was Mr. Guzman who would

11   collect money?

12   A.   Yes.

13   Q.   At meetings, right?

14   A.   Yes.

15   Q.   And I think you said he collected the money because he was

16   a more serious person?

17   A.   Yes.

18   Q.   Do you remember saying that?

19   A.   Yes.

12:38PM 20   Q.   What did you mean by that?

21   A.   Well, in the Mara, there were guys like me that would

22   drink a lot and get drunk a lot, so we weren't very serious,

23   and no one is going to give money to people like that.

24   Q.   And you also said that he was trusted with the money?

25   A.   Yes.

1    Q.   So he was trusted not to take the clique's money?  Is that

2    what you meant?

3    A.   Yes.

4    Q.   Now, you were also asked about who sent money down to

5    El Salvador, and you didn't answer that question, did you, sir?

6    A.   No.

7    Q.   You said that Playa has the money?

8    A.   Yes.

9    Q.   But you didn't say that Playa sent the money to

12:39PM 10    El Salvador, right?

11    A.   No.

12    Q.   Because you know that Mr. Guzman didn't or wasn't

13    responsible for sending money to El Salvador, right?

14    A.   Yes.

15         MR. LOPEZ:  Your Honor, can I just have a moment to

16    consult with --

17         THE COURT:  Yes.

18    Q.   Now, you also testified that there was another rule of the

19    Eastside clique and that was no cocaine use, right?

12:41PM 20    A.   That rule is a general rule in MS-13, not only for the

21    Eastsides.

22    Q.   Okay.  So the MS-13 general rule for all the cliques is

23    that there's no cocaine use by members?

24    A.   Yes.

25    Q.   And I think at some point you were corrected for drinking

1    too much?

2    A.    Yes.

3    Q.    And before you were corrected, you were told to stop your

4    drinking?

5    A.    Yes.

6    Q.    And you didn't stop your drinking?

7    A.    No.

8    Q.    Did you know that you would be corrected if you didn't

9    stop your drinking?

12:42PM 10    A.    Yes.

11    Q.    And you went ahead and drank anyway?

12    A.    Yes.

13    Q.    Now, you also talked about Chentino and him being

14    corrected?

15    A.    Yes.

16    Q.    And just to be clear, Chentino was corrected because

17    Vida Loca, the day before he committed murder, was confronted

18    by some 18th Street members and Chentino didn't back him up; is

19    that fair to say?

12:43PM 20    A.    Yes.

21    Q.    So he wasn't corrected because he didn't participate in a

22    murder, right?

23    A.    He was corrected for not participating in a murder.

24    Q.    Well, that's what I'm getting at.  He didn't go with

25    Vida Loca the night that Vida Loca committed murder, correct?

1    A.    He was there at the place, but he didn't do anything.

2    Q.    But it was the night before that he didn't back up

3    Vida Loca when the 18th Street members were giving Vida Loca a

4    hard time, right?

5    A.    Yes.

6    Q.    Now, you said that you bought a gun in December of 2014?

7    A.    Yes.

8    Q.    And it was your personal gun?

9    A.    Yes.

12:45PM 10    Q.    And that was marked as Exhibit Number 69?

11    A.    Yes.

12    Q.    And the gun was taken away from you because you

13    were -- you had it in your possession while you were drunk?

14    A.    Yes.

15    Q.    And Mr. Sandoval was concerned that you might hurt someone

16    with it while you were drunk?

17    A.    Yes.

18    Q.    Thought you were acting a little crazy when you were drunk

19    going around with a gun, right?

12:45PM 20    A.    Yes.

21    Q.    Now, do you recall complaining about the fact that the

22    clique wasn't buying guns?

23    A.    Yes.

24    Q.    And that was in approximately September of 2015?

25    A.    I don't remember exactly.

1    Q.   Well, do you recall talking to Pelon about the clique not

2    wanting to go out and buy guns?

