## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.

HERZZON SANDOVAL.

Criminal Action No.: 15-10338-FDS-6

## HERZZON SANDOVAL SENTENCING MEMORANDUM
## AND REQUEST FOR EVIDENTIARY HEARING

### I.      INTRODUCTION.

Defendant Herzzon Sandoval was convicted, following trial, of conspiring to commit racketeering in violation of 18 U.S.C. 1961(d). The advisory sentencing guidelines set the base offense level for that crime at Level 19 or, "if greater, the offense level applicable to the underlying racketeering activity." U.S.S.G. §2E1.1. Here, the Probation Department has concluded that the preponderance of the evidence supports the conclusion that Sandoval is accountable, for guidelines purposes, for three separate crimes as cross-references:

1.  Acting as an accessory after the fact to the September 20, 2015 murder of Irving de Paz by Joel Martinez ("ANIMAL");

2.  An attempted murder allegedly committed by ANIMAL on December 27, 2015; and

3.  An attempted murder allegedly committed by ANIMAL on January 1, 2016.

The Probation Department therefore calculates Sandoval's combined adjusted offense level at 40, a level that places the advisory guidelines range well above 18 U.S.C. 1961(d)'s twenty-year statutory maximum. Sandoval has objected to the Probation Department's calculation. Neither the evidence at trial nor the law supports the Probation Department's conclusion that these three offenses should be attributed to Sandoval for the purpose of calculating the advisory guidelines range.

To the extent that the government intends to rely on (and has included in the information it provided to the Probation Department) evidence it did not produce at trial to support the Probation Department's conclusion, Sandoval requests that the Court conduct an evidentiary hearing to determine, as the law requires, the credibility of any evidence the government contends supports the Probation Department's conclusion. Sandoval respectfully requests that the Court determine that the correct advisory guidelines range is 19, increase that level by 4 to reflect evidence that, under existing case law, supports the conclusion that he acted as an "organizer or leader,[1]" and sentence him to a sentence within that advisory guidelines range—46 to 57 months.

## II.    ARGUMENT.

### A.   THE RELEVANT LEGAL STANDARD

Where, as here, the government seeks to rely on a cross-reference to increase a defendant's sentencing guidelines range, the government must offer credible evidence, sufficient to establish by a preponderance, that the cross-reference applies. *See generally* U.S.S.G. §1B1.3(a). "Where a defendant has been convicted as a coconspirator, his relevant conduct for sentencing purposes 'includes not only his own acts and omissions but also the reasonably foreseeable acts and omissions of other coconspirators in furtherance of the conspiracy.'" *United States v. Walker-Couvertier*, 860 F.3d 1, 19 (1st Cir. 2017), *cert. denied* 138 S. Ct. 1339 (2018) (*quoting United States v. Dunston*, 851 F. 3d 91, 101 (1st Cir. 2017)). As Application Note 3 to U.S.S.G. §1B1.3(a) provides:

---

[1] Under existing law, Sandoval's conviction, coupled with the trial evidence that he was the leader of the ESLS clique, the four-point "organizer or leader" enhancement is warranted. For the record, however, Sandoval objects to suggestion that he was the organizer or leader of any specific criminal conduct beyond the conspiracy for which he was convicted.

Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the *court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).* In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others. *Accordingly, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).*

(emphasis added). This principle is most commonly applied in drug conspiracies, but is equally applicable in RICO cases, where a court must determine whether the conduct at issue was "reasonably foreseeable *to the particular defendant* in furtherance of the RICO conspiracy to which he belongs . . ." *United States v. Carozza*, 4 3d. 70, 74 (1st Cir. 1993) (emphasis added); *see also United States v. Hurley*, 374 F. 3d 38, 40 (1st Cir. 2004). "'[A] reasonably foreseeable act' [is] an act that a reasonable person who knew everything that the defendant knew at the time would have been able to know in advance *with a fair degree of probability*.'" *United States v. LaCroix*, 28 F. 3d 223, 229 (1st.= Cir. 1994) (emphasis added). A sentencing court must:

 recognize that foreseeability is a forward-looking concept. It is not appropriate to rely upon what the defendant learned about his coconspirators' activities only after the events alleged to be relevant conduct. Rather, the issue is whether, based on what he knew before the events, the defendant should have foreseen them with a 'fair degree of certainty.'

*United States v. Patriarca*, 912 F. Supp. 596, 608 (D. Mass. 1995) (citation, quotation omitted).

Thus, U.S.S.G. §1B1.3(a) governing principle has five important attributes. *First*, the sentencing court must make an "individualized finding" about the "relevant conduct" of each defendant. *United States v. Correy,* 773 F.3d 276, 280 (1st Cir. 2014). *Second*, "'knowledge of a co-

conspirator's activity is not enough . . . each defendant is only responsible for foreseeable conduct within the scope of his own explicit or implicit agreement.'" *United States v. Laboy*, 351 F.3d 578, 583 (1st Cir. 2003) (quoting *United States v. O'Campo*, 973 F.2d 1015, 1023 (1st Cir. 1992)). *Third,* a defendant is only accountable for conduct that can foresee with a "fair degree of probability" or "certainty." *United States v. LaCroix*, 28 F. 3d at 229; *Patriarca*, 912 F. Supp. at 608. Fourth, the government bears the burden of proving relevant conduct by a preponderance of the evidence.[2] *United States v. Dunston*, 851 F. 3d at 101. *Fifth,* the Court's cannot make the "individualized" determination the law requires "without assessing credibility." *Correy*, 773 F.3d at 380-81 (1st Cir. 2014).

