## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Cr. No. 15-10338-FDS** |
| ) | |
| **6.   HERZZON SANDOVAL,** ) | |
| **a/k/a "Casper,"** ) | |
| **Defendant** ) | |

### SENTENCING MEMORANDUM OF THE UNITED STATES

On February 26, 2018, after a month-long trial, a United States District Court jury found the defendant, Herzzon Sandoval, also known as "Casper," guilty of racketeering conspiracy, in violation of 18 U.S.C. §1962(d). Sandoval was the undisputed, long-time leader of one of the largest MS-13 cliques in Massachusetts. Sandoval fully embraced his role as the "First Word" for the Eastside Locos Salvatrucha (ESLS) clique. He worked to protect and promote an MS-13 gang member who assassinated a fifteen-year-old boy in East Boston. He supervised clique members who roamed the streets looking to kill rival gang members. He punished clique members who did not follow MS-13's rules. His actions demonstrated fidelity to MS-13's core mission to kill rivals and control territory through violence. Sandoval now faces sentencing for his leadership role in the MS-13 racketeering conspiracy, and that sentence must account not only for crimes he committed, but for the crimes others committed while under his supervision and control.

In its Pre-Sentence Report (PSR) dated October 2, 2018, the United States Probation Office concluded that Sandoval was an accessory after the fact to an MS-13 murder and that two attempted murders by members of his clique were reasonably foreseeable to him. Probation calculated Sandoval's Guidelines sentencing range (GSR) as life in prison (though his statutory maximum is 20 years). Sandoval deserves to receive the greatest punishment

allowed by law. The government recommends that the Court sentence Sandoval to 240 months in prison and three years of supervised release.

I.   **The Evidence**

On January 8, 2016, members of MS-13's Eastside Loco Salvatrucha (ESLS) clique gathered at their traditional meeting location, a garage in Everett. As always, the meeting was led by Sandoval, the long-time "First Word" or leader of the ESLS clique. Two years before, the Federal Bureau of Investigation (FBI) secretly recorded a conversation with Sandoval and his second-in-command, Edwin Guzman, also known as "Playa," where they analogized that they were the "Obama and the vice president" of ESLS. During the FBI's investigation into MS-13, agents had secretly recorded Sandoval running numerous ESLS clique meetings. Sandoval called the meetings to order, recognized members to speak, and selected topics for discussion. At the meetings, clique members paid dues used to support MS-13 generally, to support deported members in El Salvador, to acquire and replace clique firearms, and to defray legal or court costs of clique members. Sandoval disciplined members who violated gang rules and, with the clique's input, Sandoval promoted worthy probationary members to "homeboy," or full status, in MS-13.

At the January 8, 2016 meeting, Sandoval led the clique in a discussion of whether to promote or "jump in" Joel Martinez, also known as "Animal." For months, Animal had eagerly sought to become an MS-13 homeboy. On September 20, 2015, Animal and other MS-13 members spotted Irvin De Paz, a fifteen-year-old student and member of the rival 18th Street gang, near Trenton Street in East Boston. Surveillance video captured the victim running for his life as Animal chased him down Trenton Street before he repeatedly plunged

a knife through his chest, arm and back, killing him. Thereafter, agents secretly recorded

Animal bragging about the murder:

| | |
|---|---|
| CW-1: | So how many times did you stab him? |
| ANIMAL: | I stabbed the culero three times, but I stabbed him with a thing like this. |
| CW-1: | Pretty. |
| JUVENILE: | I have a knife here that's exactly the same as his, dude. |
| ANIMAL: | The thing is that culero . . . |
| CW-1: | And where did you stab him? In the chest or in the . . . |
| ANIMAL: | The first one, I stabbed him right here and he was falling dead, right. I reached him then, I was behind him, dude, and I reached him. He stared at me and he asked me if I was going to, if I was going to stab him. I told him: "Yes, the Mara rules you, chavala," I said to him. |

*****

| | |
|---|---|
| ANIMAL: | That culero, he would run a little bit, and fall over and over again. So, I caught up to him again and that's when I finished him off, man. |
| CW-1: | Awesome, dude, fucking cool, man. |
| ANIMAL: | The thing was that the culero, you know, the Beast had to take him. |

Animal expected the Everett clique to promote him to homeboy for the murder.