3    A.   Yes.

4    Q.   Do you recall complaining to him that, you know, the other

5    ones are always saying that we're going to go and get guns but

6    they never do anything, so I went out and I bought my own gun?

7    A.   I bought the gun mostly for something else.  I bought the

8    gun because I had a problem at work, so I had it to defend

9    myself.

12:47PM 10    Q.   So it was unrelated to your MS-13 activities?

11    A.   No.

12    Q.   Well, do you recall complaining to Pelon that others in

13    the clique are always saying they're going to go out and get

14    guns and they don't get anything and you told them that you

15    were going to go out and get a gun for yourself?

16    A.   Yes.

17    Q.   So you weren't going to go out and get a clique gun, you

18    were going to go out and get a gun for yourself?

19    A.   It was also for the clique.

12:48PM 20    Q.   So, did you use your money?

21    A.   To buy that gun, yes.

22    Q.   Now, I think that you testified that the first time that

23    you met the Animal was in October of 2015?

24    A.   Yes.

25    Q.   And it was Pelon and Muerto who brought him to the clique?

1          MS. LAWRENCE:  Objection.

2          THE COURT:  Overruled.

3    A.   Yes.

4    Q.   And after you met the Animal, you started hanging out with

5    him?

6    A.   Yes.

7    Q.   And you went out and did some hits with him?

8    A.   Yes.

9    Q.   Now, Mr. Guzman never told you to go out and do those

12:49PM 10   hits, did he?

11   A.   It's not necessary for the runner to tell us.  We are in

12   MS-13 and that's what we're supposed to do.

13   Q.   I'll try it again.  Mr. Guzman never told you to go out

14   with the Animal and commit hits, right?

15   A.   At the meetings, we all talked about the homeboys needed

16   to go out with the young kids to test them to see how they

17   acted.

18   Q.   Sir, you went out with the Animal to commit hits, right?

19   A.   Yes.

12:50PM 20   Q.   Prior to going out with the Animal -- and that's all I'm

21   focused on, the Animal -- who wasn't a member of the clique,

22   right?  Right?

23   A.   Yes.

24   Q.   Who wasn't a homeboy and who you had only met a couple of

25   months before you, my question to you is Mr. Guzman didn't tell

1    you to go out with the Animal and do any hits, right?

2    A.    No.

3    Q.    Now, at some point, there was a discussion about whether

4    or not the Animal could be beat into the clique?

5    A.    Yes.

6    Q.    And did you -- were you present at that meeting?

7    A.    At the meeting where we talked about bringing him into the

8    clique, yes.

9    Q.    Yes.  And were you in favor of bringing him in?

12:52PM 10   A.    Yes.

11   Q.    Do you remember what Mr. Guzman wanted to do?

12   A.    That we should walk with him for a period of time before

13   making him a member.

14   Q.    Well, it was a little strong than that, right?  Didn't he

15   say that he should stay where he is and not come into the

16   Eastside clique?

17   A.    He said we should walk with him more so that the other

18   homeboys could get to know him.

19   Q.    So your memory is that he wanted to have him in some

12:53PM 20   observation period?

21   A.    Yes.

22   Q.    So you don't have any memory of him saying he didn't want

23   any young kids in the clique and particularly he didn't want

24   the Animal in the clique?

25   A.    At the meeting we had, we all agreed based on what Animal

1   had done, especially because of the hits he had done, based on

2   that.

3   Q.   That's your memory of that meeting?

4   A.   Yes.

5        MR. LOPEZ:  If I could just have a second, your Honor.

6   Q.   Now, I'm going to show you what's been marked and admitted

7   into evidence as Exhibit 115, page -- on the bottom of page 5

8   and it reads, CW says, "Because I -- if he reports to me

9   quickly then I'll report it and like you, you know, and say it

12:55PM 10  was like this and like this.  I'll tell Muerto and after Muerto

11  and I say, it's done, you know.  No one can accuse you of any

12  bullshit."