Based on the evidence the government offered at trial, the government cannot show that the conduct the Probation Department describes as "relevant conduct" satisfies this standard. To the extent the Probation Department's guidelines calculation relies on evidence *not* offered at trial, *see, e.g*., PSR ¶ 98 ("the victim sustained life-threatening injuries"), Sandoval requests an evidentiary hearing to test the credibility of any witness the government intends to call to present evidence supporting the applicable sentencing cross-reference or enhancement.

### B. THE GOVERNMENT HAS FAILED TO OFFER EVIDENCE SUFFICIENT UNDER THE GUIDELINES TO ATTRIBUTE ANY ALLEGED ATTEMPTED MURDER TO SANDOVAL.

The Probation Department determined that two "attempted murders by Animal [Joel Martinez]" in Chelsea constituted relevant conduct for Sandoval under the guidelines. PSR ¶ 93. Those two

---

[2] This is the currently prevailing legal standard. Defendant contends however, that a beyond a reasonable doubt standard should apply and preserves his objection to the Court's use of a preponderance standard. *See United States v. Gurley,* 860 F. Supp. 2d 95, 99 (D. Mass. 2012).

attempted murders drive the applicable guidelines from 34 (151 to 188 months—an amount, for reasons argued below, that is itself too high) to 43 (life). The Court should apply neither.

1. *Joel Martinez's Alleged Attempted Murder of "WC" on December 27, 2015*[3]

The Probation Department concluded that the adjusted offense level for what it described as an "attempted murder" on December 27, 2015 was **37**—the sum of **33** ("[s]ince the object of the offense would have constituted first degree murder") and **4** ("because the victim sustained life threating injuries"). But there are at least three flaws in the Probation Department's guidelines calculation. *First,* the government has not demonstrated, even by a preponderance of the evidence, that anyone, including ANIMAL, committed an attempted murder of WC. *Second*, the government offered no evidence that WC sustained life-threatening injuries, and the information the government produced in discovery in fact shows the opposite. *Third*, the government cannot establish that any crime that ANIMAL (or others) committed that day against WC was "foreseeable conduct within the scope of [Sandoval's] own explicit or implicit agreement" and therefore properly attributable to him for the purpose of the guidelines. *Laboy*, 351 F.3d at 573 (1st Cir. 2003) (citation, internal quotation omitted).

*The Contemporaneous Police and Medical Evidence.* When the police responded to what the police report described as a "fight" and "altercation" on Pearl Street in Chelsea on December 27, 2015, they found WC sitting up in a doorway "suffering from a stab wound to the upper back area." *See* Chelsea Police Report (attached as Exhibit 1). He was breathing and conscious. *Id.* The police report described the incident (no one was ever charged with the attack) as an "A&B with Dangerous Weapon" in violation of M.G.L. c. 265 §15A, *not* an assault with intent to commit

---

[3] The government chose not to identify WC by name in pre-trial proceedings. His name has been read aloud in Court during jury selection. Nonetheless, Sandoval refers to him by his initials in this Memorandum.

murder in violation of M.G.L. c. 265, §15. WC was transported to the hospital, arriving at 4:29 p.m. *Medicaal Records* at USAO-GD-00064275 (attached as Exhibit 2). He reported that he had been punched, kicked and stabbed once. *Id*. at USAO-GD-00064284 (punched and stabbed), USAO-GD-00064288 (kicked). He was examined, and determined to have a bruise to his left forehead and left shoulder, and a single superficial stab wound, less than a centimeter in diameter, requiring two stitches. *Id*. at USAO-GD-00064293 ("sub-centimeter" wound); USAO-GD-00064290 ("superficial"); USAO-GD-00064289 (describing two stitches); USAO-GD-00064275 (describing bruise to forehead); USAO-GD-00064288 (describing bruise to left shoulder). He was released, less than two hours later, at 6:10 p.m. *Id.* at USAO-GD-00064276.

*The Trial Evidence*. At trial the government argued that Joel Martinez had attempted to kill WC, an eighteenth street member, by stabbing him in Chelsea on December 27, 2015. But the trial evidence does not support that conclusion, even by a preponderance of the evidence. The government offered three primary sources of evidence about the alleged attempted murder at trial:

- The testimony of Mauricio Sanchez ("TIGRE");
- A recording between TIGRE, Jose Hernandez-Miguel ("MUERTO") and CW-1 on January 2, 2016; and
- The testimony of Chelsea Police Officer William Brizuela, who responded to the scene on December 27, 2015.

*TIGRE's Testimony*. TIGRE testified about the event pursuant to his cooperation agreement. He testified that on December 27, 2015, he told ANIMAL "to come out with me to look for culeros." Tr. 13-49. ANIMAL, in turn, called three others, Luis, David and Sergio. *Id*. (TIGRE had never killed a rival gang member or anyone else; he had, however, falsely bragged about killing his own mother. Tr. 14-14.). In Chelsea, they saw a group of 18th Street gang members. Tr. 13-52. ANIMAL, TIGRE and the others followed them. *Id.* at 13-53. When ANIMAL caught the

18th Street members, ANIMAL allegedly "beat him with a chain that he had in his backpack." *Id.*

WC ran, and knocked on a door across the street. *Id.* at 13-54. ANIMAL caught him, and started

beating him again; TIGRE joined. *Id.* WC again escaped. *Id.* TIGRE testified:

> [A]. [WC] crossed the street at this corner. And at that corner, *Luis* arrived and lifted him up like this with his hand. He stopped him, and all of us beat him. I hit him on the head, and we were all beating him. I saw that the guy was on the floor, on the ground.
>
> Q. Did you kill him?
>
> A. No, but he looked like he was in bad shape.
>
> Q. Did you stop beating him?
>
> A. Yes.
>
> Q. Why?
>
> A. There were a lot of people around. It was early in the day.