Instead, the Everett clique disciplined him for outstanding violations. Disappointed, Animal

spoke to Sandoval about becoming a member of ESLS:

| | |
|---|---|
| ANIMAL: | Yes, [CW-1] knows what's going on, dog. I have heart, UI the barrio and I'm coming from the heart, but I also don't like being marginalized like the Side is doing. You know, doggie, they have me on ice. I do what they tell me, doggie, and later they tell me the opposite. Yes, I'm telling you straight out, doggie. I really want to hang out with your Side, doggie. |

CASPER:        Awesome! As I was explaining, homie, come by this area homie. You will meet all of us, you know. You will find out how we think as a group, homie; and if your way of thinking coordinates with ours, then it's great. Then everything will be solid and we will see what decisions we will make because it's not only my decision, they all have to check you out too, you know.

Sandoval told Animal, "We are going to discuss that shit with these dudes, as I said, and then, yes, we will be in touch." Sandoval then told CW-1 and other MS-13 member that in order to avoid any unwanted problems, ESLS would talk to the Everett clique before promoting Animal: "we'll go see them and we'll tell them before jumping him over." When asked if the Everett clique would support ESLS promoting Animal, Sandoval replied, "And why wouldn't they? It's the same Barrio, MS13." Truth be told, Sandoval did not much care whether the Everett clique balked at ESLS's plan to jump Animal in: "The dude is going to the MS13 Barrio, homeboy, and we belong to the MS13. The dude is not going to another Barrio and they have to accept it. If they don't like it, they can stuff it."

After receiving Sandoval's direction and encouragement, Animal began to associate with homeboys from ESLS.  Within a month, Animal and ESLS homeboys committed two attempted murders. On December 27, 2015, Animal, ESLS homeboy Mauricio Sanchez, also known as "Tigre," and three juveniles—friends of Animal's who also hoped to be considered for membership in MS-13—stabbed a victim in the back on Fourth Street in Chelsea. Thereafter, agents recorded conversations with Animal, Tigre, and others describing how "Animal and the kids" stabbed the victim (Tigre later called Animal "a treasure"). The day after the stabbing, Tigre advised Sandoval that the group had attacked a chavala in Chelsea. When asked why he reported the attack to Sandoval, Tigre said, "Because one has to tell the things that one does to one's runners."

On January 1, 2016, Animal, ESLS homeboy Luis Solis Vasquez, also known as "Brujo," and others committed a stabbing on Chestnut Street in Chelsea. Later that day, Animal and Brujo gleefully reported the attack:

ANIMAL:         Brujo and I just did an awesome hit, dog.

CW-1:           What do you mean?

ANIMAL:         That we got a chavala with Brujito, we got off a truck and we got out to stab a chavala, and there is evidence here that we stabbed him, dude.

CW-I:           So what happened, what do you mean?

ANIMAL:         We got a chavala, doggie. I was holding him, doggie, and dangling him while the homeboy stabbed with a knife, and when the culero tried to run, he would scream and hang on him and this homeboy would lunge at him with the knife and here is the evidence here, I have the knife and here is UI of the blood, doggie.[1]

On the day they met to consider Animal's promotion, Sandoval and other clique members discussed what it took to become a member of MS-13, discussed ways to take credit for Animal's murder, and discussed ways to shield Animal from the police. During the meeting, Sandoval asked Animal, "Do you have a place to stay right now?" ESLS members offered to help Animal find a room to rent. Sandoval explained that they needed to be careful about where they put Animal: "The thing right now, dudes, the move is that this homeboy should not be in Mara's turf. We're in Lynn, Chelsea, East Boston . . . those are the territories that this dude can't be in, dude. So then, we are going to, we are going to send this dude to the clique, homeboy. We have to hide him to that he won't be arrested, dude. Right now, it

---

[1] Martinez was wet with the victim's blood after the stabbing: "No, and when [Brujo] would stab him with the knife, I would beat him more, and that is why I was all splattered. Don't you know I got home with blood all over me?"

is our priority that this dude not be locked up." Sandoval said that Animal also had to "learn

how to look after himself. He has to find a job." Clique members then began to discuss finding

Animal a job. Playa, Sandoval's second-in-command, encouraged the clique to support

Animal: "Hey, look I am quite relaxed here, dude. That dude has killed, dude, and look, that

homie is taking it easy. A lot of people found out about the murder that guy did, dude, and I

ran into the guy walking around . . . and he's all calm dude."