13       CW is referring is talking to the Animal there, right?

14  A.   Yes.

15  Q.   And he's telling him that I want you to be brought into

16  the clique, right?

17  A.   Yes.

18  Q.   And his best friend Muerto wants him to --

19       MS. LAWRENCE:  Objection, your Honor.

12:56PM 20       MR. LOPEZ:  Well, strike that.

21  Q.   Were Muerto and Pelon friends?

22  A.   Yes.

23  Q.   And they hung out all the time?

24  A.   Yes.

25  Q.   They sold drugs together?

1     A.    As far as I know, yes.

2     Q.    Okay.  And so Pelon is saying to Animal if I want you in

3     the clique and I tell Muerto I want you in the clique, you're

4     going to be in the clique, right?

5     A.    That's what they said to show off with the kids because

6     they were just bragging because they can't go over the rules of

7     the clique or it's only the runners that can present that and

8     put it on the table.

9     Q.    I understand that was your testimony, but my question is

12:57PM 10    at this time in January of 2016, you would agree with me that

11    Pelon had status in the clique, right?

12    A.    No.

13    Q.    No, he wasn't considered solid in the clique?

14    A.    No.

15    Q.    And what about Muerto?

16    A.    Muerto, yes.

17    Q.    And what about you?

18    A.    Some did.

19    Q.    And what about Brujo?

12:58PM 20    A.    He was considered a solid homeboy.

21    Q.    So, when CW is talking to Animal, he knows -- strike that.

22    He's telling the Animal that I want you in the clique, and if I

23    want you in the clique, Muerto's going to want you in the

24    clique, and you've already told us you wanted him in the

25    clique, right?

```
 1    A.   Yes.
 2    Q.   And he went out with Brujo and did hits with Brujo?
 3              THE INTERPRETER:  Who is "he" for the interpreter?
 4              MR. LOPEZ:  The Animal.
 5    A.   Yes.
 6    Q.   So, essentially if all you guys wanted him in the clique,
 7    he was going to come into the clique, right?
 8    A.   No.
 9    Q.   Because you and Pelon and Muerto and Brujo could outvote
10    Mr. Guzman, right?
11    A.   No.
12    Q.   And the way the clique ran was that it was run
13    democratically, right?
14    A.   There are the runners.  They are the ones who put on the
15    table what's going on and who's going to be jumped in.  For
16    example, when I was jumped in, it was the two of them that made
17    the decision, and they didn't call other homeboys or many other
18    homeboys to join in the decision.
19    Q.   I'm not talking about 2013, I'm talking about the Animal.
20    A.   I'm only giving an example.
21    Q.   The Animal in 2016.  At that point in time, majority vote
22    was the rule of the clique, right?
23    A.   Yes.
24              MR. LOPEZ:  Your Honor, is this a good place to stop?
25              THE COURT:  Sure.
```

1        All right.  Ladies and gentlemen, please remember my

2   cautions not to discuss the case with each other or with anyone

3   else and to not to pay attention to any media reports.

4   Tomorrow is Friday heading into a three-day weekend.  I'm

5   feeling optimistic about the timetable, but I'm going to check

6   with the lawyers and give you a status tomorrow about when

7   you're going to get the case, but I think we are again still

8   ahead of where we thought we were going to be.  Don't make

9   other plans just yet, but I think we're in reasonable shape, so

01:01PM 10  we'll see you tomorrow morning at 9:00.

11            THE CLERK:  All rise.

12            (JURORS EXITED THE COURTROOM.)

13            (THE FOLLOWING OCCURRED AT SIDEBAR:)

14            THE COURT:  How much more do you think you have,

15  Mr. Lopez?

16            MR. LOPEZ:  I have to talk to my client because he may

17  think I have a lot more than I think I actually do, maybe half

18  an hour, 45 minutes, max.

19            THE COURT:  Okay.  Other cross, ballpark?

01:01PM 20            MR. IOVIENO:  20 minutes maybe.