*Id.* (emphasis added). TIGRE also testified that, the following day, he told Sandoval "that we had

beaten up a chavala on Broadway in Chelsea." *Id.* at 13-57.

> *The January 2, 2016 Recording.* TIGRE also identified part of a call on January 2, 2016

(Trial Exhibit 116) as relating to the December 27, 2015 attack:

> **TIGRE:** "There, like that, man. The chavalas ran, and we were chasing after them, homeboy. You can imagine how I looked little as I am, but I didn't give a shit, homie. A huge beast after those little culeros, but you can imagine."
>
> **CW-1:** "No, but they are real sons of bitches. If you are not careful, they will stab you."
>
> **TIGRE**: "No, homie. He had some shit in his hand and with one kick, kicked it out of his hand right away. I had the knife like that in my hand, dude, and when the woman saw it, homeboy, police, police. The burglar is going to kill him she said. There were a lot of fucking people, homeboy, yelling it out there in front of all the people, homie. Fuck, but you know that he was left there all fucked up."
>
> **MUERTO:** "That boy."
>
> **TIGRE**: "And they picked him up there. The ambulance picked up that culero."
>
> **CW-1**: "Oh, yes."

**TIGRE**: "Precisely, homie. He was beaten up, dude. Homeboy, *Luis*, that kid, he had the knife like this, hidden like this, dude. He was going to like this, bloop, homeboy. And I was -- when he was on the ground, I was hitting his head with my foot, dude, I was saying, fuck, the Maras is here, son of a bitch, you can imagine."

Tr. 13-71-72 (emphasis added).

_The Testimony of Officer William Brizuela_. Officer Brizuela testified that he responded to the corner of Pearl and 4th Streets in Chelsea on the afternoon of December 27, 2015 to a report of a stabbing, and testified that he arrested Luis, David, and Sergio in the basement of a nearby building and charged them with trespassing. Tr. 12-160, 162-64.

_Summary of the Evidence_. Taken together, this testimony falls short of establishing, as the Probation Department concluded, that ANIMAL intended to commit first-degree murder or that WC sustained life-threatening injuries. There is a significant gap between the account the government elicited from TIGRE, TIGRE's description of the events to MUERTO and CW-1, and the contemporaneous medical evidence. The most credible evidence about the nature of the assault and the extent of the injuries comes from the medical record (not presented by the government at trial), showing that WC sustained only a small, superficial stab wound and two bruises. TIGRE's testimony—to the extent that it describes a stabbing at all (as noted, even he claims only to have told Sandoval that he and others had "beaten up" a culero), puts the knife in *Luis's* hand, not ANIMAL's (an important distinction for sentencing purposes, as argued below), and reports that Luis used the knife only *after* ANIMAL had kicked something out of WC's hand. TIGRE never identifies ANIMAL as having stabbed WC. TIGRE also acknowledged at trial that he often exaggerated his own exploits to "show off" (as noted, TIGRE falsely claimed that he had killed his own mother, and seven others, Tr. 14-14.). Here, the medical records are compelling evidence that the testimony that the government elicited from TIGRE about the stabbing of WC ("Q. Did you kill him? A. No, but he looked like he was in bad shape") was itself a significant exaggeration.

_Legal Elements_. As the Court instructed the jury[4], first-degree murder requires proof that the defendant "consciously or purposely intended" to kill the victim and did so with "deliberate premeditation" or that the defendant acted with malice and "committed the killing with extreme atrocity or cruelty." _Court's February 20, 2018 Jury Instructions (Murder)_; _Commonwealth v. Zanetti_, 454 Mass. 449, 467, 470-71 (2009) (promulgating Massachusetts Model Homicide instruction). Malice, as the Court instructed the jury, requires proof that the defendant either "(a) intended to kill the victim, (b) intended to cause grievous bodily harm to the victim, or (c) intended to do an act which, in the circumstances known, a reasonable person would have known created a plain and strong likelihood that death would result." _Id._ Conviction for second-degree murder likewise requires proof of malice. _Id._

Proof of _attempted_ murder (assault with intent to murder in violation of M.G.L.c. 265 §15; or armed assault with intent to murder in violation of M.G.L.c. 265 §18(b)) also requires evidence "that the perpetrator possessed a specific intent to kill" or that the perpetrator, while armed with a dangerous weapon, "possessed a specific intent to cause the death of the person assaulted." _Court's February 20, 2018 Jury Instructions (Assault with Intent to Murder, Armed Assault with Intent to Murder); Commonwealth v. Johnston,_ 466 Mass. 555, 559-62 (2006); _Commonwealth v. Vick_, 454 Mass. 418, 428 (2009).

The government failed to offer credible evidence that the perpetrators' attack on WC was undertaken with the specific intent to kill him. That was certainly not the result. The government offered no evidence about the intent of either ANIMAL or Luis. TIGRE testified at length, stating that he told ANIMAL "to come out with me to look for culeros." Tr. 13-49. TIGRE had never killed anyone (Tr. 14-13), and there is no basis grounded in evidence to infer that he intended to

---

[4] Defense counsel's copy of the trial transcript does not include a transcript of the Court's charge. The language quoted comes from the copy of the instructions the Court circulated.

participate in a murder on December 27, 2015. TIGRE's conclusory description of the assault as an "attempted murder" cannot fairly be relied on for evidentiary purposes. The record contains no evidence that TIGRE's knew how that crime is defined under Massachusetts law. Moreover, Sandoval objected, and the Court sustained, the prosecutor's use of that term in questioning. *See* Tr. 13-27, 56. And the extemporaneous description by law enforcement and the clear medical evidence stands in sharp contrast to that characterization.