When clique members asked Animal if he wanted to become a homeboy with ESLS,

Animal responded, "Yes, yes, that's why I came to this clique, doggie. I want to be here."

Brujo reiterated to Sandoval and the rest of the clique that Animal had committed two recent

stabbings: "Twice in a short time, he did it with me and that is some serious shit, man . . . he

did another one with Tigre, doggie." Sandoval said, "What I am doing right now, what we

are doing is right. It's not good, you know, to get jumped in alone. He knows he is going

through the same situations as us, and at the same time, we have to see how we're going to

help him out, dude, because we have to take care of that homie."

The group talked about what were the most important characteristics of an MS-13

member. Brujo told the group that they did not need members who were only "here all the

fucking time just because they are at the bars." Prospective members had to be tested: "Let

them come and kill. Let them come and feel the pressure . . . they need to stick the knife in

and see what happens . . . if you have love for the Barrio, you will show your balls there."

Sandoval agreed: "No, look, I'm going to tell you something homie. We need the new

generation of the Eastside, homie. And thanks to the wisdom that we have gained over the

years, homie, we have to pass it along, dude, so that the new Eastside clique can come and

not think badly that we're going to fuck them over because, shit, we are Maras, and the fuckers

here will fuck it up." Duque, another ESLS homeboy, agreed: "The clique has to continue to grow." Sandoval concluded, "Seriously, everything will end up in the hands of the new generation."

At the conclusion of the meeting, Sandoval told the clique, "Let's jump this guy in now." Thereafter, Sandoval and his fellow homeboys welcomed "Animal" to MS-13. ESLS members kicked and beat Animal as Guzman counted for thirteen seconds. After the beating, members flashed MS-13 gang signs as they raced to embrace Animal. One member put his arm around Animal's shoulder and said, "Welcome to the Mara."

## II. Calculating the Guidelines

To determine Sandoval's offense level for his RICO conspiracy conviction, the Probation Office properly applied USSG §2E1.1(a)(2) and calculated the offense level applicable to the underlying racketeering activity—in this case, accessory after the fact to the murder of Irvin de Paz and two attempted murders—which resulted in a combined adjusted offense level of 40. PSR ¶¶93-112. After applying a four-level leadership enhancement based on Sandoval's role as the First Word for the ESLS clique, the Probation Office correctly concluded that Sandoval's total offense level was 44 (capped at 43). PSR ¶¶113-116. The Probation Office did not err as a matter of law or fact in reaching this conclusion.

### A. Accessory After the Fact to the September 20, 2015 Murder of Irvin de Paz

Sandoval objects to the Probation Office's application of the accessory-after-the-fact guideline, USSG §2X3.1, on two grounds. First, he contends that accessory after the fact to murder is not a predicate racketeering offense under the RICO statute and therefore the accessory-after-the-fact guideline should not be used to determine his offense level under the RICO guideline. Second, he argues that, if the Court applies the accessory-after-the-fact

guideline, his conduct was "limited to harboring a fugitive" and therefore his offense level should be 20, not 30. The Court should overrule both objections.

Accessory after the fact to murder falls comfortably within the statutory definition of racketeering activity. RICO provides that "racketeering activity" refers to any of a number of federal or state crimes. *See* 18 U.S.C. §1961(1). Its references to federal crimes, *see* §1961(1)(B)-(F), are specific, citing various statutes by name or by code title and section: for example, "any act which is indictable under any of the following provisions of title 18, United States Code: section 201 (relating to bribery), section 204 (relating to sports bribery)," and so on. 18 U.S.C. §1961(1)(B). In contrast, its references to state law, *see* §1961(1)(A), are not to chapter and verse, but are instead "generic," serving "to identify generally the kind of activity made illegal by the federal statute." *United States v. Bagaric*, 706 F.2d 42, 62-63 (2d Cir. 1983). For example, "any act or threat involving murder . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. §1961(1)(A). "RICO was not intended to incorporate 'the elements of the penal codes of the various states where acts of racketeering occurred,' but only to provide general substantive frames of reference." *United States v. Miller*, 116 F.3d 641, 675 (2d Cir. 1997) (quoting *Bagaric*, 706 F.2d at 62). "By defining racketeering activity to include 'any act . . . *involving* murder,' 18 U.S.C. §1961(1)(A) (emphasis added), Congress made it clear that the RICO defendant's act need not be murder, so long as it directly concerns murder." *Miller*, 116 F.3d at 675. Moreover, Congress has expressly stated that the RICO statute "shall be liberally construed to effectuate its remedial purposes." Pub. L. 91-452, §904(a) (codified at 18 U.S.C. §1961 (note).