21            THE COURT:  Is it fair to assume if all goes according

22  to plan that cross and redirect will be done roughly mid-day

23  tomorrow, does that sound about right?

24            MS. RODRIGUEZ:  Yes.

25            THE COURT:  And the government either rests tomorrow

1    or Tuesday?

2         MR. LOPEZ:  If I put my client's wife on the stand,

3    every day that she loses work is a hardship on the family, so I

4    guess what --

5         THE COURT:  We'll try to accommodate her.  We'll try

6    to accommodate her and take her out of turn, if necessary.

7         MR. LOPEZ:  Should I have her here tomorrow is the

8    question?

9         MR. POHL:  I doubt it.  I think we will have at least

01:02PM 10   one more witness after Mr. Sanchez, so...

11        THE COURT:  And if she is the only defense witness,

12   we'll break early on Friday, call her Tuesday morning and go

13   into closing arguments.

14        MR. MURPHY:  We've reached a stipulation as to CW-1,

15   we're closest to CW-2.

16        THE COURT:  Stipulation, meaning?

17        MR. POHL:  I think it would be something that would be

18   read, and we can give you a final report tomorrow morning.  I

19   think we've made progress.

01:03PM 20        THE COURT:  Again, all I'm looking for now is

21   assurances that we're reasonably on track.  We obviously need

22   time to talk about the jury charge, which will be done in an

23   afternoon.  What I will do is circulate a draft just to kick

24   start it.  It's going to look a whole like the jury

25   instructions in the last, you know, but just so we're focused

1     on, you know, what is different or what matters to you, like I

2     hope things like boilerplate and standard instructions can all

3     be dealt fairly easily, but we will circulate that to you

4     probably as an e-mail attachment at some point.  We may hand it

5     to you physically, but just, again, to get that process

6     started.

7          MR. POHL:  Good.

8          THE COURT:  Obviously, I expect the verdict form at

9     this point, they're being asked to render six verdicts, it

01:04PM 10     would just be guilty or not guilty, four defendants on Count 2,

11     two defendants on Count, whatever it is, 3.

12          MS. LAWRENCE:  If you wouldn't mind, we may submit a

13     proposed one because we have a drug weight allegation that

14     needs to be addressed.  There is a second part of that.

15          THE COURT:  Okay.

16          MR. POHL:  When have you thought -- I know this

17     depends on things that are not entirely in your control, but I

18     do think it's likely we'll be done tomorrow or if not early

19     Tuesday, so...

01:04PM 20          THE COURT:  If we're this far ahead.

21          MR. POHL:  We have Trooper Estevez reading some

22     transcripts, and there might be some cross, but I don't think

23     he's going to be anything like one of the longer witnesses, and

24     we've already had to call him once to go through the part of

25     the assessment.

1          THE COURT:  I'll give the answer to the question I

2     think you're asking, I will be reasonably generous in the sense

3     that if we are done at 11 a.m. on Tuesday, I'll say we're going

4     to do all the openings in one day and we'll just break early

5     for the day and have the openings on Wednesday.  That's ideal,

6     it depends on my own happiness level.

7          MR. LOPEZ:  Get a lot of rest over the weekend, your

8     Honor.

9          MR. POHL:  Okay.

01:05PM 10          THE COURT:  How far we're doing and, you know, what I

11     think the timetable is and whether or not your wives are going

12     to testify.

13          MR. LOPEZ:  She's not on the witness list, your Honor.

14          THE COURT:  8:30 tomorrow.

15          (Whereupon, the hearing was adjourned at 1:05 p.m.)

16                                    - - - -

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS ) ss.

5   CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8   recorded by me stenographically at the time and place aforesaid

9   in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10  SANDOVAL, et al., and thereafter by me reduced to typewriting

11  and is a true and accurate record of the proceedings.

12           Dated this 21st day of June, 2018.

13                       s/s Valerie A. O'Hara

14           _____

15                       VALERIE A. O'HARA

16                       OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25