*The Events Concerning WC Were Not Foreseeable to Sandoval for Guidelines Purposes.* The government presented no evidence that Sandoval authorized the December 27, 2015 attack on WC, or even knew about it in advance. The only evidence about the attack the government offered demonstrated that *Luis*, not ANIMAL (as the Probation Department concluded) stabbed WC. The government presented no evidence that Sandoval ever even *met* Luis. And the evidence the government offered does not support, even generally, the conclusion that any crime committed by ANIMAL was foreseeable, within the meaning of the sentencing guidelines, to Sandoval. Sandoval spoke to ANIMAL for the first time, at CW-1's *insistence*, Trial Exhibit 106 at 3, on December 6, 2018. During that conversation, Sandoval only told ANIMAL to "come by" so that ANIMAL can find out "how [they] think as a group" and confirm if ANIMAL's "way of thinking coordinates with [theirs]." *Id*. at 5. At no point during this conversation did Sandoval indicate or imply that ANIMAL would need to "try out" before hanging out with the clique or commit any additional crimes to prove himself worthy of joining MS-13. The opposite is true— Sandoval states during the call that ANIMAL "does not need to see [him]," should not come to the garage, and that all that needed to take place was a "conversation," "discussion," or "talk" before a decision was made. *Id*. at 3, 5. At trial, the government failed to offer any evidence that Sandoval expected ANIMAL

to commit additional acts of violence, ordered him to do so, instructed anyone to surveil, mentor, or incite ANIMAL's actions, or requested that anyone report back on ANIMAL's activities.

In sum, the government has failed to meet its burden to show by a preponderance of the evidence that the December 27, 2015 attack on WC was "foreseeable conduct within the scope of [Sandoval's] own explicit or implicit agreement." *United States v. Laboy*, 351 F.3d at 583 (citation and internal quotation omitted). And while "knowledge of a co-conspirator's activity is not enough . . .," *id.*, the government cannot even prove that Sandoval knew about the attack before it happened. And even after the fact, Sandoval was allegedly informed only of a *beating*, not a stabbing or an attempted murder.

### 2. *Joel Martinez's January 1, 2016 Alleged Attempted Murder*

The Probation Department concluded that the adjusted offense level for what it described as an "attempted murder" on January 1, 2016 was **35**—the sum of **33** ("[s]ince the object of the offense would have constituted first degree murder") and **2** ("because the victim sustained serious bodily injury."). PSR ¶¶ 104-05. For many of the same reasons identified in the discussion above about the alleged December 27 attempted murder, this conclusion is also incorrect.

*Evidence About the January 1, 2016 Attempted Murder*. The only testimony the government offered about this stabbing came from MUERTO. MUERTO testified that BRUJO told him (MUERTO) that BRUJO, ANIMAL and several others were driving in a van in Chelsea owned by someone named MERCHO. According to BRUJO (MUERTO testified), "they told [MERCHO][5] to stop the van and they jumped out of the car. It was BRUJO, ANIMAL, and the other two were the ones that would hang out with ANIMAL, and he said that they started following the chavalas

---

[5] The transcript says MUERTO, not MERCHO; in context, this is clearly an error.

and one tried to run towards the park and they grabbed him there and BRUJO said that he stabbed him with a knife." Tr. 8-93[6].

The government offered transcripts of two tape recordings that described this assault. Trial Exhibits 114-15. In the first, Exhibit 114, ANIMAL calls CW-1 to report that "BRUJO and I just did an awesome hit, dog." *Id.* at 1. ANIMAL reported to CW-1 that he and BRUJO had stabbed a chavala:

> We got a chavala, doggie. I was holding him, doggie, and dangling him while the homeboy stabbed with a knife, and when the culero tried to run, he would scream and hang on him and this homeboy would lunge at him with the knife and here is the evidence here, I have the knife and here is UI of the blood, doggie.

*Id.*  On the transcript, BRUJO states: "I struck that son of a bitch with a knife and UI." At trial, the government presented no evidence to corroborate this assault. The government offered none of the evidence described in PSR ¶¶ 75-78, no evidence of the extent of any injuries the victim allegedly suffered, and no other evidence describing BRUJO's intent at the time of the alleged stabbing. To the extent the government requests that the Court rely on that information for sentencing, defendant requests that the Court conduct an evidentiary hearing to permit the Court to exercise its responsibility to determine whether any such evidence is credible.

*Sandoval Did Not Direct or Approve the January 1, 2016 Murder*. Again, the government offered no evidence at trial that Sandoval knew about the alleged attack on January 1, 2016 in advance, directed it to take place, or authorized it. Based on information provided by the government, the Probation Department concluded that Sandoval explicitly "approved of the attacks on rivals," quoting Sandoval as saying "[t]he homie wasn't doing anything wrong, He was doing the

---

[6] MUERTO described this as an "attempted murder." For the reasons stated above, the Court should conclude that this conclusory description is an insufficient evidentiary basis to apply the murder cross-reference.

things that he's supposed to be doing, dog. You know?" PSR ¶ 85. The Probation Department's conclusion is erroneous. In the exhibit the government offered, Trial Exhibit 31, the statement of Sandoval's quoted above follows an ellipsis. *Id.* at 10. The transcript provided to counsel prior to trial makes clear that five pages of the transcript have been omitted—pages 40-44 of the pre-trial transcript. *See Draft Transcript* (attached as Exhibit 3). Those pages describe a dispute between CHECHA (defendant Cesar Martinez) and CW-1. CHECHA, unhappy that CW-1 and MUERTO had brought ANIMAL and his friends to the garage in Everett, threatened CW-1 that if "they closed down this shop, that he was going to hang this kid by the neck . . . ." *Id*. at 40. The dispute between CW-1 and CHECHA continues, and Sandoval tells CHECHA, "We have to be careful about how we express ourselves after a few drinks." *Id*. at 44. It was in reference to this argument – between CHECHA and CW-1 – that Sandoval intervened and made his statement concerning a "homie [not] doing anything wrong." The discussion, in its entirety, does not support the conclusion that Sandoval's remark constituted approval for ANIMAL's actions on December 27, 2015 or January 1, 2016.