Taken together, the plain text and express purpose of the RICO statute compel a finding that accessory after the fact to murder, which is an act "involving murder" that is

chargeable under State law and punishable by imprisonment for more than one year, *see* Mass. Gen. Laws c.274, §4, constitutes racketeering activity. *See United States v. Patriarca*, 912 F. Supp. 596, 627 (D. Mass. 1995) (Wolf, J.) (noting that 18 U.S.C. §1961(1)(A) "states that 'any act . . . involving murder' is a RICO predicate. In this context, to 'involve' means 'to relate closely.' *See Webster's New International Dictionary Unabridged* 1191 (3d ed. 1981). The court finds that being an accessory after the fact to murder relates closely to murder. Thus, §1961(1) makes the crime a RICO predicate."); *Miller*, 116 F.3d at 675 ("Insofar as the underlying substantive state offense is murder, we have no difficulty in concluding that the accessorial offenses described in these state-law provisions 'involve' murder within the meaning of RICO . . . We conclude that the criminal facilitation charge against Miller was a proper RICO predicate."). *Cf. United States v. Ruggiero*, 726 F.2d 913, 919 (2d Cir. 1984) (holding that "conspiracy to murder in violation of New York's Penal Law . . . is an 'act *involving*' murder and therefore may constitute 'racketeering activity' within the meaning of the RICO statute") (emphasis in original), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997).

Since accessory after the fact to murder is a RICO predicate, the Probation Office did not err when it used the accessory-after-the-fact guideline to calculate Sandoval's offense level for the RICO conspiracy. *See United States v. Carrozza*, 4 F.3d 70, 77 (1st Cir. 1993) (finding that "the term 'underlying racketeering activity' in §2E1.1(a)(2) means simply any act, whether or not charged against defendant personally, that qualifies as a RICO predicate act under 18 U.S.C. §1961(1) and is otherwise relevant conduct under §1B1.3"). As set forth above and in the PSR, the evidence presented at trial established that Sandoval and other ESLS clique members acted with intent to help Animal avoid arrest, prosecution, and punishment for his murder of Irvin de Paz. The accessorial conduct of Sandoval and others

9

was undertaken in furtherance of the charged MS-13 racketeering conspiracy and therefore is relevant conduct to the offense of conviction. Accordingly, the accessory-after-the-fact guideline applies to Sandoval.

Sandoval's second objection is equally unavailing. He argues that, even if the accessory-after-the-fact guideline applies, the Probation Office incorrectly calculated his offense level to be 30. *See* PSR ¶94 (applying USSG §2X3.1(a)(3)(A)). In Sandoval's view, his offense level should be capped at 20 because his conduct was "limited to harboring a fugitive." *See* USSG §2X3.1(a)(3)(B). Sandoval's conduct was not so limited, and the First Circuit has made clear that §2X3.1(a)(3)(B)'s 20-level cap does not apply to defendants who do "more than simply giv[e] shelter to fugitives." *United States v. Vega-Coreano*, 229 F.3d 288, 290 (1st Cir. 2000) (defendant who escorted robber out of the house, gave him a key to hide his spoils after the robbery, advised a third party that the money had been counted, and used a false name to obtain hotel rooms for the robbers to hide in did more than just harbor a fugitive); *United States v. Greig*, 717 F.3d 212, 219 (1st Cir. 2013) (defendant who committed identity fraud crimes that facilitated wanted individual avoiding capture for years, traveled with wanted individual across country, lived with him for years, and saw to his day-to-day needs, which allowed him to remain in hiding, did more than just harbor a fugitive).