## C. THE COURT SHOULD NOT APPLY THE ACCESSORY AFTER-THE-FACT CROSS-REFERENCE; ALTERNATIVELY, THE COURT SHOULD CONCLUDE THAT SANDOVAL'S ROLE WAS LIMITED TO "HARBORING" MARTINEZ.

The PSR concluded that Sandoval is separately accountable for sentencing purposes as an accessory after the fact to the murder of Irvin de Paz by Joel Martinez, PSR ¶ 94, resulting in a base offense level of 30. Sandoval objected to this determination. As a factual matter, as defense counsel acknowledged in his closing, Sandoval did urge others to help Martinez pay for a place to live after MUERTO and CW-1 (at the FBI's behest, although Sandoval obviously did not know it at the time) brought Martinez back from New Jersey after Martinez killed De Paz. Sandoval makes two objections to the Probation Department's calculation. *First,* as a matter of law, the Court should conclude that use of U.S.S.G. 2X3.1(a)(3)(A)'s accessory after the fact cross-reference is

not permitted here, where Congress chose not to make "accessory after the fact" a RICO predicate. *Second,* should the Court conclude that the accessory-after-the-fact cross reference *does* apply here, Sandoval requests that the Court apply U.S.S.G. 2X3.1(a)(3)(B), which provides that "[i]n any case in which the conduct is limited to harboring a fugitive . . . the base offense level . . . shall not be more than 20."

      1.     *The Accessory-After-the Fact Cross-Reference is Inapplicable in RICO cases.* The definition of "racketeering activity" is limited to a highly particular and clear list of crimes set by the RICO Act. *See* 18 U.S.C. § 1961(1). RICO is aimed at addressing conduct, and this conduct must specifically meet the definitions and meaning of the statute. To conclude otherwise would simply create too much discretion in defining what constitutes "organized crime" and punish defendants under the guidelines for crimes RICO does not permit. *See Zurkowsky v. Gov't Dev. Bank (GDB)*, 52 B.R. 1007, 1011 (D.P.R. 1985) (RICO "must be strictly adhered to because the statute is a relatively specific one, designed to accomplish certain Congressional intent") (quoting *Ralston v. Capper*, 569 F. Supp. 1575, 1579 (E.D. Mich. 1983) ("Where the RICO statute itself defines the offense, there is no reason to allow courts to impose additional definitions according to their own conceptions of what 'organized crime' is or is not.")). While Congress has chosen to include numerous predicate offenses in the statute, the definition does not include accessory after the fact as one such predicate for RICO purposes.[7] Given that any allegations that Sandoval was an accessory after the fact would not qualify him as a RICO co-conspirator, it should similarly not be permitted for use at sentencing.

      2.     *The Court Should Rely on the Guidelines' "Harboring" Limitation.* The government's evidence about Sandoval's conduct as an accessory after the fact to Martinez's murder of

---

[7] The government likewise did not identify accessory after the fact as a predicate offense in the indictment.

Irvin de Paz comes from Sandoval's participation in Martinez's "jump-in" ceremony on January 8, 2016. Trial Exhibit 31. The government offered no evidence that Sandoval knew Martinez before CW-1 introduced Martinez to Sandoval by telephone on December 6, 2015, and the transcript of that conversation makes clear that Sandoval did not know Martinez until CW-1 introduced the two men on that date. Trial Exhibit 106. The government offered no evidence that Sandoval and Martinez met or spoke between December 6, 2015 and January 8, 2016. At the January 8, 2016 clique meeting, Sandoval and others spoke about helping Martinez escape responsibility for his participation in De Paz's murder by helping him find a place to live. Indeed, all of Sandoval's comments about helping Martinez focus on that subject:

> CASPER: And the plan that we have for this homeboy once he's in, so that the police does not get him, we have to take care of this dude, homies. How are we going to do it?
>
> MUERTO: Well, that's why…
>
> CASPER: Do you have a place to stay right now?
>
> MUERTO: That's the same thing, we're moving him.
>
> CASPER: Where to stay and everything?
>
> MUERTO: That's why we're moving him however we can, dude. Also, several dudes don't want to give him a place to stay, dude. So then…[8]
>
> ***********
>
> MUERTO: That's what I'm saying. Many of the dudes don't want him staying there anymore. So, what we're doing is moving the guy.
>
> CW-1: I've even paid for hotels for the dude and the man can tell you. Out of my own pocket.
>
> MUERTO: Yeah.
>
> CASPER: Fuck! That's awesome, dog.

---

[8] Trial Exhibit 31, at 2.

MUERTO: Yeah. So, right now we have him at a house over there, dude. It's been, he's been at a house for a month. He's all set in that house for now, dude. The dude has a room there and…[9]

***[10]

LOBO: There is, there is a room right now for 500 fucking bucks. I don't know if you guys are in agreement.

CABALLO: Where?

LOBO: Because I know that girl. But I'd prefer not telling her that this homie is with the Mara, you know?