In this case, the trial evidence established that Sandoval and other ESLS clique members did far more than "simply giv[e] shelter" to Animal following his murder of Irvin de Paz. To be sure, at the January 8, 2016 clique meeting, Sandoval and others discussed finding Animal a place to stay in a neighborhood that was not too "hot," meaning one not known for its MS-13 gang presence. However, they did far more than that: they talked about lending him money, finding him a job so he could pay them back, keeping watch over him so

he could avoid the police and 18th Street members who would tell the police of his whereabouts or exact revenge themselves, and settling his debts with the Everett clique. Sandoval specifically advised Animal how to handle himself on the street with civilians, law enforcement, and rival gang members to avoid arrest, prosecution, and punishment for the murder he committed. Sandoval also directed Animal to make sure that other MS-13 members gave credit for the murder not only to Animal, but to the Eastside clique, which was promoting him to homeboy for killing a rival gang member. In that sense, Sandoval was reaping his share of Animal's spoils—the increased respect and enhanced reputation owed to the leader of a clique whose member committed the brutal murder of a rival gang member. The evidence makes abundantly clear that the Probation Office properly assigned Sandoval an offense level of 30 for his role as an accessory after the fact to the murder of Irvin de Paz.

### B.     December 27, 2015 and January 1, 2016 Attempted Murders

Sandoval also objects to the calculation of his offense level based on two attempted murders committed by Animal and other ESLS members in furtherance of the MS-13 racketeering conspiracy. The facts of these attempted murders are described above and in the PSR, and the evidence establishes that each attempted murder was reasonably foreseeable by Sandoval and within the scope of his agreement as the leader of the ESLS clique and member of the MS-13 racketeering conspiracy.[2]

---

[2]Sandoval also specifically objects to the Probation Office's application of a four-level increase to his offense level for the December 27, 2015 attempted murder, based on a finding that the victim sustained life-threatening bodily injury. *See* PSR ¶¶99-103. At the May 21, 2018 sentencing hearing for Joel Martinez, a/k/a "Animal," the Court accepted the Probation Office's offense-level calculation for this attempted murder, which included the four-level injury enhancement. Martinez, however, did not object to the injury enhancement, so the issue was not litigated. In this case, the Court need not resolve Sandoval's objection to the four-level injury enhancement, as it has no bearing on his GSR. Even with a lesser, or no,

First, contrary to Sandoval's claims, both attacks were premeditated and committed with intent to kill rival gang members or suspected rival gang members. The trial evidence established that the primary goal of MS-13 is to eliminate its rivals, and the gang issued—and enforced—what was essentially a standing order to kill rival gang members on sight. Cooperating defendant and ESLS member Jose Hernandez Miguel, also known as "Muerto," set forth the mission of MS-13: "MS wants to be the only one. It doesn't want any rivals. It wants to control everything." Sandoval knew the nature of the organization he belonged to and what its members did: when he felt that oversight from El Salvador had become burdensome, Sandoval complained, "There are many of us who have killed, homie, and we deserve their respect, and not to have them trying to pilot us." See Tr. Ex. 28 (transcript of October 24, 2015 ESLS clique meeting). Sandoval told Muerto what to expect when Muerto joined ESLS:

> Q:    When you and Casper talked about the Eastside clique and you met Casper, did you talk about what it means to be a member of MS-13?
>
> A:    Yes
>
> Q:    And what did Casper and you discuss about that?
>
> A:    That when one is jumped into MS-13, one is aware that one is jumped in to kill or to look for chavalas . . . that's the main mission of MS-13, to kill chavalas.

Tr. 2/7/18 at 9. Thus, contrary to Sandoval's claim, Sandoval dispatched his gang members to roam the streets looking to kill, and every armed attack of a rival gang member was committed with intent to kill, even if the end result was not death. The trial testimony and transcripts of those who participated in these attacks provide abundant support for the

---

enhancement for bodily injury applied to this attempted murder, Sandoval's total offense level would be 42 and his GSR would continue to be 240 months, the statutory maximum.

Probation Office's determination that the December 27, 2015 and January 1, 2016 attacks were, in fact, attempted murders.