CASPER: Yes, but 500 bucks is expensive, son of a bitch.

CABALLO: No man, five hundred bucks is cheap, dude.

CW-1: And where is it, dude?

LOBO: Here in Chelsea, next to the clock.

CABALLO: And in Chelsea?

CASPER: No, man. This dude has to go far away from there, dude.

CW-1: And who is it with, man?

CABALLO: No but, hey, dude, but five hundred bucks is cheap because it's expensive right now.

LOBO: It's with a lady that I know, a friend of mine who is going to kick out an old guy.[11]

***********

CASPER: Those are the territories that this dude, can't be in, dude. So then, we are going to, we are going to send this dude to the clique, homeboy. We have to hide him so that he won't be arrested, dude. Right now, it is our priority that this dude not be locked up, dude. [12]

***********

CASPER: I'm going to give you something to get a room for this homeboy for 500 bucks I'm calculating that we all have to meet twice a week, man. The thing

---

[9] *Id.*

[10] This ellipsis was in the government's Trial Exhibit. In this passage, the other ellipses are defense counsel's.

[11] Trial Exhibit 31, at 3.

[12] *Id.*

is like this, dude. This homie has to learn how to look after himself. He has to find a job.[13]

*************

CASPER: Yeah, but, it's going to be very difficult for us to be give 500 bucks for this dude's rent..

CW-1: No, no, no, not 500 dollars. That's just to get started, understand? Just while he…because we also have to think about the move.[14]

Because Sandoval's role in assisting Martinez following Martinez's murder of De Paz was limited to helping him find a place to live, and encouraging others to do likewise, the appropriate cross-reference for guidelines purposes is U.S.S.G. 2X3.1(a)(3)(B), and the appropriate base offense level is 20, not 30.

The First Circuit's opinion in *United States v. Greig*, 717 F.3d 212 (1st Cir. 2013) shows why the "limited to harboring" guidelines provision applies here. In *Greig*, the defendant, Catherine Greig, a longtime girlfriend of James Bulger, lived with him while Bulger was a fugitive for sixteen years. *Id.* at 215-17. Greig sought to invoke U.S.S.G. 2X3.1(a)(3)(B)'s "limited to harboring" language to reduce her advisory guidelines base offense level to 20, but the First Circuit rejected that attempt. The Court noted that Greig had done far more than simply help Bulger find housing. She participated in the creation of false identification documents (a separate crime to which she pleaded guilty) and told a false story to a transient woman to obtain that woman's identification documents for herself, so that she could stay on the run. *Id.* at 215. She told false stories to help conceal her and Bulger's identities. *Id.* at 216. She "saw to [Bulger's] day-to-day needs, ran errands, maintained the house, paid the bills, and helped him procure medical treatment and needed medications." *Id.* at 219. Because the Court concluded that Greig did more than "merely

---

[13] *Id.* at 7.

[14] *Id.* at 12.

house the fugitive" it concluded that U.S.S.G. 2X3.1(a)(3)(B) did not apply and the correct guide-lines provision was U.S.S.G. 2X3.1(a)(3)(A), which set the base offense level at 30. *Id.* at 219; *see also United States v. Vega-Coreano*, 229 F.3d 288, 289-90 (1st Cir. 2000).

Here, the government has failed to offer evidence that Sandoval did more than agree to pay Martinez's rent. (Indeed, the government has failed to offer evidence that Sandoval actually *contributed* to Martinez's rent.). Because, in sharp contrast to *Greig*, Sandoval did no more than agree to "merely [help] house the fugitive," U.S.S.G. 2X3.1(a)(3)(B) should apply, and his base offense level should be 20, not 30.

### D. Consideration of the Factors Set Forth in 18 U.S.C. 3553(a) Counsels Against the Imposition of the Statutory Maximum.

Determining the advisory guidelines range does not, of course, end the individualized analysis concerning the fair and appropriate sentence for Sandoval. The Court must determine "whether other factors," including those listed in 18 U.S.C. § 3553(a), "warrant an ultimate sentence above or below the guideline range." *United States v. Rodriguez*, 731 F.3d 20, 26 (1st Cir. 2013). "'[A] sentencing judge should engage in a . . . holistic inquiry,' by considering 'a tapestry of factors, through which runs the thread of [the] overarching principle' of parsimony." *United States v. Russell*, 537 F.3d 221, 228 (1st Cir. 2008) (quoting *Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008)). By law, the ultimate disposition must be "sufficient, but not greater than necessary" to advance the statutory purposes of sentencing. Under 18 U.S.C. § 3553(a), the Court must consider, in addition to the guidelines:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

*     *     *     *     *

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

*Sandoval's Personal History and Characteristics.* As acknowledged by the Probation Department, Sandoval, who was born in El Salvador, fled to the United States in his teens as a political asylee. PSR ¶¶ 125-27. Sandoval's father was a member of the Farabundo Martí National Liberation Front (in Spanish: Frente Farabundo Martí para la Liberación Nacional or "FMLN"). The FMLN was one of the main participants in the Salvadoran Civil War, representing El Salvador's farming class. Sandoval's father fled El Salvador for the United States because the Salvadoran government and armed forces threatened to kill him and other FMLN guerillas as part of ongoing offensives to maintain control of El Salvador that took place in the late 1980s and early 1990s. After his father's departure, these threats transferred to Sandoval, whose own life was repeatedly threatened, most seriously when his skull was fractured after being intentionally run over by a car. Sandoval is, and has always been, legally present in the United States, although this conviction is sure to trigger removal proceedings.