Second, the Probation Office also correctly found that the two attempted murders were committed in furtherance of the charged MS-13 conspiracy, were reasonably foreseeable to Sandoval, and were therefore relevant conduct to the offense of conviction. As the leader of ESLS, Sandoval directed and controlled the activities, including acts of violence, committed by clique members. He set the tone for and maintained order within ESLS. He also specifically invited Animal to join ESLS, provided his thinking aligned with the clique's, and placed him under observation while considering whether to elevate him to homeboy. The clear inference to be drawn from Sandoval's conversation with Animal on December 6, 2015 and his decision to jump Animal into the clique on January 8, 2016 is that Sandoval concluded that Animal had proved himself worthy of homeboy status by, among other things, committing two attempted murders of rival gang members with ESLS members. Sandoval also had a personal stake in Animal's success, as evidenced by his own words at the January 8, 2016 jump in: Animal was the first in what Sandoval envisioned would be a long line of "new generation" members to join ESLS. Given Sandoval's undisputed role as ESLS's leader, his requirement that Animal prove himself worthy, and his selfish desire to bolster the reputation of ESLS and cement his own legacy, it is disingenuous at best to suggest that he did not know about and was not responsible for the violence committed by Animal during his probationary period. The Probation Office therefore correctly included the two attempted murders in its calculation of Sandoval's offense level for the RICO conspiracy.[3]

---

[3]Based on the trial testimony and information contained in the PSR, the Probation Office was surely correct to reject Sandoval's claims that these attempted murders were not reasonably foreseeable to him. If anything, in Sandoval's case, the Probation Office was

### III.    Characteristics of the Defendant

Sandoval devotes two pages of his sentencing memorandum to his personal characteristics. In the government's view, only two facts are relevant to sentencing. First, after Sandoval fled El Salvador, he was admitted to the United States, settled in the Boston area, and was granted legal status. After receiving protected legal status, he joined MS-13. The trial testimony showed that Sandoval's involvement with MS-13 lasted for years and included the violent acts discussed above. Sandoval counseled ESLS members to use the difficult circumstances in El Salvador as a cover story for why they were in the U.S.: "You always deny it [MS involvement] to the police. Tell them you don't know . . . [h]ey homie, do what they do on the news, 'Keep running away from the violence in El Salvador.'"

Second, Sandoval has never accepted responsibility for his actions. Many MS-13 members charged in this investigation—including many who committed horrific acts of violence—pleaded guilty and accepted responsibility for their conduct. The arguments Sandoval advances in his sentencing memorandum show that he still has not come to terms with his decision to join MS-13, his decision to become a leader within MS-13, and the effect that his choices have had on the victims of his clique's senseless acts of violence.

---

conservative in its use of relevant conduct. Given the nature of the MS-13 enterprise and Sandoval's role in running the ESLS clique, the Probation Office easily could have found that Muerto's and Brujo's May 12, 2015 attempted murder of an 18th Street gang member in Highland Park was attributable to Sandoval (and to Playa, where Muerto went to Playa's house immediately to report the attack and get clean clothes). Probation also could have found that the December 14, 2014 murder of Javier Ortiz—planned at the ESLS garage, committed by Brujo and Hector Enamorado, also known as "Vida Loca"—was attributable to Sandoval, particularly in light of Sandoval's decision to discipline Victor Ruiz, also known as "Chentino," for failing to support Vida Loca in the fight which precipitated the murder.

## IV.    Conclusion

A sentence at the statutory maximum is, in effect, a significant downward departure from Sandoval's correctly calculated GSR. There is no reason to depart further from the guidelines here. Sandoval spent his entire adult life in the service of MS-13 and ran a clique whose members committed countless acts of violence. Sandoval has earned the maximum punishment allowed by law.

For these reasons, the government requests that the Court sentence Sandoval to 240 months in prison. While Sandoval will face deportation at the conclusion of his sentence, as with similarly-situated defendants, the government requests that the Court place Sandoval on supervised release for three years.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    /s/ Christopher Pohl
Christopher Pohl
Kelly Begg Lawrence
Glenn A. MacKinlay
Kunal Pasricha
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify the foregoing document was filed through the Electronic Court Filing (ECF) system on October 5, 2018 and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

/s/ Christopher Pohl
Christopher Pohl
Assistant U.S. Attorney