After arriving in the United States, Sandoval attended high school for two years, but unfortunately needed to abandon his studies in the middle of the 11th grade in order to work full-time to support his family. Sandoval worked full-time consistently and legally as a driver, even obtaining his commercial driver's license, for over a decade up until the time of his arrest. He supported his mother (his father passed away as a result of a heart attack in 2006), younger brother, and three children throughout the time of his employment.

In 2009, Sandoval learned that MS-13 gang members had killed his half-brother, who remained in El Salvador and served as a police officer. Sandoval, mourning the loss of his brother, attempted to investigate who specifically had killed his brother and the motives for doing so. It was at this time that he encountered local MS-13 members, who convinced Sandoval that it was necessary to join MS-13 in order to protect himself and his family from further violence. This is a dilemma persistently faced by immigrant populations living in socioeconomically disadvantaged neighborhoods all across the country – join up or remain susceptible to threats (violence, deportation, etc.) with no one to protect you.

At trial there was significant evidence that Sandoval was at odds with MS-13 leadership. As the government and Sandoval stipulated, during the investigation, CW-1 told agents that Sandoval:

- wanted to keep ESLS meetings secret from MS-13 leadership in El Salvador;
- did not want ESLS members to follow MS-13 rules requiring, among other things, the collection of "rent" from local business; and
- criticized another MS-13 member for engaging in a shooting, calling him "crazy" and "acting like he's in El Salvador."

Tr. 14-101. In May 2015, MS-13 leaders talked in conference calls about punishing Sandoval for disobeying their orders and replacing him as the leader of the clique. Tr. 5-63. Over the course of the summer of 2015, the dispute between Sandoval and MS-13 leadership escalated. *Id.* at 5-71. MS-13 leaders greenlighted—that is issued an order to kill Sandoval—so serious that on September 3, 2015, agents warned Sandoval that his life was in danger. *Id.* Senior MS-13 leaders discussed planning to kill Sandoval at a meeting in Virginia in December 2015. *Id.* at 5-83-86. The government warned counsel that MS-13 had renewed the instruction to kill Sandoval as recently as the Friday before the start of trial.

These circumstances influenced Sandoval's decision to go to trial. Going to trial created a possibility, however remote, that he might be able to avoid being killed by MS-13 in prison or in El Salvador, following post-imprisonment removal proceedings. Sandoval regrets his decision to join MS-13. He never anticipated when he came to the United States that he would join a gang and face serious legal consequences for doing so. Sandoval remains conscious of the fact, however, that time served in a federal prison may likely result in his death at the hands of MS-13. If his sentence is completed and he is likely deported back to El Salvador, there he will be even more vulnerable to threats and attempts to take his life.

*Deterrence/Public Protection*. The sentence Sandoval urges the Court to impose is sufficient to deter future criminal conduct and protect the public. There is no evidence that Sandoval committed crimes outside MS-13, and the evidence of MS-13 leadership's threats to kill Sandoval, coupled with the prospect of Sandoval's removal, makes further criminal conduct by him highly unlikely.

*Avoiding Unwarranted Sentence Disparities*. A core aim of the guidelines regime is the elimination of unwarranted disparities in sentences among similarly situated offenders. Thus, in determining a fair and appropriate sentence for a particular defendant, the Court must consider "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); *see Gall v. United States*, 552 U.S. 38, 55 (2007) (holding that sentencing judges should consider "unwarranted disparities" among co-defendants when imposing sentences). Here, the defendant has no criminal record. And to defense counsel's knowledge, no defendant charged in this case solely with RICO conspiracy rather than predicate crimes has been sentenced to the statutory maximum.

*Promoting Respect for the Law and Providing Just Punishment*. A sentence substantially below the statutory maximum is sufficient to satisfy the ends of punishment in all the circumstances present here. Indeed, on these facts, Sandoval respectfully submits that a sentence based on the Probation Department's calculation would be substantively unreasonable. Sandoval's argument draws on principles derived from cases describing what the First Circuit has described as "sentencing factor manipulation." Those cases recognize that in certain circumstances, the government's instigation of the criminal conduct at issue may serve as mitigation, and reduce a defendant's advisory guidelines range. This Court summarized the cases in its opinion in *Beatty v. United States*, 2012 US Dist. LEXIS 147967 (Oct. 15, 2012):

> Sentencing-factor manipulation occurs 'where government agents have *improperly* enlarged the scope or scale of the crime.' *United States v. Montoya*, 62 F.3d 1, 3 (1st Cir. 1995) (emphasis in original). A [defendant] 'must show that "the agents overpowered the free will of the defendant and caused him to commit a more serious offense than he was predisposed to commit."' *United States v. Jaca-Nazario*, 521 F.3d 50, 58 (1st Cir. 2008) (quoting *United States v. Barbour*, 393 F.3d 82, 86 (1st Cir. 2004)). When sentencing-factor manipulation occurs, the sentencing court may ignore the transaction in computing relevant conduct or depart downward from the guideline sentence and statutory minimums. *Id.* A [defendant] must prove sentencing-factor manipulation by a preponderance of the evidence. *West v. United States*, 631 F.3d 563, 570 (1st Cir. 2011). A [defendant] seeking to show sentencing-factor manipulation bears a high burden and must show that agents engaged in 'extraordinary misconduct.' *Id.* at 570 (quoting *United States v. Fontes*, 415 F.3d 174, 180 (1st Cir. 2005). A claim of sentencing-factor manipulation requires more than a 'showing that the idea originated with the government or that the conduct was encouraged by it, or that the crime was prolonged beyond the first criminal act, or exceeded in degree or kind what the defendant had done before.' *Montoya*, 62 F.3d at 3-4 (internal citations omitted) (noting that a defendant is not often helped by arguing over the number or size of transactions when 'the extent of the crime is more likely to be a matter of opportunity than of scruple').

*Id.* at *15-16. The high standard the First Circuit has set, as *Beatty* correctly describes, presents challenges to the application of sentencing factor manipulation here. Sandoval cannot, consistent

with the facts, contend that the government "overpowered [his] free will" when he agreed to accept Martinez as a clique member, and Sandoval does not contend (putting aside for these purposes, but not waiving, his contention that Congress's determination that accessory after-the-fact is not a RICO predicate), that sentencing factor manipulation should impact his sentencing based on the accessory-after-the-fact cross-reference to the guideline. U.S.S.G. 2X3.1(a)(3). But the attempted murder cross-references stand on a different footing, as there is no evidence that Sandoval knew or approved of these attempted murders before they occurred. Sandoval respectfully submits that failing to take the government's role in the events leading to these alleged attempted murders— and other crimes—into account, would make a sentence based on what the Probation Department and the government contend that Joel Martinez and others did substantively unreasonable. *See, e.g., United States v. Sirois*, 893 F.3d 134 (1st Cir. 2018) (generally describing reasonableness review). The relevant facts are these:

- Despite calling two ESLS clique members who have known Sandoval for years (in MUERTO's case, twelve years, Tr. 6-128, 130 (2004 to 2016); in TIGRE's case, three years, Tr. 13-13, 17 (2013-2016)), the government offered no evidence that Sandoval personally participated in any act of violence, or counseled, commanded, authorized or directed any other ESLS member to commit any act of violence.

- The government's introduction of CW-1 into Massachusetts itself created unauthorized criminal conduct that would not otherwise have occurred. In particular, CW-1 engaged in a series of unauthorized robberies of as many as 30 or 40 gypsy cab drivers in Chelsea and Everett (one such robbery involved a stabbing), *see Grand Jury Testimony* (attached as Exhibit 4), set in motion the events that led to a stabbing in Highland Park, Chelsea on May 12, 2015, Tr. 10-35-36, and, at least according to MUERTO's statement to the FBI, held the victim down as others stabbed him. The government knew about CW-1's unauthorized criminal activity as early as December 2015. Exhibit 4; Tr. 11-11.

- At the direction of the FBI, CW-1 introduced Martinez, then living in New Jersey, to Sandoval. Tr. 14-27; Trial Exhibit 106.

- At the direction of the FBI, and despite the fact that the FBI knew that Martinez had confessed to the murder of Irvin de Paz, CW-1 and MUERTO drove Martinez back to Massachusetts. Tr. 5-102.

- As a result of a request from the FBI task force, the Boston Police Department, who were then conducting an investigation into De Paz's murder and had interviewed an eyewitness, transferred their files concerning their murder to the task force and stopped actively working the case. Tr. 3-112.

- Despite the fact that Martinez was subject to deportation proceedings, the FBI consciously chose not to turn him over to ICE. Tr. 14-25.

- Despite the fact that the FBI had chosen to cause CW-1 to bring Martinez back to the Boston area, it took no steps to have law enforcement officials surveil him, monitor his whereabouts, or warn local law enforcement that it had returned Martinez to the Boston area. Tr. 5-67; 12-165-66; 14-85-86.

- The FBI relied on CW-1, not other law enforcement officers, to "keep an eye on" Martinez. CW-1 instead appears to have encouraged Martinez and others to commit violent crimes. It is telling, for example, that when Martinez sought to "report" the "hit" he allegedly committed on January 1, 2016, he called CW-1, not Sandoval. Trial Exhibit 114 at 1; Trial Exhibit 115 at 1-5. CW-1's telephone conversation with Martinez reveals CW-1 actively encouraging the commission of violent crimes by Martinez and his friends. The government offered no evidence suggesting that Sandoval ever encouraged Martinez to do so.

Sandoval recognizes that the Court must sentence him based on the jury's verdict and the evidence the Court heard, and that, under the Sentencing Guidelines, the advisory range is not based solely on his personal conduct, but on "foreseeable conduct within the scope of his own explicit or implicit agreement." *United States v. Laboy*, 351 F.3d at 583 (citations, internal quotations omitted). Nevertheless, the Probation Department's determination of the advisory sentencing range places Sandoval well beyond the statutory maximum based on two alleged acts that Sandoval did not authorize, direct, or even know about in advance. CW-1 and the FBI played a larger role in causing these events than Sandoval, who played no role. The FBI chose to return Martinez to Boston, failed to surveil him or warn local law enforcement about him, despite asking local law enforcement to turn over their investigation of De Paz's murder, and effectively deputize CW-1 to

24

"keep an eye on" Martinez, despite knowing that CW-1 himself had engaged in as many as 30 or 40 unauthorized cab robberies, one resulting in a stabbing. CW-1 (not Sandoval) appears to have actively encouraged Martinez and others to commit those acts. On these facts, imposing a statutory maximum sentence on Sandoval would be substantively unreasonable.

### III.    CONCLUSION.

For the reasons stated above, Sandoval respectfully requests that the Court determine that the advisory guidelines range is 46 to 57 months and to impose a sentence within that range.

Respectfully submitted,

Dated: October 4, 2018

*/s/ Madeleine K. Rodriguez*
Martin F. Murphy, BBO #363250
Madeleine K. Rodriguez, BBO #684394
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617- 832-1000
Fax: 617-832-7000
mmurphy@foleyhooag.com
mrodriguez@foleyhoag.com

*Attorneys for Herzzon Sandoval*

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on October 4, 2018.

*/s/ Madeleine K. Rodriguez*
Madeleine K. Rodriguez